**Nos. 23-1980, 23-2076**

# United States Court of Appeals for the Federal Circuit

JUNIPER NETWORKS, INC.,
*Appellant*,

*v.*

SWARM TECHNOLOGIES, LLC,
*Appellee.*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, in *Inter Partes* Reviews Nos. IPR2022-00141, IPR2021-01445

**APPELLANT JUNIPER NETWORKS, INC.'S PRINCIPAL BRIEF**

Alan M. Fisch
R. William Sigler
Jeffrey M. Saltman
Matthew R. Benner
FISCH SIGLER LLP
5301 Wisconsin Avenue NW
Suite 400
Washington, DC 20015

*Counsel for Appellant*
*Juniper Networks, Inc.*

November 27, 2023

## PATENT CLAIMS AT ISSUE

Per Fed. Cir. R. 32(a)(3), the following claims are illustrative. Emphasis is added to the limitations most relevant to the issues on appeal.

**U.S. Patent No. 10,592, 275 ('275 patent), Claim 1:**

1. A collaborative intelligence system, comprising:

a task pool;

a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;

a first co-processor configured to successively: proactively retrieve a first task from the task pool; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

a second co-processor configured to successively: proactively retrieve a second task from the task pool; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

wherein the collaborative intelligence system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system ***on a plug-and-play basis without any communication with the controller;***

the plurality of first tasks and the plurality of second tasks are associated with a common objective;

the first and second co-processors autonomously work together in solidarity with the task pool to complete the common objective.

**U.S. Patent No. 9,852,004 ('004 patent), Claim 1:**

1. A processing system, comprising:

a task pool;

a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;

a first co-processor configured to successively: retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

a second co-processor configured to successively: retrieve a second task from the task pool; deliver the second task to the second co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

wherein the processing system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system ***on a plug-and-play basis without any communication with the controller***.

# CERTIFICATE OF INTEREST

Per Fed. Cir. R. 47.4, the below-signed counsel certifies the following:

1. The full name of every entity represented in the case by the counsel filing the certificate: Juniper Networks, Inc.

2. For each entity, the name of every real party in interest, if that entity is not the real party in interest: Not Applicable.

3. For each entity, that entity's parent corporation(s) and every publicly held corporation that owns ten percent (10%) or more of its stock: Dodge & Cox; The Vanguard Group.

4. The names of all law firms, partners, and associates that have not entered an appearance in the appeal, and: (A) appeared for the entity in the lower tribunal; or (B) are expected to appear for the entity in this court:

    Ken K. Fung (Fisch Sigler LLP)
    Kyle K. Tsui (Fisch Sigler LLP)
    Andrew L. Ramos (Fisch Sigler LLP)
    Joseph F. Edell (formerly of Fisch Sigler LLP)

5. An indication as to whether there are any related or prior cases, other than the originating case number(s), that meet the criteria under Federal Circuit Rule 47.5: Yes. *See* D.I. 20 (Notice of Related Case Information); Statement of Related Cases, *infra*.

6. All information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases: Not Applicable.

Dated: November 27, 2023

*/s/ R. William Sigler*
R. William Sigler

# TABLE OF CONTENTS

PATENT CLAIMS AT ISSUE .......... ii

CERTIFICATE OF INTEREST .......... iv

TABLE OF AUTHORITIES .......... vii

INTRODUCTION .......... 1

STATEMENT OF RELATED CASES .......... 3

JURISDICTIONAL STATEMENT .......... 4

STATEMENT OF THE ISSUES .......... 4

STATEMENT OF THE CASE .......... 5

I. The Parties and Underlying Litigation .......... 5

II. The Swarm Patents .......... 7

III. The Prior Art .......... 10

A. Leong .......... 11

B. AppleTalkBook .......... 13

IV. IPR Proceedings .......... 14

A. Institution: The Board Rejects Swarm's Arguments on Broadcast Packets Teaching Away. .......... 14

B. IPR2021-01445 Final Written Decision: The Board Relies on Its Construction of "Communication" to Confirm All Claims. .......... 16

C. IPR2022-00141 Final Written Decision: The Board Confirms Both IPRs Hinged on Its "Communication" Construction. .......... 17

V. Swarm's Contingent Motions to Amend and § 101 .......... 20

SUMMARY OF THE ARGUMENT .......... 22

ARGUMENT .......... 24

I. Standard of Review ........................................................................24

II. The Board Erred in Finding All Challenged Claims Not Unpatentable Based on Its Construction of "Communication." ....................................25

A. The Intrinsic Evidence Contradicts the Board's Construction. ........26

B. The Extrinsic Evidence, Including from Swarm's Own Expert, Further Confirms That the Board Erred in Its Construction. ...........30

III. Even if the Board's Construction Were Correct, Substantial Evidence Doesn't Support Its Decisions. ...............................................................36

A. The Board Never Found, and No Evidence Shows, that an AppleTalk Broadcast Packet Necessarily Would Impart Any Information to the Controller. .........................................................36

B. The Board Improperly Ignored the Evidence Showing that the Broadcast Packet Wouldn't Necessarily Be Sent to the Controller. .........................................................................39

1. Juniper's Discussion of AppleTalkBook's "Zones" was a Proper Reply to Swarm's Arguments......................................39

2. The Board Erroneously Rejected the Discussion of Zones ......45

CONCLUSION .......................................................................................52

# TABLE OF AUTHORITIES

**Cases**

*AC Techs., S.A. v. Amazon.com, Inc.*,
912 F.3d 1358 (Fed. Cir. 2019) .......... 15

*Anacor Pharms., Inc. v. Iancu*,
889 F.3d 1372 (Fed. Cir. 2018) .......... 40, 42

*Apple Inc. v. Andrea Elecs. Corp.*,
949 F.3d 697 (Fed. Cir. 2020) .......... 40

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) .......... 24

*Axonics, Inc. v. Medtronic, Inc.*,
75 F.4th 1374 (Fed. Cir. 2023) .......... 41, 43

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015) .......... 24

*Consol. Edison Co. of New York v. N.L.R.B.*,
305 U.S. 197 (1938) .......... 24

*Corephotonics, Ltd. v. Apple Inc.*,
84 F.4th 990 (Fed. Cir. 2023) .......... 39

*Corning v. Fast Felt Corp.*,
873 F.3d 896 (Fed. Cir. 2017) .......... 28, 49

*Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*,
527 F.3d 1300 (Fed. Cir. 2008) .......... 29

*Dickinson v. Zurko*,
527 U.S. 150 (1999) .......... 24

*EMC Corp. v. Clouding Corp.*,
686 F. App'x 857 (Fed. Cir. 2017) .......... 50

*EWP Corp. v. Reliance Universal Inc.*,
755 F.2d 898 (Fed. Cir. 1985) .......... 28, 48

*Free Stream Media Corp. v. Alphonso Inc.*,
No. 2019-1506, 2021 WL 1880931 (Fed. Cir. May 11, 2021)............................29

*Genzyme Therapeutic Prods. Ltd. P'ship v. Biomarin Pharm. Inc.*,
825 F.3d 1360 (Fed. Cir. 2016)........................................................................42

*Hewlett-Packard Co. v. Mustek Sys. Inc.*,
340 F.3d 1314 (Fed. Cir. 2003)........................................................................50

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012)........................................................................28

*In re Glatt Air Techniques, Inc.*,
630 F.3d 1026 (Fed. Cir. 2011)........................................................................45

*In re Lamberti*,
545 F.2d 747 (CCPA 1976)..............................................................................28

*In re Taylor Made Golf Co., Inc.*,
589 F. App'x 967 (Fed. Cir. 2014) ..................................................................48

*Intel Corp. v. PACT XPP Schweiz AG*,
61 F.4th 1373 (Fed. Cir. 2023)..........................................................................49

*Juniper Networks, Inc.* v. *Swarm Tech., LLC*,
No. 5:20-cv-3137 (N.D. Cal.)......................................................................21, 22

*Knowles Elecs. LLC v. Iancu*,
886 F.3d 1369 (Fed. Cir. 2018)........................................................................25

*Nexpoint Advisors, L.P. v. TICC Cap. Corp.*,
No. 3:15-cv-1465, 2015 WL 6408117 (D. Conn. Oct. 23, 2015) .......................29

*OSI Pharms., LLC v. Apotex Inc.*,
939 F.3d 1375 (Fed. Cir. 2019)........................................................................45

*Phillips v. AWH Corp*.,
415 F.3d 1303 (Fed. Cir. 2005)..................................................................25, 26

*Qualcomm Inc. v. Intel Corp.*,
6 F.4th 1256 (Fed. Cir. 2021)............................................................................28

*Randall Mfg. v. Rea*,
733 F.3d 1355 (Fed. Cir. 2013) ....................................................................24

*Rembrandt Diagnostics, LP v. Alere, Inc.*,
76 F.4th 1376 (Fed. Cir. 2023) ....................................................................42

*Samsung Elecs. Co. v. UUSI, LLC*,
775 F. App'x 692 (Fed. Cir. 2019) ....................................................................30

*Sud-Chemie, Inc. v. Multisorb Techs., Inc.*,
554 F.3d 1001 (Fed. Cir. 2009) ....................................................................15

*Swarm Tech., LLC v. Amazon.com, Inc.*,
No. 2:21-cv-438 (D. Ariz.) ....................................................................6, 20, 21

*Swarm Technology LLC v. Amazon.com, Inc.*,
No. 23-2323 (Fed. Cir.) ....................................................................7

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015) ....................................................................25

*UltimatePointer, L.L.C. v. Nintendo Co.*,
816 F.3d 816 (Fed. Cir. 2016) ....................................................................29

*United States v. Castro*,
837 F.2d 441 (11th Cir. 1988) ....................................................................29

*Unwired Planet, LLC v. Google Inc.*,
841 F.3d 995 (Fed. Cir. 2016) ....................................................................50

*USA Choice Internet Servs., LLC v. United States*,
522 F.3d 1332 (Fed. Cir. 2008) ....................................................................29

# INTRODUCTION

In confirming the challenged claims of Swarm's patents, the Board relied on a claim construction that ignored the intrinsic evidence, that neither party had asked for, and that both sides' experts expressly disagreed with. The Board erred in adopting that construction, and this Court should reverse.

Indeed, all challenged claims of Swarm's patents require adding a co-coprocessor "on a plug-and-play basis without any communication with the controller."[1] The Board "broadly construe[d] the claim term 'communication'" in this limitation to "include[e], among other things, one-way messaging that does not require a response" from the controller.[2] This "broad" construction of the negative "without any communication …" limitation significantly narrowed the scope of the claims, and was the basis for the Board's finding that the Leong-AppleTalkBook combination in the petitions didn't render the claims obvious. Yet, the Board adopted this construction based solely on its own understanding of the words "any" and "communication," without briefing, without considering the other claim language, without citing specification support, and without crediting Swarm's own expert's contrary opinion.

---

[1] The challenged claims describe, in general terms, computer systems where "autonomous co-processors" proactively retrieve tasks from a "task pool" populated by a "controller.

[2] Appx66.

Contrary to the Board's unsupported conclusions, the intrinsic record confirms that "communication with the controller" refers to communication in which the controller participates. For instance, the specification repeatedly states that the goal is to avoid consuming controller bandwidth.[3] Consistent with that and the usual English meaning of the claim language, Juniper and its expert, Dr. Jonathan Weissman, showed that the Leong-AppleTalkBook combination satisfied the "without any communication …" limitation because the controller wouldn't need to respond to anything or do anything.

And despite some earlier conflicting statements in his declarations, Swarm's expert, Dr. Brent Nelson, agreed with Juniper's understanding. At his deposition, Juniper asked Dr. Nelson: "[D]id you draft your declaration?"[4] Otherwise unprompted, he then testified: "[T]here's something I would like to clarify in this at this time."[5] And he explained, consistent with Juniper's petitions, that:

> When -- in the context of AppleTalkBook, there's two cases of broadcast going on. And in the first case, the broadcast is sent but a particular processor ***does not respond***. And I would classify that as ***not a communication*** between the broadcaster and that particular processor.
>
> The second case is when a broadcast occurs and a particular processor does respond. And I would classify that as communication between the

[3] *See*, *e.g.*, Appx85 ('004 patent at 1:61–2:1).

[4] Appx6969 (at 17:5-10).

[5] Appx6969 (at 17:10-13).

broadcaster and the particular processor.[6]

Thus, the extrinsic evidence from Swarm's expert confirms that the Board erred, as a matter of law, in adopting an unsupported construction of "communication" and relying on it to confirm all challenged claims.

And assuming *arguendo* that the Board's construction is correct, substantial evidence doesn't support its decisions for two additional, independent reasons: (1) regardless of whether communication is "one way" or "two way," no evidence shows that AppleTalkBook's broadcast packets necessarily communicate or impart any information to Leong's surveying agent (i.e., the combination's "controller"); and (2) the Board improperly ignored AppleTalkBook's teachings of "zones," which show that AppleTalk broadcast packets wouldn't necessarily be sent to a controller.

Accordingly, and as further detailed below, this Court should reverse the Board's construction, and otherwise remand on all challenged claims in both IPRs.

## STATEMENT OF RELATED CASES

Per Rule 47.5, Appellant states that no other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly

[6] Appx6969-70 (at 17:14–18:2) (emphasis added).

affected by this court's decision in the pending appeal are as follows:

> *Juniper Networks, Inc. v. Swarm Technology LLC*,
> N.D. Cal. No. 3:20-cv-3137
>
> *Swarm Technology LLC v. Amazon.com, Inc.*,
> D. Ariz. No. 2:21-cv-438
>
> *Swarm Technology LLC v. Amazon.com, Inc.*,
> Fed. Cir. No. 23-2323 (Companion Case)

## JURISDICTIONAL STATEMENT

On February 7, 2023, in IPR2021-01445, the Patent Trial and Appeal Board ("Board") issued a Final Written Decision determining that the challenged claims of the '004 patent had not been shown to be unpatentable. Two months later, on April 20, 2023, the Board denied Juniper's request for rehearing in that proceeding. And on April 26, 2023, in IPR2022-00141, after allowing for additional briefing, the Board likewise issued a Final Written Decision determining that the challenged claims of the '275 patent had not been shown to be unpatentable. The Board had jurisdiction pursuant to 35 U.S.C. § 314. Petitioner-appellant Juniper timely appealed the Board's decisions in both proceedings on May 24, 2023. On June 30, 2023, this Court consolidated these two appeals. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## STATEMENT OF THE ISSUES

1. Whether the Board erred as a matter of law by confirming all challenged claims of Swarm's patents based on a construction of "communication"

that ignored the intrinsic evidence, that neither party had asked for, and that both sides' experts expressly disagreed with in their sworn deposition testimony?

2. Whether substantial evidence supports the Board's decisions, where no evidence shows that AppleTalkBook's broadcast packets necessarily communicate or impart any information to Leong's surveying agent, and the Board improperly ignored AppleTalkBook's "zones" teachings showing that AppleTalk broadcast packets wouldn't necessarily be sent to a controller?

## STATEMENT OF THE CASE

### I. THE PARTIES AND UNDERLYING LITIGATION

**The NDCA Action:** Appellant Juniper is a major designer and seller of high-performance networking products and services, including routers, gateways, associated software, and support.[7] Beginning in 2019, Swarm repeatedly contacted Juniper, threatening patent-infringement litigation unless Juniper agreed to license Swarm's three patents: U.S. Patent Nos. 9,852,004 ('004 patent); 10,592,275 ('275 patent); and 9,146,777 ('777 patent).[8] On July 23, 2020, Juniper filed a complaint in the Northern District of California seeking a declaration of non-infringement as to those three patents.[9]

---

[7] *E.g.*, Appx3536.

[8] *Id.*

[9] *Id.*

**Juniper's IPRs:** After commencing that action, Juniper filed three IPR petitions, challenging claims of each Swarm patent.[10] The Board instituted the '004 and '275 IPRs, and later issued the Final Written Decisions finding no challenged claims unpatentable at issue in these consolidated appeals.[11]

| IPR | Challenged Claims | Appeal |
|---|---|---|
| IPR2022-00141 | '275 patent, claims 1–7, 9–17 | 23-1980 |
| IPR2021-01445 | '004 patent, claims 1–12 | 23-2076 |

**Swarm's *Amazon* Action:** In a separate action in the District of Arizona, Swarm has also asserted its '004, '275, and '777 patents against unrelated defendant Amazon.com, Inc.[12] Like Juniper, Amazon filed IPR petitions challenging all three Swarm patents, and the Board instituted Amazon's '004 and '275 IPRs.[13] In Amazon's '275 IPR, like in Juniper's IPR2022-00141, the Board confirmed the claims over Amazon's cited prior art.[14] Amazon filed its Notice of Appeal on October 27, 2023. But in Amazon's '004 IPR, unlike in IPR2021-

[10] Appx4205.

[11] Appx75; Appx40 (noting that Board denied institution in IPR2021-01317, where the petition challenged the '777 patent).

[12] *Swarm Tech., LLC v. Amazon.com, Inc.*, D. Ariz. No. 2:21-cv-438.

[13] *See generally* IPR2022-00283 ('004 patent); IPR 2022-00633 ('275 patent); and IPR2023-00390 ('777 patent).

[14] IPR2022-00633, Paper 36.

01445, the Board found claims 1–12 unpatentable.[15] Swarm's appeal of that final written decision is before this Court in companion case 23-2323.

## II. THE SWARM PATENTS

Swarm's patents describe systems or methods where "autonomous co-processors" proactively retrieve tasks from a task pool populated by a central processing unit ("CPU" or "controller").[16] Swarm's '004 and '275 patents, at issue here, are continuations of its earlier '777 patent.[17]

Swarm's patents acknowledge that parallel processing systems with multiple co-processors were already well known in the art.[18] But they purport to disclose an improvement "harnessing the processing capacity" of the other available processors.[19] As Swarm's '004 patent further explains:

> Current market examples [of IoT devices] include home based networks that involve smart thermostats, light bulbs, and washer/dryers that utilize wifi for remote monitoring. Due to the ubiquitous nature of connected objects in the IoT, it is estimated that more than 30 billion

---

[15] Fed. Cir. No. 23-2323, Docket Item 5 at 1.

[16] Appx85 ('004 patent at 1:16–18); Appx101 ('275 patent at 1:19–23); *see also* Appx90 ('004 patent at 11:35–36) (Fig. 4's illustrated embodiment "includes a controller (CPU)"); Appx106 ('275 patent at 11:51–52) (same).

[17] More specifically, the '275 patent is a continuation of the '777 and '004 patents' applications, while the '004 patent is a continuation of '777 patent's application. Appx85 ('004 patent at 1:8–10); Appx101 ('275 patent at 1:8–13).

[18] Appx85 ('004 patent at 1:56–59). Because the patents at issue substantially share a specification, citations are to the '004 patent, *infra*.

[19] Appx85 ('004 patent at 1:22–41).

devices will be wirelessly connected to the Internet of Things by 2020.[20]

According to Swarm's '004 patent, the below is a "schematic layout of an internet of things network including available plug and play devices in accordance with an embodiment" of the purported inventions.[21]



FIG. 4

The "non-limiting" examples of plug-and-play IoT devices shown "include a light bulb 410, a thermostat 412, an electrical receptacle 414, a power switch 416, an appliance (e.g., toaster) 418, a vehicle 420, a keyboard 422."[22] But they may also "include virtually any other plug and play device or application capable of interfacing with a network."[23]

Swarm's '004 and '275 patents don't, however, explain how any plug-and-

[20] Appx86 ('004 patent at 3:65–67).

[21] Appx90 ('004 patent at 11:40–43).

[22] Appx86 ('004 patent at 3:65–67).

[23] Appx90 ('004 patent at 11:43–45).

play device joins or establishes a connection to the Internet, or any other network.[24] Instead, the patents focus on the purportedly novel idea embodied in the claims—i.e., gathering tasks in a "task pool" for autonomous co-processors to retrieve and complete, rather than using a central processor or "controller" to distribute tasks to the co-coprocessors.[25] According to Swarm's patents, this advantageously reduces management overhead compared to prior-art systems, where "a significant amount of CPU bandwidth is consumed by task distributing" and "responding to" messages from co-processors.[26]

But Swarm's patents describe the implementation of the claimed inventions only in general terms. First, the controller "populate[s]" the task pool.[27] Second, co-processors "proactively" retrieve and complete tasks from the pool.[28] Finally, the co-processors indicate completion of the task.[29] This is shown in the patents'

---

[24] *Cf.* Appx86 ('004 patent at 3:34–44) ("Those skilled in the art will appreciate that interoperability among the CPU and co-processors may be facilitated by configuring the CPU to compose and/or structure tasks at a level of abstraction which is independent of the instruction set architecture associated with the various co-processors, thereby allowing the components to communicate at a task level rather than at an instruction level. As such, devices their associated co-processors may be added to a network on a "plug and play" basis.")

[25] Appx85 ('004 patent at 1:16–18).

[26] *Id.* ('004 patent at 1:56–2:7).

[27] *Id.* ('004 patent at 2:12–13).

[28] *Id.* ('004 patent at 2:13–14).

[29] *Id.* ('004 patent at 2:14–17).

only flowchart, below.



FIG. 6

And Swarm's patents repeatedly state that the claimed inventions don't require any new or specific components, or any particular novel implementation.[30] Rather, they use generic, off-the-shelf components as the claimed co-processors that "to work together" to complete a "common objective."[31]

## III. THE PRIOR ART

In both IPRs, Juniper asserted that all challenged claims were invalid under § 103(a) as obvious over the combination of Leong and AppleTalkBook, detailed

---

[30] *See*, *e.g.*, Appx87 ('004 patent at 5:17–23) ("The CPU 11 may be any single or multi-core processor … used to execute a software program. The system 10 may be implemented on a personal computer, smart phone, tablet, or Internet-of-Things device"); *id*. ('004 patent at 5:29–44) (further describing implementations).

[31] Appx85 ('004 patent at 2:24–28, 2:43–46); *see also* Appx91-92, Appx107-08 ('004 claims 1–12 and '275 claims 1–17, none of which recite new or specific components).

below, among other grounds.[32] As Juniper and its expert Dr. Weissman explained, a POSITA would've found it obvious and been motivated to apply AppleTalkBook's automatic configuration teachings to Leong's data-processing architecture, satisfying all limitations of the challenged claims, including the "on a plug-and-play basis without any communication with the controller" limitation.[33]

### A. Leong[34]

Leong is a 1997 patent describing a data-processing architecture where multiple processing units collaborate to complete a project by independently completing smaller tasks posted to a computerized bulletin board.[35] One or more processing units act as "surveying agents" that break the project into smaller tasks and post those tasks on the bulletin board.[36] The other processing units then

---

[32] Appx8-9; Appx45 (Final Written Decisions listing grounds). Juniper also, for example, contended that the combination of Leong, AppleTalkBook, and Bates (U.S. Patent Application Publication No. 2007/0074207) rendered '004 claim 9 obvious. The Board found that none of the additional prior art taught the "on a plug-and-play basis without any communication with the controller" limitation, and thus didn't further address those grounds. *See*, *e.g.*, Appx32-33 (addressing Bates combination).

[33] Appx238-44; Appx604-10; Appx1501-07; Appx2184-91.

[34] U.S. Patent No. 6,006,249, entitled "Method and Apparatus for Concurrent Data Processing."

[35] Appx688 (Leong at 1:56–67).

[36] Appx689 (Leong at 4:9–24).

determine if they can perform those tasks.[37] To that end, the task information on the bulletin board describes what each task entails, how high a priority it is, and whether it's currently being executed by another processor or has been completed.[38] Once a processing unit selects a posted task, it changes the status on the bulletin board to prevent another unit from duplicating its work.[39] The processing unit then completes the task and marks it as completed on the bulletin board before selecting a new task.[40] Leong's processing units collectively repeat this process until each posted task has been accounted for and the project has been completed.[41]

As Juniper explained below, Leong disclosed all or nearly all elements of the challenged claims some two decades before Swarm filed its first patent application, but it wasn't considered during the original prosecutions of Swarm's patents.[42]

---

[37] Appx689-90 (Leong at 3:11–15, 3:26–30, 4:18–35, 6:47–61).

[38] Appx689 (Leong at 3:11–4:3).

[39] Appx689, Appx691 (Leong at 3:45–54, 7:39–45).

[40] Appx689, Appx691 (Leong at 3:55–61, 7:46–48).

[41] Appx688-89 (Leong at 2:54–64, 3:6–18).

[42] *E.g.*, Appx205-06; Appx1471-72.

### B. AppleTalkBook[43]

Leong doesn't expressly refer to "plug-and-play," though this notion was well known in the art when Leong issued.[44] For instance, Microsoft popularized it when the "Plug and Play" feature was introduced in Windows 95.[45] And AppleBus, renamed AppleTalk, allowed for plug-and-play networking even earlier, in 1983.[46]

For the challenged claims' "plug and play …" limitations, Juniper relied on *Hands-On AppleTalk*, a 1989 book written by Mike Rogers and Virginia Bare.[47] AppleTalkBook, as it's cited in the record, describes AppleTalk networks as self-configuring because each device in the network picks a unique address and independently identifies available resources.[48] To do so, devices in an AppleTalk network use broadcast packets when joining a network to identify themselves and other devices.[49] As AppleTalkBook further explains:

> One of the first things that happens when you turn your Macintosh on is it looks up what node number it had last time it was turned on. Say that node number was 25. The first thing the Mac does, then, is send out a number of packets to node 25. The content of that packet

[43] Appx695.

[44] *E.g.*, Appx210. In general, this term relates to features in which the user doesn't need to manually configure a device.

[45] Appx210.

[46] Appx240.

[47] Appx697-98.

[48] Appx798-99.

[49] Appx803.

> essentially says, "Hey, I'm node number 25 and I'm about to come online. Is anybody else using node number 25?" … If some other device responds to say node 25 is in use, the Mac then picks a random number within the valid range and sends out another packet. This time it says "I'll take, for example, node number 50—is anybody using that?" The Mac keeps doing that until it has a node number it knows is unique.[50]

This allows a new device to pick a unique network address and configure itself to communicate with other devices on the network, without central control.[51]

## IV. IPR PROCEEDINGS

### A. Institution: The Board Rejects Swarm's Arguments on Broadcast Packets Teaching Away.

Neither party requested construction of "on a plug-and-play basis without any communication with the controller," or any claim term, in their pre-institution submissions.[52] And the Board concluded in both institution decisions that it "need not expressly construe any claim terms."[53]

In the '004 patent IPR (IPR2021-01445), Swarm didn't dispute Juniper's showing that Leong and AppleTalkBook rendered obvious the "on a plug-and-play basis without any communication with the controller" limitations.[54] And at the

---

[50] Appx803-04.

[51] *Id.*

[52] *See* Appx4053 (noting "Patent Owner does not address claim construction"); Appx4213 (same).

[53] *See* Appx4053; Appx4213.

[54] Appx4064-67.

institution phase, the Board found persuasive Juniper's showing that "implementing AppleTalkBook's teaching into Leong's system creates a plug-and-play system that 'would have resulted in no manual system configuration being necessary and the bulletin board automatically connecting to the added processing unit.'"[55]

In the '275 patent IPR (IPR2022-00141), Swarm argued that "combining the teachings of AppleTalkBook with those of Leong would explicitly teach away from the 'without any communication with the controller' limitation because the broadcast packets would be sent to each processing unit."[56] The Board rejected that Swarm argument. In doing so, the Board first noted this Court's law holding that "a reference need not state a feature's absence in order to disclose a negative limitation."[57] The Board then further explained that:

> Even when the broadcast packets are sent to every node on the network, AppleTalkBook does not require communication with a controller for the system to accept the new co-processor into the processing system. AppleTalkBook teaches a system requiring only communication between the new co-processor and Leong's bulletin board (i.e., task pool) to accept the new co-processor into the system. Thus, AppleTalkBook explains that a resource would "only ha[ve] to be plugged in, attached to the net, and turned on" for a new co-processor

[55] Appx4067.

[56] Appx4238-39 (citing Appx3462-64).

[57] Appx4239 (quoting or citing *AC Techs., S.A. v. Amazon.com, Inc.*, 912 F.3d 1358, 1367 (Fed. Cir. 2019), and *Sud-Chemie, Inc. v. Multisorb Techs., Inc.*, 554 F.3d 1001, 1004–05 (Fed. Cir. 2009)).

to identify the bulletin board, retrieve a task from the bulletin board, process the task, generate resulting data, and update the task pool.[58]

### B. IPR2021-01445 Final Written Decision: The Board Relies on Its Construction of "Communication" to Confirm All Claims.

In IPR2021-01445, the first of the two Final Written Decisions on appeal, the Board implicitly construed "communication," as used in the negative limitation "on a plug-and-play basis without any communication with the controller."[59] And the Board relied on this new construction to find that Juniper's Leong-AppleTalkBook combination didn't render the challenged claims of the '004 patent obvious.[60]

More specifically, the Board first noted in the "Claim Construction" section of its decision that neither party had proposed any constructions.[61] The Board then concluded, as it did when instituting the IPRs, that it "need not expressly construe any claim terms."[62] But in the later "Analysis" section, the Board nonetheless

[58] Appx4239-40 (record citations omitted) (concluding that "Juniper presents sufficient evidence that [Leong-AppleTalkBook combination teaches] 'on a plug-and-play basis without any communication with the controller' as recited in independent claim 1"); Appx4066-67 (record citations omitted) (similarly concluding "the combination of Leong and AppleTalkBook teaches all the undisputed limitations").

[59] Appx25–26.

[60] Appx21–30.

[61] Appx4269-70 ("Patent Owner submits that all claim terms of the '004 Patent should be given their ordinary and customary meaning.").

[62] Appx12.

proceeded to determine the meaning of the claim language in the "plug-and-play …" limitation at issue.[63] And the Board concluded that "the use of 'any' before communication in the claims implies a broad interpretation of communication that encompasses a one-way communication that does not require a response" from the controller.[64]

Based on that new and "broad interpretation of communication," the Board found that the Leong-AppleTalkBook combination didn't teach "on a plug-and-play basis without any communication with the controller" because AppleTalkBook's broadcast packets would be sent to all devices on a network.[65] In doing so, the Board declined to distinguish the reasoning in the institution decisions, despite the 180-degree shift from its previous conclusions.

### C. IPR2022-00141 Final Written Decision: The Board Confirms Both IPRs Hinged on Its "Communication" Construction.

Following the decision on the '004 claims, the Board ordered additional briefing in IPR2022-00141 on whether any differences in the record warranted a

---

[63] Appx25-26.

[64] Appx26; *see also* Appx25 (similarly stating that "'any' precludes both communication with a response and communication without a response" from controller).

[65] Appx30. As this is a negative limitation, a broader construction of "communication" corresponds with a narrower claim scope, for purposes of validity and infringement.

different result for the ’275 claims.[66] As before, neither party had requested any claim constructions.[67] But given the apparently dispositive interpretation of “communication” in IPR2021-01445, Juniper “ask[ed] the panel to expressly construe ‘communication’ and thus prevent [Swarm] from arguing one way here to salvage validity, and another way in district court to foster its infringement assertions.”[68]

As Juniper explained, the ’275 patent used the “communication” term that the Board had construed to refer to two-way messaging—i.e., communications where the controller actually participates, not one-way messages like broadcast packets.[69] In support, Juniper noted that both parties’ experts had agreed that a “communication” occurs only when there is a response.[70] This included Swarm’s

---

[66] Appx9043 (directing parties to brief “(1) whether the combination of Leong and AppleTalkBook teaches or suggest adding a co-processing ‘on a plug- and-play basis without any communication with the controller,’ as recited in each [’275 claim]; and (2) whether the deficiencies noted in the Final Written Decision in IPR2021-01445 equally apply to Juniper’s proposed [Leong-AppleTalkBook] combination … in this proceeding.”).

[67] Appx9300; Appx9832.

[68] Appx9840.

[69] Appx9837-38.

[70] Appx9835-36 (Paper 49, Petitioner’s Additional Briefing at 2–3). During his deposition, Swarm’s expert, Dr. Nelson, offered an unprompted “clarification” of his testimony, stating that when a “broadcast is sent by a particular processor does not respond” he “would classify that as not a communication between the broadcaster and that particular processor.” Appx9834 (*Id.* at 1). This mirrors the testimony of Juniper’s expert, Dr. Weissman Appx9835-36 (*Id.* at 2–3 n. 5 (citing

expert, Dr. Nelson, whose recent deposition testimony offered the unprompted "clarification" that when a "broadcast is sent but a particular processor does not respond," that's "not a communication between the broadcaster and [that] processor."[71]

Despite that evidence, the Board found that because the Leong-AppleTalkBook combination relied on sending broadcast packets, a device using these packets would necessarily "communicate," unilaterally, with a controller.[72] In doing so, the Board confirmed that the earlier Final Written Decision in IPR2021-01445 "took a position as to the scope and meaning of 'communication' as that term is used in the context of the '004 patent."[73] As the Board acknowledged:

---

Appx5675, 247:2-7 (agreeing that "just because a broadcast packet happens to arrive at Leong's surveying unit, that doesn't mean [it] communicates with the node that sent the broadcast packet")))

[71] Appx9591. This mirrors the testimony of Juniper's expert, Dr. Weissman. Appx9835; Appx5675 ("[J]ust because a broadcast packet happens to arrive at Leong's surveying unit, that doesn't mean [it] communicates with the node that sent the broadcast packet").

[72] Appx66.

[73] Appx65. For reasons that aren't clear, the Board incorrectly suggests that its descriptions of the IPR2021-01445 decision are "contrary" to how Juniper described it. *Id.*; *see also* Appx65–66 (crediting Juniper for "correctly not[ing] that we did not construe expressly any claim terms … under the header '*Claim Construction*,'" but erroneously criticizing Juniper as "fail[ing] to mention" that the decision still "addressed the scope and meaning of the claim term 'communication'"). To be clear, Juniper's additional briefing described the IPR2021-01445 decision substantially identically to how the Board itself did. *See*, *e.g.*, Appx9839 ("In IPR2021-01445, the final written decision stated that it didn't

> [W]hen addressing the explicit requirement in each [independent claim] of adding a co-processor "without any communication with the controller," we stated that "the use of 'any' precludes both communication with a response and communication without a response." After addressing various disclosures in the specification of the '004 patent, we also stated that "the use of 'any' before communication in the claims implies a broad interpretation of communication that encompasses a one-way communication that does not require a response."
>
> Together, these two statements make clear that our intent was to broadly construe the claim term "communication" in the context of the '004 patent as including, among other things, one-way messaging that does not require a response.[74]

## V. SWARM'S CONTINGENT MOTIONS TO AMEND AND § 101

In both IPRs, Swarm filed contingent motions to amend its claims to add new language.[75] The Board then issued preliminary guidance (i.e., non-final rulings under a pilot program) indicating that Swarm's proposed amended claims were likely invalid as directed to ineligible subject matter under § 101.[76]

The Board's preliminary guidance echoed decisions of the district courts in California and Arizona finding all original claims of the '004 and '275 patents or Swarm's related '777 patent unpatentable under § 101. First, in Swarm's *Amazon*

---

need to expressly construe any terms. But the outcome turned on the panel's construction of 'communication' and the alleged failure of Petitioner's Leong-AppleTalkBook combination to meet this limitation.").

[74] Appx66 (internal citations omitted).

[75] Appx4944; Appx5029.

[76] Appx6443–50; Appx7889–96.

case, the Arizona court had held all claims of the ’004 and ’275 patents ineligible because they’re “directed towards the abstract idea of a scrum board” and fail to present an inventive concept.[77] Then, in Juniper’s declaratory-judgment action, the California court similarly ruled with respect to Swarm’s ’777 patent.[78] The California court also dismissed Swarm’s ’004 and ’275 counterclaims as improper collateral attacks on the Arizona court’s § 101 ruling, with leave to amend if further proceedings in Arizona warrant.[79]

After a series of reassignments, a new judge in Swarm’s *Amazon* action then reversed course and granted Swarm leave to file an amended complaint alleging infringement of all three of its patents.[80] In doing so, the Arizona court found that Swarm’s allegations of novelty were sufficient to survive a motion to dismiss based on § 101, conflicting with the California court’s previous analysis of identical allegations in Swarm’s ’777 patent counterclaim.[81] Soon after, the parties

---

[77] *Swarm Tech., LLC v. Amazon.com, Inc.*, D. Ariz. No. 2:21-cv-438, Docket Item 64 at 5, 9 (granting Rule 12(b)(6) motion). This didn’t address Swarm’s ’777 patent because Swarm had so far only asserted its ’004 and ’275 patents.

[78] *Juniper Networks, Inc.* v. *Swarm Tech., LLC*, N.D. Cal. No. 5:20-cv-3137, Docket Item 92.

[79] *Id*. at 2.

[80] D. Ariz. No. 2:21-cv-438, Docket Items 73-78.

[81] D. Ariz. No. 2:21-cv-438, Docket Item 101 at 2; N.D. Cal. No. 5:20-cv-3137, Docket Item 83 at 7 (Juniper’s reply noting verbatim identical allegations in proposed amended complaint that Swarm attached to motion for leave to amend in Arizona).

in both district court actions consented to stays pending the resolution of these IPRs.[82]

As a result, Swarm's counterclaims based on its '004,'275, and '777 patents remain pending against Juniper, despite the § 101 infirmities that two district courts and the Board had identified.[83]

## SUMMARY OF THE ARGUMENT

In both IPRs, the Board disregarded intrinsic and extrinsic evidence to reach its own unprompted construction of the term "communication." Contrary to the Board's conclusions, Swarm's patents' use of "communication" requires the controller to send a response to the device contacting it.

The patents' specifications confirm the purpose of the purported inventions is to conserve the controller's resources. Construing the claim language to subsume one-way communications requires the controller to expend resources parsing data received from co-processors, even when the data isn't intended for the co-processors. This undermines the very goals of the patents.

And both sides' experts disagreed with the Board's construction. Juniper's expert, Dr. Weissman, showed in his declarations that combining the architecture

---

[82] D. Ariz. No. 2:21-cv-438, Docket Item 111; N.D. Cal. No. 5:20-cv-3137, Docket Items 98, 102.

[83] N.D. Cal. No. 5:20-cv-3137, Docket Items 98, 102.

of Leong with AppleTalkBook's network configuration teachings results in a system where the controller wouldn't have to respond to messages from the co-processors. And Swarm's expert, Dr. Nelson, volunteered his opinion during cross examination that in the Leong-AppleTalkBook combination, a one-way broadcast wouldn't constitute a communication. That opinion is consistent with Dr. Nelson's declarations stating that the focus of Swarm's technology is reducing the burden on the controller.

But even under the Board's incorrect construction, there isn't substantial evidence to support its conclusion that the Leong-AppleTalkBook combination communicates with the controller. There is no evidence in the record that an AppleTalkBook broadcast packet, if implemented in a Leong data-processing architecture, would impart any information to unintended recipients like the controller. The Board never addressed Juniper's argument that the controller would simply discard a broadcast packet from a co-processor since the packet seeks a response from a bulletin board, not a controller.

Moreover, the Board incorrectly excluded Juniper's discussion of zones, which explains why broadcast packets would never reach the controller in the first place. The discussion of zones wasn't a new argument, contrary to the Board's conclusion. Rather, it was responsive to Swarm's opposition, and relies on the same theory of obviousness that Juniper asserted in the petitions.

Once properly considered, AppleTalkBook's teachings on zones show that a POSITA would design a network to keep broadcast packets from reaching a controller. The Board erroneously relied on a supposed concession from oral argument to conclude that all devices in a single Leong "standard network" belong to the same zone and thus share network traffic. But that conclusion fails to consider that Leong and AppleTalkBook define "network" differently, and there are embodiments of Leong's "standard networks" that are simultaneously AppleTalkBook "internetworks" that prevent broadcast packets from reaching a controller.

## **ARGUMENT**

### I. STANDARD OF REVIEW

A claim is unpatentable if, at the time of invention, the differences between it and the prior art would've been obvious to a person of ordinary skill in the relevant art.[84] Obviousness is a legal question based on underlying factual determinations.[85] The ultimate legal issue is reviewed de novo.[86] Predicate factual findings, including "the scope and content of the prior art, the differences between the prior art and the claimed invention, and the level of ordinary skill in the art" are

---

[84] 35 U.S.C. § 103.

[85] *E.g.*, *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015).

[86] *E.g.*, *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013).

reviewed for substantial evidence.[87] A finding is supported by substantial evidence if "a 'reasonable mind might accept' a particular evidentiary record as 'adequate to support a conclusion.'"[88]

Additionally, this Court reviews de novo the "ultimate construction of [a] claim, as well as any claim construction relying solely on intrinsic evidence (i.e., the claims, specification, and prosecution history)."[89] Subsidiary factual findings beyond the intrinsic evidence, if any, are reviewed for substantial evidence.[90] In the IPRs at issue, under *Phillips v. AWH Corp.*, claim terms are given their plain and ordinary meaning, as understood by a person of ordinary skill in the art at the time of invention and in the context of the entire patent disclosure.[91]

## II. THE BOARD ERRED IN FINDING ALL CHALLENGED CLAIMS NOT UNPATENTABLE BASED ON ITS CONSTRUCTION OF "COMMUNICATION."

In both IPRs, the Board's patentability conclusions hinge on its determination that Juniper's Leong-AppleTalkBook combination failed to teach adding a co-processor "on a plug and play basis without any communication with

---

[87] *See*, *e.g.*, *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1364 (Fed. Cir. 2015).

[88] *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

[89] *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 320 (2015).

[90] *Knowles Elecs. LLC v. Iancu*, 886 F.3d 1369, 1374 (Fed. Cir. 2018).

[91] 415 F.3d 1303, 1313 (Fed. Cir. 2005); *accord* Appx11-12; Appx46-48.

the controller," as all challenged claims require.[92] But the Board arrived at that determination based on an erroneous construction of "communication," divorced from the other claim language and the specification, that neither party asked for and both sides' experts expressly disagreed with. Relying solely on its own understanding of the words "any" and "communication," the Board "broadly construe[d] the claim term 'communication,'" as used in the negative limitation above, to "include[e], among other things, one-way messaging that does not require a response.[93] For the reasons detailed below, this Court should reverse that erroneous construction.

### A. The Intrinsic Evidence Contradicts the Board's Construction.

As this Court stated in *Phillips v. AWH Corp.*, the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."[94] Here, the '004 and '275 patents repeatedly make clear that a primary goal of the claimed inventions is to reduce the burdens on the CPU or "controller" in a multiprocessor system.[95] To

---

[92] Appx34; Appx74. All independent challenged claims ('004 claims 1, 3 and '275 claims 1, 6, 11) recite this limitation.

[93] Appx66 (internal citations omitted).

[94] 415 F.3d at 1315.

[95] *See*, *e.g.*, Appx85 ('004 patent at 1:56–2:1); *see also* Appx90 ('004 patent at 11:35-45) (describing embodiment that "includes a controller (CPU)" shown in Fig. 4).

achieve this, the patents describe a swarm of co-processors that autonomously retrieve tasks from a task pool, thereby eliminating the need for the controller to distribute tasks and respond to messages from subordinate co-processors.[96] For example, the specification explains that:

> Presently known multiprocessing approaches are disadvantageous in that a significant amount of CPU bandwidth is consumed by ***task distribution***; waiting for tasks to be completed before ***distributing new tasks*** (often with dependencies on previous tasks); ***responding to interrupts*** from co-processors when a task is completed; and ***responding to other messages*** from co-processors.[97]

In contrast, the specification never discusses one-way messages to a network that don't require a response or action from the CPU, much less any disadvantages of the prior art or benefits of the inventions related to such messages.

In addition, other portions of the specification use "communication" to describe two-way messaging. For instance, when discussing a sequence of events involving a "'communication channel' phase," the specification describes two-way communication between the co-processor and the task pool.[98]

---

[96] *See*, *e.g.*, Appx85 ('004 patent at 1:56–2:7); Appx101 ('275 patent at 1:63-2:15) (same).

[97] Appx85 ('004 patent at 1:61–2:1) (emphasis added); *accord*, *e.g.*, *id.* ('004 patent at 2:4–7) ("A multiprocessor architecture in thus needed which reduces CPU management overhead, and which also more effectively harnesses and exploits available co-processing resources.").

[98] Appx86 ('004 patent at 6:20-30) ("During a poll phase each cell periodically sends an agent to the task pool until a matching task is found. … When a task match is found within a task pool, the task pool transmits an acknowledgement to

And the specification doesn't provide any detail on how any particular device in the "Internet of Things" would connect to a network "on a plug and play basis." Instead, the '004 and '275 patents take it as a given that these "ubiquitous" Internet-capable devices can do so.[99] AppleTalkBook is the only technical explanation in the record of how plug-and-play networking occurs. It was error to disregard this prior art based on AppleTalkBook's one-way broadcast packets, when the '004 and '275 patents provide no other explanation.[100]

Indeed, when read as a whole, the specification uniformly indicates to persons of skill in the art that the '004 and '275 claims preclude communication with the CPU that may utilize CPU resources, where the CPU is actually involved in the communication and not just the passive or inadvertent recipient of a message that serves no purpose and could be filtered or discarded.[101] All relevant portions of the specification are consistent with Juniper's understanding of the limitation at

---

the cell. The next step is the "communication channel" phase. During the communication channel phase, the cell receives the task and begins to execute the task."); Appx9514-15.

[99] Appx85 ('004 patent at 1:35-38).

[100] *See In re Applied Materials, Inc.*, 692 F.3d 1289, 1298 (Fed. Cir. 2012) ("A reference must be considered for everything that it teaches") (citing *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985); *In re Lamberti*, 545 F.2d 747, 750 (CCPA 1976)).

[101] *See generally* Appx7223; Appx9838; Appx9726-27 (Swarm's expert, Dr. Nelson, testifying that he didn't consider filtering).

issue and showings of obviousness. Yet, the Board ignored these portions of the specification and the knowledge of persons of skill in the art when it adopted a dispositive "broad interpretation of 'communication'" that neither party had previously asked for or briefed.[102] In doing so, the Board erred.[103]

And the Board further erred by relying on the words "any" and "communication" in isolation, divorced not only from the specification but also the other claim language.[104] Notably, the limitation could've said "without any communication ***to*** the controller," had that been what the applicant intended. Instead, it says "without any communication ***with*** the controller." Consistent with the specification and the understanding of the claim language reflected in Juniper's petitions, the preposition "with" indicates reciprocity and the inclusion or participation of controller in the communication.[105] And contrary to the Board's

---

[102] *See* Appx26; Appx146-47; *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256 (Fed. Cir. 2021) (finding APA procedural violation where Board relied on *sua sponte* construction and failed to give party meaningful opportunity to dispute it).

[103] *E.g.*, *Corning v. Fast Felt Corp.*, 873 F.3d 896, 900–01 (Fed. Cir. 2017) (reversing Board based on unduly narrow "implicit[]" construction).

[104] *Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1308 (Fed. Cir. 2008) (rejecting construction "[d]ivorced from the specification" despite it being plausible in isolation); *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 824 (Fed. Cir. 2016) (same).

[105] *See*, *e.g.*, *United States v. Castro*, 837 F.2d 441, 445 n.6 (11th Cir. 1988) (Commerce "with foreign nations" rather than "to foreign nations" strongly supports interpretation of statute requiring "reciprocity"—i.e., both "the to and fro movement of merchandise," including both imports and exports).

assumption that the claim language alone supports its construction, common parlance and case law interpreting similar language has always much more strongly supported Juniper's understanding that communication with the controller involves the controller as a participant.[106] The Board thus erred by focusing on the words "any" and "communication" in isolation, while ignoring the other claim language.[107]

Accordingly, all intrinsic evidence of record, including the specification and the other claim language, contradicts the Board's construction.

### B. The Extrinsic Evidence, Including from Swarm's Own Expert, Further Confirms That the Board Erred in Its Construction.

The briefing in the '004 proceeding (IPR2021-01445) closed on October 5, 2022.[108] The next day, Juniper took the deposition of Swarm's expert, Dr. Nelson,

---

[106] *See*, *e.g.*, *Free Stream Media Corp. v. Alphonso Inc.*, No. 2019-1506, 2021 WL 1880931 (Fed. Cir. May 11, 2021) (affirming a district court's construction of "communication session" to exclude one-way communication); *USA Choice Internet Servs., LLC v. United States*, 522 F.3d 1332 (Fed. Cir. 2008) (in tax case, noting that lower court drew distinction between "communication to" and "communication with" and concluded that "communication with" denotes reciprocity); *Nexpoint Advisors, L.P. v. TICC Cap. Corp.*, No. 3:15-cv-1465, 2015 WL 6408117, at *13 (D. Conn. Oct. 23, 2015) (statement that company "engaged with" another in negotiations, "in the sense of that verb that the reader of English would understand," implied a back and forth, not a one-way soliciting of information).

[107] *Samsung Elecs. Co. v. UUSI, LLC*, 775 F. App'x 692, 696 (Fed. Cir. 2019) (criticizing the Board and reversing where it relied on an implicit construction of a claim term to find that prior art did not render a patent obvious).

[108] IPR2021-01445, Paper 29 (modifying Due Date 3 to October 5, 2022).

in the ’275 proceeding (IPR2022-00141).[109] When confirming preliminary matters, Juniper’s counsel asked: “[D]id you draft your declaration?”[110] Dr. Nelson, otherwise unprompted, then testified:

> [A]s I -- as I look at this, though, there’s something I would like to clarify in this at this time.
>
> When -- in the context of AppleTalkBook, there’s two cases of broadcast going on. And in the first case, the broadcast is sent but a particular processor does not respond. And I would classify that as not a communication between the broadcaster and that particular processor.
>
> The second case is when a broadcast occurs and a particular processor does respond. And I would classify that as communication between the broadcaster and the particular processor. And that would be in the context of AppleTalk.[111]

When Juniper’s counsel questioned Dr. Nelson about this, he confirmed that his opinions referring to a “communication,” for purposes of whether the Leong-AppleTalkBook combination teaches the limitation at issue, require two-way messaging. For instance, in response to a question about his declaration, he testified:

> And so what I’m saying in my clarification is that my testimony is that a communication occurs when a processor responds. But when the processor doesn’t respond, I would not categorize that as a communication.[112]

---

[109] Appx6953.

[110] Appx6969 (at 17:5).

[111] Appx6969-70 (at 17:14–18:2).

[112] Appx6972 (at 20:12–18).

Dr. Nelson then provided similar testimony when discussing his opinions in response to the petition's Leong-AppleTalkBook combination generally:

> And so my testimony is that when -- when a broadcast package is sent but is not responded to by a particular node, then there is no communication there. But when it does, when that particular node or processor does respond, there would be communication.[113]

Juniper submitted this cross-examination testimony, and the Board entered it as part of the record, in both IPR proceedings.[114] As Juniper explained, this testimony from Swarm's own expert confirms Juniper's understanding and showing in the petitions of how a POSITA would've understood "communication" in the challenged claims.[115] And Juniper's expert, Dr. Weissman, similarly confirmed that a controller would need to respond to a transmission to constitute "communication," for purposes of the "plug and play …" limitation.[116]

---

[113] Appx6974 (at 22:13–18); *accord* Appx7106 ("Yes, the CPU refers to the '275 controller. And when I gave my clarification, I was -- what I was saying is I don't consider [the controller] hearing a broadcast but not responding to the broadcast as a communication.").

[114] Filed as Ex. 1029 in IPR2022-00141 and Ex. 1041 in IPR2021-01445. As noted, briefing closed in IPR2021-01445 the day before this deposition took place. But in the Board's later decision denying rehearing, the Board granted Juniper's request to consider this new evidence. Appx10044 ("[A]dmitting the substance of [this] cross-examination testimony in this proceeding is in the interest of justice.").

[115] Appx9835-36.

[116] Appx608-09 (describing communication with bulletin board); Appx5675 (at 247:2–7, testifying that "just because a broadcast packet happens to arrive at Leong's surveying unit, that doesn't mean [it] communicates with the node that sent the broadcast packet"); Appx7218 (noting Dr. Nelson's cross-examination testimony clarifying or withdrawing previous opinions inconsistent with that

In both IPRs, Dr. Nelson also repeatedly provided opinions in declarations in support of Swarm's contingent motions to amend describing the '004 and '275 patents' goal of reducing the burdens on the CPU or controller associated with responding to messages from co-processors. In doing so, Dr. Nelson omitted any discussion of one-way broadcast packets from co-processors. For instance, Dr. Nelson explained that:

> The management burden placed on the CPU includes not only the burden of distributing tasks and responding to task completion interrupts, but also includes "responding to other messages from co-processors." As a result the [specification] describes that "[a] multiprocessor system that alleviates the management workload on the CPU … is needed."[117]

He further opined:

> [A] POSITA would understand the specification to convey that the inventor intended, as a major objective of [as-filed application], to provide a multiprocessor system that reduces or eliminates any CPU processing time spent managing or communicating with co-processors.[118]

And there are numerous other examples in Dr. Nelson's declarations, all consistent with Juniper's understanding of the limitation at issue, the petitions, and the above discussion of the intrinsic evidence.[119]

---

testimony).

[117] Appx8201.

[118] Appx8202.

[119] Appx8227-28 (In conventional systems, "dynamic changes to the system (e.g., adding or removing co-processors) consume additional CPU bandwidth. Since the

Moreover, in the ’275 proceeding (IPR2022-00141), Swarm initially ignored Dr. Nelson’s testimony clarifying his opinions on the limitation at issue.[120] This was unlike the ’004 proceeding where Swarm specifically mentioned this limitation.[121] But after the Board issued the Final Written Decision in IPR2021-01445 with its dispositive “broad interpretation of ‘communication,’” Swarm disavowed Dr. Nelson’s testimony regarding the limitations at issue in the ’275 proceeding. Specifically, Swarm argued in its Board-ordered additional briefing that its own expert, Dr. Nelson, should “be accorded little weight, consistent with the Board’s other evidentiary findings in the [IPR2021-01445] Decision.”[122] And

---

CPU manages task distribution among the co-processors of the system, the addition of a new co-processor to the system requires communication with the CPU.”); Appx8202 (The claimed system is “more efficient than traditional computer architectures in which auxiliary modules and co-processors are dependent on instructions from the main CPU. In view of this, a POSITA would understand that a goal of the [filed application] is to avoid communication between the co-processors and the CPU.”); Appx8219 (“By configuring the multiprocessor system to dynamically accept additional co-processors on a plug-and-play basis, without communication with the CPU, the system further reduces the overhead burden on the CPU.”); *see also* Appx8204 (“A POSITA would understand that reprogramming a CPU to account for added/removed co-processors is the key, if not sole, burden placed on a CPU when co-processors are added/removed to/from a traditional multiprocessor system.”).

[120] *Compare* Appx6847-48, Appx6868 (Juniper’s Reply, emphasizing Dr. Nelson’s testimony agreeing with Juniper’s understanding of limitation at issue) *with* Appx8130, Appx8136-8147 (Swarm’s Sur-Reply, ignoring this testimony and Juniper’s arguments on this limitation).

[121] Appx6816-6818 (Swarm’s Sur-Reply discussing this limitation)

[122] Appx9314; *accord id*. (further arguing that “[w]hile Dr. Nelson acted in good

although the Board described this as "unusual,"[123] it ultimately agreed with Swarm that Dr. Nelson's "testimony on this particular issue should be accorded little to no weight."[124]

As a result, the Board didn't rely on extrinsic evidence to support the construction that was dispositive in both IPRs. Nor is there any extrinsic evidence in the record that the Board could've relied on, apart from conclusory statements in Dr. Nelson's declarations that he withdrew at deposition and the Board found not to be credible.[125]

---

faith, his clarification during his deposition lacked any citation or reference, and should therefore be accorded little weight").

[123] Appx62 ("This strikes us as unusual. Swarm is the party who offered Dr. Nelson as its declarant in this proceeding, yet requests that we don't credit his cross-examination testimony.").

[124] Appx60; *see also* Appx60-61 (concluding, among other things, that Dr. Nelson's cross-examination testimony was inconsistent with the opinions in his declaration on the "plug and play …" limitation).

[125] For example, the Board found Dr. Nelson's testimony inconsistent with a declaration paragraph stating that "a newly added processing unit would necessarily communicate with [Leong's] surveying unit by transmitting a broadcast packet to the surveying unit. This communication would necessarily be read by the surveying unit (broadcast packets are read by all the nodes on the network)." Appx60-61. Regardless of the Board's findings, such statements are conclusory, given that Dr. Nelson's declaration didn't explain why the broadcast packet "would necessarily be read" by all nodes including the surveying unit. *Cf.* Appx7223; Appx9838.

## III. EVEN IF THE BOARD'S CONSTRUCTION WERE CORRECT, SUBSTANTIAL EVIDENCE DOESN'T SUPPORT ITS DECISIONS.

Even if "without any communication with the controller" precludes one-way messages, the Board's decisions still lack the support of substantial evidence. And this Court should overturn the decisions in both IPRs for two additional, independent reasons, detailed below.

### A. The Board Never Found, and No Evidence Shows, that an AppleTalk Broadcast Packet Necessarily Would Impart Any Information to the Controller.

To a POSITA reading the Swarm patents, and in common parlance, "communication" with someone or something indicates a transfer of information, regardless of whether it's one-way or two-way. For example, it would generally be inaccurate or misleading for one person to say that they communicated with another, if all the first person did was mail a letter that the Post Office returned to sender. Similarly, in computer networking, devices routinely discard or ignore packets for reasons including invalid addresses, header errors, and expired counters.[126] Such occurrences aren't examples of communication with someone or something; rather, they're examples of a failure to communicate.

Here, assuming that an AppleTalk broadcast packet necessarily would be

---

[126] *See generally* Appx9837-38; Appx5675 ("[J]ust because a broadcast packet happens to arrive at Leong's surveying unit, that doesn't mean [it] communicates with the node that sent the broadcast packet").

sent to the Leong-AppleTalkBook combination's controller, there's still no evidence showing that the controller would do anything except discard or ignore it since the broadcast packet isn't requesting a controller response.[127] Instead, the combination's broadcast packet seeks a bulletin board.[128] As such, there's no evidence that any information is imparted or communicated to the controller. And the Board failed to address whether the Leong-AppleTalkBook combination's controller would discard the broadcast packet, despite Juniper raising this below.[129] Substantial evidence thus doesn't support the Board's conclusion that Juniper's Leong-AppleTalkBook combination didn't teach adding a co-processor on a "plug and plug basis without any communication with the controller."

Moreover, it bears repeating that this is a negative limitation, meaning that substantial evidence must support the Board's conclusion that AppleTalk broadcast packets necessarily or always constitute the precluded "communication." If an AppleTalk broadcast packet may sometimes be a "communication," and may other times allow the addition of co-processors on a plug-and-plug basis "without any

[127] *See* Appx241-43 ("In an AppleTalk network, a specific broadcast packet identifies available network resources."); Appx1503-07 (same).

[128] *See* Appx241 ("Leong's modified processing units, when connected to a network transmit a broadcast packeting seeking a bulletin board device type. Any of Leong's bulletin boards receiving this broadcast packet would respond with its address.")

[129] Appx9838; Appx7223-24.

communication," that teaching satisfies the negative limitation. As the Board stated in the IPR2022-00141 institution decision:

> The Federal Circuit has explained that "a reference need not state a feature's absence in order to disclose a negative limitation." *AC Techs., S.A. v. Amazon.com, Inc.*, 912 F.3d 1358, 1367 (Fed. Cir. 2019) (citing *Sud-Chemie, Inc. v. Multisorb Techs., Inc.*, 554 F.3d 1001, 1004–05 (Fed. Cir. 2009) (affirming finding that reference disclosed "uncoated" film where it did not describe the film as coated and did not suggest necessity of coatings)). ***Here, AppleTalkBook need not disclose that there is no communication between the new co-processor and the controller to teach the negative limitation because it does not suggest the necessity of those communications***. AppleTalkBook supports that assertion by teaching that new co-processors are added to a system "without a system administrator assigning an address for the [resource] and distributing it to the network."[130]

Thus, the Board failed to address whether the AppleTalk broadcast packet would impart any information to the Leong-AppleTalkBook combination's controller, as opposed to discarding or ignoring it. Further, the Board didn't explain why this would necessarily occur in the Leong-AppleTalkBook combination, despite recognizing in its institution decision that AppleTalkBook "does not suggest the necessity" of any communication with the controller, as the negative limitation at issue requires.[131]

---

[130] Appx4239 (citing Appx802-03).

[131] *Id*.

### B. The Board Improperly Ignored the Evidence Showing that the Broadcast Packet Wouldn't Necessarily Be Sent to the Controller.

As AppleTalkBook explains, larger networks can be divided into "zones" of devices that work closely together to optimize network traffic.[132] These zones prevent network traffic from reaching devices that don't need to receive it.[133] In both IPRs, Juniper invoked AppleTalkBook's "zones" teachings to rebut Swarm's incorrect assertion that the broadcast packets necessarily must be sent to all devices in Juniper's Leong-AppleTalkBook combination. But the Board concluded that it shouldn't consider this evidence because "Juniper's zone theory," as the Board called it, was "a new argument raised for the first time in its Reply."[134] As detailed below, that was improper, and the Board further erred in its alternative findings addressing this evidence.

#### 1. Juniper's Discussion of AppleTalkBook's "Zones" was a Proper Reply to Swarm's Arguments.

As this Court explained in *Corephotonics, Ltd. v. Apple Inc.*, IPR reply arguments are subject to two restrictions: (1) they "must not be part of a new theory of unpatentability," and (2) they "must be responsive to the patent owner's contentions."[135] Here, Juniper's discussion of AppleTalkBook's teachings on

[132] Appx777; Appx914; Appx6432-33.

[133] Appx777; Appx914; Appx6432-33.

[134] Appx70.

[135] 84 F.4th 990, 1008 (Fed. Cir. 2023) (emphasis omitted); *see also* 37 C.F.R.

"zones" complied with both restrictions.

**Newness:** As *Corephotonics* explains, the "newness" restriction prohibits a petitioner from raising, in reply, "an entirely new theory of prima facie obviousness absent from the petition."[136] Here, from the petitions onward, Juniper has consistently argued that combining AppleTalkBook's teachings with Leong renders all challenged claims obvious.[137] And with respect to the limitation at issue, Juniper has always relied on the same components (i.e., Leong's processing units and AppleTalkBook's broadcast packets) and reasoning. For example, the relevant section of the IPR2021-01445 petition explained that Juniper's combination satisfies this limitation because, "[a]s modified, there's no need to contact a central server to coordinate participation in the Leong system."[138] Juniper

§ 42.23(b) ("A reply may only respond to arguments raised in the corresponding opposition, patent owner preliminary response, or patent owner response.").

[136] *Corephotonics*, 84 F.4th at 1008.

[137] *See*, *e.g.*, Appx224 ("When considered by a POSITA at the time of the purported invention, the combination of Leong and AppleTalkBook discloses, either expressly or inherently, or renders obvious, each and every element of the Challenged Claims.").

[138] Appx243; *accord*, *e.g.*, Appx241 ("[I]mplementing a dynamic configuration system like AppleTalk wouldn't require any coordination with a central management computer or program."); Appx242 (A POSITA would've understood this to be "'on a plug-and-play basis' because AppleTalkBook teaches any configuration is automatically handled by the AppleTalk devices (e.g., the new processing unit and the bulletin board). This would have resulted in no manual system configuration being necessary."); Appx608 (similar from Dr. Weissman).

has never deviated from that theory of obviousness. The salient point, as explained in the petition, and as Juniper's expert repeatedly recognized, is that applying AppleTalkBook's teachings wouldn't require the controller to respond, configure, or do anything for the system to add a co-processor. Juniper's discussion of zones didn't change that theory and was only necessary to explain how the already-disclosed AppleTalkBook reference contradicted Swarm assertions about its content.[139] That wasn't an "entirely new theory" of obviousness.[140]

**Responsiveness:** Neither party proposed constructions for any claim terms during the IPRs (apart from in the additional briefing in IPR2022-00141, following the Board's implicit construction of "communication" in IPR2021-01445). Juniper's petitions thus relied on the meaning of "without any communication with the controller" to a POSITA at the time of invention, as confirmed by Dr. Weissman. As detailed above, this requires the controller to be involved with the communication, not just an inadvertent or passive recipient of a one-way message

---

[139] *See Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 706 (Fed. Cir. 2020) (holding that Board abused its discretion when it excluded reply argument that relied on same prior art to advance same legal argument); *Anacor Pharms., Inc. v. Iancu*, 889 F.3d 1372, 1380–81 (Fed. Cir. 2018) (confirming that the introduction of new evidence after the petition stage is proper if it is used "to document the knowledge that skilled artisans would bring to bear in reading the prior art identified as producing obviousness.").

[140] *See Corephotonics*, 84 F.4th at 1008.

that may be ignored or discarded.[141] It wasn't until Swarm, in its responses, raised the argument that AppleTalkBook's one-way broadcast packets teach away from the "without any communication with the controller," on the basis that they necessarily go to the controller, that there was a reason to further address that issue.[142]

For instance, Dr. Nelson asserted in a declaration that a POSITA would've understood AppleTalkBook to teach that all broadcast packets inherently traverse every connection to every node in a system.[143] According to that view (which he later contradicted in his deposition testimony), the broadcast packets thus "would necessarily communicate with the [Leong] surveying unit."[144] But the AppleTalkBook prior art teaches that it's not a given that every node always receives every broadcast packet.[145] It's possible and, indeed, recommended, to

---

[141] Appx609 ("AppleTalkBook's teachings are also consistent with Leong's decentralization focus. As modified, there's no need to contact a central server to coordinate participation in the Leong system.").

[142] *See Axonics, Inc. v. Medtronic, Inc.*, 75 F.4th 1374, 1380–81 (Fed. Cir. 2023) ("There is no rule, for example, requiring a petition to describe all possible or reasonable claim constructions and to present invalidity theories under those constructions.").

[143] Appx4363-67.

[144] Appx4364-65.

[145] Appx914 ("Conveniently, broadcast packets travel only to the networks within the zone for which they are intended. Thus, dividing an internet into zones, each containing only one or two networks, can help manage traffic on the network.")

create partitions in a network to limit traffic.[146] AppleTalkBook's "zones" are one such method known to persons of skill in the art.[147] Based on AppleTalkBook's teachings, a POSITA would've applied known techniques to limit the reach of broadcast packets by creating zones of related devices to partition network traffic.[148] In a zone-based embodiment, broadcast packets from a newly added co-processor would reach only the other co-processors since they would be separated from the controller by a zone boundary.[149] Raising this directly responded to Swarm's arguments and evidence.

Indeed, this Court has repeatedly held that there's no prohibition on presentation of new evidence in reply when it's a fair extension of a previous argument and has a "nexus" to an argument made by the patent owner.[150] At bottom, the requirements preventing new arguments in reply is designed to ensure fairness and efficiency within necessarily expedited IPR proceedings. Fairness

---

[146] Appx914.

[147] Appx914.

[148] *See* Appx6868 ("POSITAs would've understood techniques exist for limiting broadcast packets, including zones, as AppleTalkBook teaches").

[149] Appx914; Appx7215.

[150] *Rembrandt Diagnostics, LP v. Alere, Inc.*, 76 F.4th 1376, 1384–85 (Fed. Cir. 2023); *see also Anacor Pharms.* 889 F.3d at 1380–82; *Genzyme Therapeutic Prods. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1366 (Fed. Cir. 2016) ("the introduction of new evidence in the course of the trial is to be expected in [IPR] trial proceedings" and is permissible "as long as the opposing party is given notice of the evidence and an opportunity to respond to it.").

dictates that Juniper should be allowed to respond to an argument raised for the first time in Swarm's responses—namely, that AppleTalkBook's one-way messages necessarily go to the controller and thus teach away from "without any communication with the controller."[151] And those fairness concerns are particularly strong here, where Swarm's argument, reframed in the Board's Final Written Decisions as a claim-construction issue, was ultimately dispositive.[152]

This Court's recent decision in *Axonics v. Medtronic* is analogous. There, the patent owner suggested for the first time in its response that claims covering a medical-implant charging device should be constructed to require two different measurement values.[153] Neither party had previously proposed constructions for the relevant claim terms.[154] But the Board adopted the patent owner's two-value construction and excluded the petitioner's reply arguments because they weren't in the petition.[155] This Court overturned the Board's conclusions, explaining that

---

[151] *See*, *e.g.*, Appx4292; Appx5002.

[152] Appx21-22 ("[T]he relevant teachings of AppleTalkBook and Leong result[] in the additional co-processor communicating with Leong's controller by sending a broadcast message to all components when it is added."). What's more, Swarm had the opportunity in the '004 IPR to respond to Juniper's arguments on zones or argue that the Board shouldn't consider them. But Swarm's sur-reply in that proceeding opted not to do so, while simultaneously asserting that different Juniper arguments constituted new, impermissible material. Appx6832.

[153] 75 F.4th at 1378–79.

[154] *Id.*

[155] *Id.* at 1379.

because the petitioner didn't rely on wholly new prior art, the Board should've considered the reply arguments rebutting the patent owner's two-value construction.[156] In doing so, this Court observed that allowing a patent owner to raise a claim-construction issue for the first time in response without allowing the petitioner to contest it creates a perverse incentive for "sandbagging" and "gamesmanship."[157]

There's no reason for the Court to reach a different result here, where the fairness and incentive concerns are at least as great as in *Axonics*. Here, Swarm presented arguments in its responses that the Board, after Juniper filed its replies, converted into a new construction in its Final Written Decisions. Just as in *Axonics*, this Court should permit Juniper to rely on the teachings of its already-disclosed prior art to rebut that belated construction.

#### 2. The Board Erroneously Rejected the Discussion of Zones

The Board also erred by substantively misconstruing AppleTalkBook's teachings on zones. After concluding that this evidence should be excluded, the Board went on to reject the merits of the "zone theory" in dicta. According to the Board, "all of the elements of Leong are part of a single network," so "all devices

---

[156] *Id.* at 1383–84. The court explicitly declined to consider whether citation to a new embodiment of previously disclosed prior art would be permissible.

[157] *Id*. at 1384.

in a single network will belong to the same zone" and AppleTalkBook's teachings on zones are inapplicable.[158] But the Board failed to explain or identify any support for its assumption that a "single network" must mean the same thing in Leong and AppleTalkBook. After all, a POSITA would've recognized that the meaning of "network" depends on context and that a larger "network" (e.g., the Internet) can encompass other physical or virtual networks, such as local area networks (LANs). And the '004 and '275 patents themselves refer to the billions of devices in the "Internet of Things" as "an ad hoc network."[159]

When reviewing for substantial evidence, this Court must "take into account evidence that both justifies and detracts from the [Board's] factual determinations."[160] Additionally, the Board's conclusions regarding obviousness are called into question when its decision is based on a misunderstanding of the prior art.[161] Here, in the '004 Final Written Decision, the Board laid out its reasoning for rejecting what it called the "zone theory."[162]

> AppleTalkBook describes using zones for two purposes: "to divide devices on an internetwork into logical groups, and to limit

---

[158] Appx29.

[159] Appx85 ('004 Patent at 1:22-24).

[160] *In re Glatt Air Techniques, Inc.*, 630 F.3d 1026, 1029 (Fed. Cir. 2011).

[161] *See OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375 (Fed. Cir. 2019) (reversing the Board when it relied on an erroneous reading of prior art).

[162] The Board adopted this reasoning essentially wholesale in the '275 IPR as well. *See* Appx71.

> internetwork traffic." Ex. 1006, 219–20. AppleTalkBook further describes that, although a zone can include multiple networks, "all devices in a single network will belong to the same zone." *Id.* (emphasis added). Because all of the elements of Leong are part of a single network (Tr. 18:1–4), AppleTalkBook teaches away from Petitioner's theory of placing the different processors of Leong, whether old processors or newly added processors, into different zones.[163]

The Board's understanding that all the elements of Leong are part of a single "network" comes from a question asked during oral argument, to which Juniper acknowledged that the controller and co-processor would be a part of a single network in Leong's terms.[164] The Board went on to write that the testimony of Juniper's expert, Dr. Weissman, wasn't persuasive because he "ignores the requirement" in AppleTalkBook that all devices in a single network will belong to the same zone.[165] But that misconstrues the teachings of the two prior-art references and constitutes clear error. Leong and AppleTalkBook use the term "network" differently, and a connected system can simultaneously be a single network in Leong's terms and an "internetwork" of zones or smaller networks per AppleTalkBook's definitions. This is consistent with how those of skill in the art and laypersons use the word "network" every day to describe connected systems

[163] Appx29.

[164] Appx29 ("JUDGE HOWARD: And just be clear, though, when you were talking about the network, do you consider all of Leong and all its -- its coprocessors as -- as part of a single network? MR. SIGLER: Yes, Your Honor.")

[165] Appx30.

that may encompass other connected systems.

More specifically, Leong contemplates the controller and the co-processors being connected as part of a "standard network."[166] It fails to define what a "standard network" is, but the specification references connections over "Ethernet, Local Area Network, or the like."[167] Local Area Networks, or "LANs," can include Ethernet devices like bridges or gateways in some deployments.[168]

In AppleTalkBook, on the other hand, networks are a separate concept. In one sense, they represent the same thing: a group of connected devices. But AppleTalkBook makes a distinction once a standard networking component like a bridge or gateway is introduced. At that point, rather than referring to it as a simple network, AppleTalkBook refers to the resulting system as an "internetwork," with components on each side of the bridge being labeled as "networks."[169]

Critically, AppleTalkBook teaches that, "[z]ones can only be created at network boundaries, which is why only bridges and gateways can define zones."[170] Thus, if an embodiment of a Leong "standard network" uses zones, it must

---

[166] Appx690 ("Consequently, the micro-processing units may be coupled together using standard network technology").

[167] Appx690.

[168] Appx731; Appx736.

[169] Appx777.

[170] Appx780.

simultaneously be an AppleTalkBook "internetwork" because it would have to contain a bridge or a gateway, and there's no other way to implement a zone in AppleTalkBook.[171] Any embodiment of the Leong-AppleTalkBook combination where the controller is on one side of a bridge and the co-processors are on the other would be an AppleTalkBook internetwork due to the bridge. But it would still be "network" of connected devices for Leong's purposes, or the purposes of both Swarm patents at issue, as they use "network" the same way.

This Court has found error where the Board failed to consider common knowledge in the art documented in specific prior art references produced in IPR proceedings.[172] And it has cautioned that "[a] reference must be considered for everything it teaches by way of technology."[173] For instance, in *Corning v. Fast Felt Corp.*, this Court reversed the Board's finding of nonobviousness as to a method patent related to printing reinforcement strips on roofing materials.[174] There, the court criticized the Board for implicitly construing the term "roofing or building cover material" in a way that required the materials to be covered with

---

[171] *See* Appx780.

[172] *See In re Taylor Made Golf Co., Inc.*, 589 F. App'x 967, 971 (Fed. Cir. 2014) ("neither the Examiner nor the Board considered the record evidence before it that press fitting was common knowledge at the time of the invention and was disclosed even in the specific prior art references considered by the Board.").

[173] *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985).

[174] 873 F.3d 896 (Fed. Cir. 2017)

asphalt.[175] Despite writing that its construction did "not require an asphalt-coated" material, the court based its decision exclusively on prior art and expert testimony that focused on material that had been asphalt covered.[176] After discarding the Board's "too-narrow view of what materials are covered by the patents at issue," the record showed there was "only one permissible factual finding"—the prior art rendered the patents obvious.[177] Thus, reversal was appropriate.[178]

This Court should reach a similar conclusion here. The Board's sole support for rejecting AppleTalkBook's "zones" teachings on the merits was that all devices on a single AppleTalkBook network would belong to the same zone.[179] Here, the Board improperly focused on AppleTalkBook, not the Leong-AppleTalkBook combination, viewed the prior art with too narrow of a focus, and failed to consider what AppleTalkBook teaches—the very thing it chastised Dr. Weissman for doing.[180]

---

[175] *Id.* at 900.

[176] *Id.*

[177] *Id.* at 902–03

[178] *See also Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1378–79 (Fed. Cir. 2023) (reversing a Board's determination of nonobviousness where its interpretation of a prior art drawing was contrary to the only "reasonable understanding of [the] figure.").

[179] *See* Appx29; Appx71.

[180] *See* Appx30.

Beyond that, the Board reads too much into Juniper's concession that Leong must operate on a single network. When viewed in the full context of the combined teachings of Leong and AppleTalkBook, the Board's decision erroneously conflated the two references' embodiments of a single "network" based on the supposed concession.[181] It should have recognized that Leong and AppleTalkBook define network differently.

No reasonable mind would find that the evidence supported the Board's conclusions given that the only way to implement zones in AppleTalkBook is to create an internetwork that includes a bridge or gateway. And Leong's requirement of a "standard" network can include such a device, just as the roofing materials in *Corning* also included non-asphalt materials.[182]

Because there is no conflict in a system being a single standard Leong network and an AppleTalkBook internetwork, there is not substantial evidence to support the Board's terse rejection of zones. In fact, there is no evidence to support the Board's conclusion. Neither Final Written Decision cites any other evidence

---

[181] *See EMC Corp. v. Clouding Corp.*, 686 F. App'x 857 (Fed. Cir. 2017) (reversing the Board for placing too much weight on an oral argument concession taken out of context).

[182] *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1002 (Fed. Cir. 2016) ("[C]ombinations of prior art that sometimes meet the claim elements are sufficient to show obviousness.") (citing *Hewlett-Packard Co. v. Mustek Sys. Inc.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003).

and simply relies on the Board's mistaken assumptions about the prior art.[183] Properly considered, the prior art requires vacatur here so that the Board can actually contend with AppleTalkBook's teachings.

## CONCLUSION

The Board relied on a claim construction that ignored the intrinsic evidence, that neither party had asked for, and that both sides' experts expressly disagreed with. That was error. Indeed, the Board's decisions weren't supported by substantial evidence and should be vacated since they improperly excluded evidence, and failed to consider aspects of the record. Accordingly, this Court should reverse and remand for further proceedings.

---

[183] Appx29-30; Appx71.

November 27, 2023

Respectfully submitted,

*/s/ R. William Sigler*
Alan M. Fisch
R. William Sigler
Jeffrey M. Saltman
Matthew R. Benner
FISCH SIGLER LLP
5301 Wisconsin Avenue NW
Suite 400
Washington, DC 20015
202.362.3500

*Counsel for Appellant*
*Juniper Networks, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system on November 27, 2023.

Dated: November 27, 2023

*/s/ R. William Sigler*
R. William Sigler

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rule 32(b). This brief contains 11,518 words, excluding parts exempted by Federal Rule of Appellate Procedure and 32 and Federal Circuit Rule 32.

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6). This brief uses a proportionally spaced typeface using Microsoft Word and 14-point Times New Roman font.

Dated: November 27, 2023

*/s/ R. William Sigler*
R. William Sigler

# ADDENDUM

**Table of Contents for Addendum**

IPR2021-01445 Final Written Decision (Feb. 7, 2023) ……………………………………….Appx1

IPR2022-00141 Final Written Decision (Apr. 26, 2023) …………………………………….Appx37

U.S. Patent No. 9,852,004 ……………………………………………………………Appx77

U.S. Patent No. 10,592,275 …………………………….………………………………Appx93

Trials@uspto.gov
571-272-7822

Paper 62
Date: February 7, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

JUNIPER NETWORKS, INC.,
Petitioner,

v.

SWARM TECHNOLOGY LLC,
Patent Owner.

---

IPR2021-01445
Patent 9,852,004 B2

---

Before MICHAEL R. ZECHER, GREGG I. ANDERSON, and SCOTT B. HOWARD, *Administrative Patent Judges.*

HOWARD, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
Dismissing Patent Owner's Revised Motion to Amend
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

## *A. Background and Summary*

Juniper Networks, Inc. ("Petitioner") filed a Petition requesting *inter partes* review ("IPR") of claims 1–12 of U.S. Patent No. 9,852,004 B2 (Ex. 1001, "the '004 patent"). Paper 1 ("Pet."). Swarm Technology LLC ("Patent Owner") filed a Preliminary Response. Paper 6 ("Prelim. Resp."). With our authorization, Petitioner filed a Preliminary Reply (Paper 11) and Patent Owner filed a Preliminary Sur-reply (Paper 13). We instituted an *inter partes* review of claims 1–12 of the '004 patent on all grounds of unpatentability alleged in the Petition. Paper 15 ("Institution Decision" or "Inst. Dec.").

After institution of trial, Patent Owner filed a Response (Paper 21, "PO Resp."), Petitioner filed a Reply (Paper 31, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 35, "PO Sur-reply").

Patent Owner also filed a Contingent Motion to Amend the '004 patent (Paper 28), to which Petitioner filed an Opposition (Paper 30). We issued Preliminary Guidance (Paper 32) concerning the Contingent Motion to Amend. Following the Preliminary Guidance, Patent Owner filed a Revised Contingent Motion to Amend the '004 patent. Paper 33 ("Motion to Amend" or "Mot."). Petitioner filed an Opposition to the Motion to Amend (Paper 37), Patent Owner filed a Corrected Reply to Petitioner's Opposition (Paper 49), and Petitioner filed a Sur-reply to Patent Owner's Reply (Paper 56).

An oral hearing was held on January 4, 2023, and the record contains a transcript of this hearing. Paper 59 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons that

follow, we determine that Petitioner has not shown by a preponderance of the evidence that claims 1–12 of the ’004 patent are unpatentable. Additionally, we *dismiss* Patent Owner’s Contingent Motion to Amend as moot.

*B. Real Parties in Interest*

Petitioner identifies itself as the real party in interest (“RPI”). Pet. ix.

Patent Owner identifies itself as the RPI. Paper 5, 1 (Patent Owner’s Mandatory Notices).

In the Institution Decision, we concluded that there was no need to determine whether any of fifteen entities identifies by Patent Owner were real parties in interest. Inst. Dec. 10–12.

*C. Related Matters*

The parties identify the following district court proceedings involving the ’004 patent: (1) *Juniper Networks, Inc. v. Swarm Technology LLC*, No. 3:20-cv-03137-JD (N.D. Cal.) and (2) *Swarm Technology, LLC v Amazon.com, Inc.*, No. 2:21-cv-00438-DJH (D. Az.). Pet. ix; Paper 5, 1. The parties also identify the following *inter partes* review proceeding involving the ’004 patent: *Amazon.com, Inc. v. Swarm Technology LLC*, IPR2022-00283 (PTAB). Paper 9, 1 (Petitioner’s Updated Mandatory Notices); Paper 54, 1 (Patent Owner’s Updated Mandatory Notices).

Patent Owner also identifies an additional patent and patent application that claims or may claim the benefit of the filing date of the ’004 patent. Paper 5, 2.

*D. The ’004 Patent*

The ’004 patent is titled “System and Method for Parallel Processing Using Dynamically Configurable Proactive Co-Processing Cells” and is generally directed to “a processing architecture which involves autonomous

co-processors configured to proactively retrieve tasks from a task pool populated by a central processing unit." Ex. 1001, code (54), 1:14–18.

According to the '004 patent, "[c]omputer processors traditionally execute machine coded instructions serially. To run a plurality of applications concurrently, a single processor interleaves instructions from various programs and executes them serially, although from the user's perspective the applications appear to be processed in parallel." Ex. 1001, 1:42–47. The '004 patent further states that "[t]rue parallel or multi-core processing, on the other hand, is a computational approach that breaks large computational tasks into individual blocks of computations and distributes them among two or more processors." *Id.* at 1:47–50. "A typical multiprocessor system includes a central processing unit ('CPU') and one or more co-processors. The CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Completed threads are reported to the CPU, which continues to distribute additional threads to the co-processors as needed." *Id.* at 1:56–61.

The '004 patent identifies a problem with using the CPU to control the distribution of tasks:

> Presently known multiprocessing approaches are disadvantageous in that a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors. In addition, co-processors often remain idle while waiting for a new task from the CPU.

Ex. 1001, 1:61–2:3. The '004 patent addresses that problem using a system that reduces CPU management overhead and which "more effectively harnesses and exploits available co-processing resources." *Id.* at 2:4–7.

Figure 1 of the ’004 patent is reproduced below.




FIG. 1

Figure 1 “is a schematic block diagram of a parallel processing architecture including a CPU, memory, task pool, and a plurality of co-processors configured to communicate through a fabric.” Ex. 1001, 3:56–59. More specifically, Figure 1 shows “a single or multi-core CPU 11 and one or more solidarity or co-processing cells 12A-12[n] configured to communicate with a task pool 13 through a cross-bar switching fabric 14. The solidarity cells 12 may also communicate with each other through the switching fabric 14 or through a separate cell bus (not shown).” *Id.* at 4:30–36. “The CPU 11 may communicate with the task pool 13 directly or through the switching fabric 14 as shown. One or more memory units 15 each contain data and instructions” to perform computations. *Id*. at 4:36–39.

*E. Illustrative Claims*

Claims 1 and 3 are independent. Claims 1 and 3, reproduced below and with the dispositive claim limitation italicized, are illustrative of the claimed invention.

> 1. [1 Premable] A processing system, comprising:
>
> [1.1] a task pool;
>
> [1.2] a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;
>
> [1.3] a first co-processor configured to successively: retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and
>
> [1.4] a second co-processor configured to successively: retrieve a second task from the task pool; deliver the second task to the second co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;
>
> [1.5] *wherein the processing system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller*.

Ex. 1001, 14:10–32 (emphasis added).

> 3. [3. Preamble] A processing system, comprising:
>
> [3.1] a task pool;
>
> [3.2] a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;
>
> [3.3] a first co-processor configured to successively: retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting

data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

[3.4] a second co-processor configured to successively: retrieve a second task from the task pool; deliver the second task to the second co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

wherein:

[3.5] *the processing system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller*;

[3.6] the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first type, and the first agent is configured to search the task pool for a task of the first type;

[3.7] the second task includes indicia of a second task type, the second co-processor is configured to perform tasks of the second type, and the second agent is configured to search the task pool for a task of the second type;

[3.8] the first co-processor includes a first agent comprising a first source address, a first destination address, and a first payload; and

[3.9] the second co-processor includes a second agent comprising a second source address, a second destination address, and a second payload;

[3.10] and further wherein:

when the first agent is retrieving the first task from the task pool, the first source address corresponds to an address associated with the first co-processor, the first destination address corresponds to an address associated with the task pool, and the first payload includes a first function which the first co-processor is configured to perform;

> [3.11] when the first agent is returning from the task pool, the first source address is the task pool's address, the first destination address is the first co-processor's address, and the first payload includes a descriptor of the first task;
>
> [3.12] when the second agent is retrieving the second task from the task pool, the second source address corresponds to an address associated with the second co-processor, the second destination address corresponds to an address associated with the task pool, and the second payload includes a second function which the second co-processor is configured to perform; and
>
> [3.13] when the second agent is returning from the task pool, the second source address is the task pool's address, the second destination address is the second co-processor's address, and the second payload includes a descriptor of the second task.

Ex. 1001, 14:42–15:36 (emphasis added)

### *F. Prior Art and Asserted Grounds*

Petitioner asserts that claims 1–12 would have been unpatentable on the following grounds:

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 1–12 | 103(a) | Leong,[2] AppleTalkBook[3] |

[1] The Leahy-Smith America Invents Act ("AIA") included revisions to 35 U.S.C. §§ 102, 103 that became effective on March 16, 2013. Because the '004 patent is a continuation of U.S. Patent Application No. 13/750,696, which was filed before March 16, 2013, and neither party has argued that the provisions of the AIA apply, we apply the pre-AIA versions of the statutory bases for unpatentability. *See* Ex. 1001, code (63).

[2] US 6,006,249, issued Dec. 21, 1999 (Ex. 1005).

[3] Rogers, M., & Bare, V. (1989). *Hands-on AppleTalk*. Brady Books (Ex. 1006). All citations are to the page numbers added by Petitioner.

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 3–12 | 103(a) | Leong, AppleTalkBook, Ethernet Specification[4] |
| 9 | 103(a) | Leong, AppleTalkBook, Bates[5] |
| 9 | 103(a) | Leong, AppleTalkBook, Ethernet Specification, Bates |

Petitioner also relies on the testimony of Dr. Jon B. Weissman (Ex. 1003 (Declaration of Dr. Weissman in support of Petition); Ex. 1031 (Reply Declaration of Dr. Weissman); Ex. 1035 (Declaration of Dr. Weisman opposing the Revised Motion to Amend)) and Sylvia D. Hall-Ellis, Ph.D. (Ex. 1018 (Declaration of Dr. Hall-Ellis)).

Patent Owner relies on the testimony of Dr. Brent Nelson (Ex. 2007 (Declaration of Dr. Nelson in support of Patent Owner Response); Ex. 2028 (Declaration of Dr. Nelson in support of Revised Motion to Amend); Ex. 2037 (Reply Declaration of Dr. Nelson in support of Revised Motion to Amend)).

Cross Examination testimony can be found at Exhibits 1028, 1034, and 1039 (Dr. Nelson); Exhibits 2010 and 2039 (Dr. Weismann); and Exhibit 2011 (Dr. Hall-Ellis).

## II. ANALYSIS

### *A. Legal Standards*

In *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966), the Supreme Court set out a framework for assessing obviousness under 35 U.S.C. § 103(a) that requires consideration of four factors: (1) the "level

---

[4] The Ethernet, A Local Area Network, Data Link Layer and Physical Layer Specifications, dated Sept. 30, 1980 (Ex. 1007). All citations are to the native pagination.

[5] US 2007/0074207, published Mar. 29, 2007 (Ex. 1008).

of ordinary skill in the pertinent art," (2) the "scope and content of the prior art," (3) the "differences between the prior art and the claims at issue," and (4) if in evidence, "secondary considerations" of non-obviousness such as "commercial success, long-felt but unsolved needs, failure of others, etc." *Id.* at 17–18. "While the sequence of these questions might be reordered in any particular case," *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 407 (2007), the U.S. Court of Appeals for the Federal Circuit has repeatedly emphasized that "it is error to reach a conclusion of obviousness until all those factors are considered," *WBIP v. Kohler*, 829 F.3d 1317, 1328 (Fed. Cir. 2016).[6]

### *B. Level of Ordinary Skill in the Art*

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham*, 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). The "person having ordinary skill in the art" is a hypothetical construct, from whose vantage point obviousness is assessed. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).

Factors pertinent to a determination of the level of ordinary skill in the art include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and

---

[6] Because neither party address objective evidence of non-obviousness, we focus solely on the first three *Graham* factors.

(6) educational level of active workers in the field." *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696–697 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). "Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case." *Id.*

Both Petitioner and Patent Owner argue that a person having ordinary skill in the art "would have had a bachelor's degree in computer science, electrical engineering, computer engineering, or a closely related field, and one or more years of experience in the design and development of parallel or distributed processing systems." Pet. 11; *see also* PO Resp. 7. The parties alternatively argue that a person having ordinary skill in the art "would have a master's degree or similar post-graduate work in computer science, electrical engineering, computer engineering, or a closely related field, and less design and development experience." Pet. 11 (citing. Ex. 1003 ¶¶ 62–67); *see also* PO Resp. 7.

We adopt the parties' proposed formulation of the level of ordinary skill in the art.

*C. Claim Construction*

We apply the same claim construction standard used in the federal courts, in other words, the claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), which is articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). *See* 37 C.F.R. § 42.100(b) (2021). Under the *Phillips* standard, the "words of a claim 'are generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the

effective filing date of the patent application." *Phillips*, 415 F.3d at 1312–13.

Petitioner states that "[f]or the purposes of this proceeding, Petitioner construes all terms as having their ordinary and customary meanings." Pet. 11–12.

Patent Owner does not address claim construction. *See* PO Resp.

For purposes of this Decision, we need not expressly construe any claim terms. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

*D. Admissibility of AppleTalkBook and Dr. Hall-Ellis's Testimony*

In the Preliminary Response, Patent Owner challenged the admissibility of AppleTalkBook based on the best evidence rule.[7] Prelim. Resp. 28. In the Institution Decision, we dismissed the challenge as premature. Inst. Dec. 20. Additionally, we advised the parties on the specific mechanism for challenging the admissibility of evidence under our rules, including the need to make a timely objection, the right of the proffering party to cure the objection with supplemental evidence, and the need to then preserve the objection by filing a motion to exclude. *Id.* (citing

---

[7] Patent Owner did not cite the rule by that name or Federal Rule of Evidence 1002. However, Patent Owner's challenge is based on the lack of an original document with which to compare the copy submitted as evidence, thus implicating the best evidence rule. *See* Fed. R. Evid. 1002 ("An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise.").

37 C.F.R. § 42.64(b)(1), (b)(2), (c)). Specifically, we stated that "[p]rovided that Patent Owner timely objects to the admissibility of Petitioner's evidence in accordance with our regulations, we will address such objection at the procedurally appropriate time." *Id.*

Despite our reminding the parties of the proper procedure for challenging the admissibility of evidence, Patent Owner elected not to do so. Specifically, Patent Owner did not file a timely objection, thereby giving Petitioner an opportunity to supply supplemental evidence to cure the objection. *See* Pet. Reply 28. Accordingly, Patent Owner forfeited its right to object to evidence, such as AppleTalkBook and Dr. Hall-Ellis' testimony, and, as a result, forfeited its request that we exclude the evidence.

Instead of following our rules and filing a timely objection, Patent Owner argues in the Response, citing the Federal Rules of Evidence, that we should give limited weight to AppleTalkBook and Dr. Hall-Ellis' testimony due to a lack of authenticity. *See* PO Resp. 8–15. But this is no more than a disguised motion to exclude evidence. Under these circumstances where Patent Owner's argument is premised on the Federal Rules of Evidence, we see no meaningful difference between excluding the evidence and giving it little weight. Because Petitioner did not file a timely objection to the evidence, we deny Patent Owner's request to give AppleTalkBook and Dr. Hall-Ellis' testimony limited weight.

*E. Weight of Expert Testimony*

Patent Owner argues that we should give Dr. Weissman's testimony little weight as it "selectively embellishes, augments, and mischaracterizes the references to support Petitioner's hindsight invalidity narrative." PO Resp. 15; *see also id.* at 15–18. Specifically, Patent Owner argues that Dr. Weissman's claim mapping is not supported by the language of Leong, Dr.

Weissman refused to answer questions at the deposition, Dr. Weissman "conflates his subjective understanding of obviousness with legal obviousness under 35 U.S.C. § 103," and Dr. Weissman provided a new theory at his deposition. PO Resp. 15–18.

Petitioner argues that each of those arguments lack merit. Pet. Reply 27–28.

We have reviewed the specific examples cited in Patent Owner's Response. Even if the specific examples cited by Patent Owner were valid complaints, none of them, either alone or in combination, arise to such a level that we would discount the entirety of Dr. Weissman's testimony.

That does not mean that we found all of the testimony in this proceeding, whether provided by Dr. Weissman or Dr. Nelson, credible. In judging the credibility of experts, we focus on whether the witness offers corroboration and provides opinions that are consistent with the prior art, and the witness' cross-examination testimony. In our obviousness analysis below, we specially identify the relevant testimony provided by the parties' declarants that we find to be credible and not credible.

*F. Asserted Obviousness in View of Leong and AppleTalkBook*

Petitioner argues that claims 1–12 would have been obvious over Leong and AppleTalkBook. *See* Pet. 12–78.

*1. Summary of Leong*

Leong is titled "Method and Apparatus for Concurrent Data Processing" and is directed "to multi-tasking systems employing networked stand alone and independently operating micro-processing units each of which perform one or more tasks for manipulating electronic data." Ex. 1005, code (54), 1:7–11. Leong states it is an improvement on prior art

multi-tasking computing systems which used a CPU coupled to a plurality of processing units. *Id.* at 1:19–24, Fig. 1.

Leong Figure 2 is reproduced below.




Figure 2 "is a block diagram of a multi-tasking computing system." Ex. 1005, 2:14–16. Each processing unit 12 "is self controlled using a software application running on its own operating system" and "there is no central management and/or control unit." *Id.* at 2:43–48. The one or more processing units 12 determine which tasks need to be performed and post status information about the tasks on bulletin board 14. *Id.* at 4:9–16. Additionally, each processing unit 12 is capable of reading the tasks on bulletin board 14 and executing tasks that it is capable of performing. *Id.* at 3:6–18.

*2. Summary of AppleTalkBook*

AppleTalkBook describes itself as "a practical book" that "is about the process of choosing and using an AppleTalk network." Ex. 1006, 11. Relevant to this proceeding, AppleTalkBook discusses "dynamic configuration." *Id.* at 104–10. Dynamic configuration refers to the "self-configuring, 'automatic' nature of AppleTalk" and is characterized by each

device having the ability to pick its own unique network address and the ability of devices "to look up across the network and identify, at any given time, what resources are available." *Id.* at 105.

*3. Analysis of Claims 1–12*

Claim 1 recites, *inter alia*, "[1.5] wherein the processing system is configured to dynamically accept . . . an additional co-processor into the processing system *on a plug-and-play basis without any communication with the controller*." Ex. 1001, 14:28–32 (emphasis added). Independent claim 3, limitation [3.5] recites the same limitation. *Id*. at 14:61–65. We focus on the parties' arguments on the italicized language regarding "a plug-and-play basis without any communication with the controller."

*a) The Petition*

Petitioner argues that the combination of Leong and AppleTalkBook teaches limitations [1.5] and [3.5]. Pet. 35–41 (limitation [1.5]), 46 (arguing limitations [1.5] and [3.5] are "identical"). Specifically, Petitioner argues that Leong teaches the need for a "readily scalable" computer system in which the number of processing units available to execute a given task changes. *Id.* at 35–36 (citing Ex. 1005, 1:44–52, 4:30–61, 5:26–35; Ex. 1003 ¶¶ 105–106). According to Petitioner, a person having ordinary skill "would have . . . investigated techniques to introduce new processing units to Leong's bulletin board with as little configuration as possible to use the available processing capacity." *Id.* at 36–37 (citing Ex. 1005, 6:4–14; Ex. 103 ¶ 107).

Petitioner also argues that a person having ordinary skill in the art "would have been aware of techniques characterized as plug-and-play since those techniques were common before 2013" and "would have sought to implement such techniques in Leong's system to facilitate adding of

processing power." Pet. 37. Specifically, Petitioner argues that AppleTalkBook describes how an Apple Macintosh computer can be used to easily network computers and peripheral devices to make a local area network. *Id.* (citing Ex. 1003 ¶¶ 107; Ex. 1016, 10, 18 ("A History of Macintosh Networking" by Alan B. Oppenheimer)). According to Petitioner, a person having ordinary skill in the art "seeking to introduce new processing capacity to Leong's system would have considered and applied AppleTalkBook's teachings to Leong's system so there is no need for manual configuration to add new processing units." *Id.* at 38.

Petitioner describes the relevant teaching of AppleTalkBook and its combination with Leong as follows as follows:

> As taught by AppleTalkBook, implementing a dynamic configuration system like AppleTalk wouldn't require any coordination with a central management computer or program because no central management is needed. *The AppleTalk network leverages each device's ability to identify its own address and transmit a broadcast packet to identify available services.* This is consistent with Leong's decentralization teachings. As modified by AppleTalkBook's teachings regarding the AppleTalk protocol, the new processing unit in Leong's system would independently discover the bulletin board and obtain work.
>
> *In one implementation, Leong's modified processing units, when connected to a network transmit a broadcast packet seeking a bulletin board device type.* Any of Leong's bulletin boards receiving this broadcast packet would respond with its address. The newly added Leong processing unit would then connect to the responding bulletin board(s) and obtain tasks.

Pet. 38–39 (emphases added) (footnotes omitted) (citing Ex. 1006, 108–109, Figs. 4–11; Ex. 1003 ¶ 110; Ex. 1005, 5:66–6:3). According to Petitioner, this would have resulted in adding "the new processing unit 'on a plug-and-play basis'" without any "manual system configuration being necessary."

*Id.* at 39 (citing Ex. 1006, 104–109; Ex. 1003 ¶ 111). Petitioner further argues that the combination would have been a matter of routine skill to a person having ordinary skill in the art, who would have had a reasonable expectation for success in making the combination. *Id.* at 39–40 (citing Ex. 1003 ¶ 112; Ex. 1005, 5:21–25; Ex. 1006, 126–30).

*b) Patent Owner's Arguments*

Patent Owner argues that, "[c]ontrary to Petitioner's stated position, AppleTalkBook does not teach, disclose, or suggest 'dynamically accept[ing] the co-processor into the processing system on a plug-and-play basis without any communication with the controller.'" PO Resp. 30. Specifically, Patent Owner argues that "AppleTalkBook explicitly teaches a system that requires a newly added device to communicate with, and interrupt, all nodes on the network including any controller." *Id.*

Patent Owner describes AppleTalkBook as follows:

> According to AppleTalkBook, prior network protocols relied on "static configuration" with the disadvantage that "[b]efore the devices can communicate, an administrator is required to pick a unique node number, or address, for every device on the network and distribute that information around the Network. To a laser printer, they might assign node number 28." AppleTalk, however, implemented "dynamic configuration" which granted each device "the ability to pick its own unique network address." While it is correct that the dynamic configuration of the AppleTalk protocol can occur "without a system administrator assigning an address for the [resource] and distributing it to the network," this does not mean that such dynamic configuration occurs "without any communication with the controller."
>
> In order to implement the AppleTalk protocol and enable devices to set their own unique addresses (node numbers) and identify available resources on the AppleTalk network, the AppleTalk protocol employs a special packet of information

> known as the "broadcast packet." AppleTalkBook underscores that *"[t]he broadcast packet is critical* to the ease-of-use of AppleTalk; *it allows for simple configuration and reconfiguration of the network* without complicated administration tasks."
>
> Petitioner concedes the importance of broadcast packets, noting that "The AppleTalk network leverages each device's ability to identify its own address and transmit a broadcast packet to identify available services." Petitioner fails, however, to mention that according to AppleTalk, "[a] broadcast packet doesn't travel to one particular node, *but is sent to every node on the network*."

*Id.* at 31–33 (emphases added) (footnotes omitted) (quoting Ex. 1006, 109 then quoting *id.* at 108) (citing Ex. 1006, 104–10; Pet. 38).

Patent Owner argues that "AppleTalk with Leong requires the use of broadcast packets among all of Leong's processing units, including the 'surveying unit.[8]'" PO Resp. 33. According to Patent Owner, "a newly added processing unit must necessarily communicate with the surveying unit by transmitting a broadcast packet to the surveying unit. This communication would necessarily be read by every surveying unit (broadcast packets are read by all nodes on the network)." *Id.* (citing Ex. 1006, 108).

Patent Owner also argues that its description is consistent with how Petitioner describes AppleTalkBook:

> The above characterization is consistent with Petitioner's admission that "[i]n one implementation, Leong's modified processing units, when connected to a network *transmit a broadcast packet* seeking a bulletin board device type . . . . A [person having ordinary skill in the art] would have understood

---

[8] Petitioner maps Leong's processing unit that acts as a surveying unit to the claimed "controller." Pet. 24–28.

> this to be adding of the new processing unit '*on a plug-and-play basis*' because the devices are automatically configured . . . ." It bears repeating, however, that the "broadcast packet doesn't travel to one particular node, *but is sent to every node on the network*. In turn, every node receives a broadcast packet and, if appropriate, responds to it."

PO Resp. 34 (emphases added) (quoting Pet. 39 and then quoting Ex. 1006, 108).

*c) Petitioner's Reply Arguments*

Petitioner argues that Patent Owner's arguments "improperly physically incorporate Apple hardware/software into Leong's system and further posit that Petitioner's obviousness combination requires each co-processor [to] send identification information to the controller." Pet. Reply 19, *see also id.* at 15–19 (arguing that Petitioner does not propose physically incorporating AppleTalkBook into Leong's system).

Petitioner also argues that a person having ordinary skill in the art "wouldn't equate broadcasts and communications because broadcasts aren't two way." Pet Reply 19–20 (citing Ex. 1006, 42, 45, 83, 91, 93, 108–9; Ex. 1031 ¶¶ 17–19).

Petitioner also argues that AppleTalkBook teaches "zones dividing systems into logical groups." Pet. Reply 20–21 (citing Ex. 1006, 220; Ex. 1031 ¶ 20). According to Petitioner, a person having ordinary skill in the art "would've been motivated to avoid any communication with Leong's controller and co-processors by applying AppleTalkBook's zone teachings to group devices that 'work closely together.'" *Id.* at 21 (citing Ex. 1006, 220; Ex. 1031 ¶ 20). Petitioner argues that "[t]his would result in Leong's system having a zone for the controller(s) separate from the dynamically accepted co-processor(s), thereby limiting broadcast traffic emitted from the

dynamically added co-processors." *Id.* at 21–22 (citing Ex. 1006, 220; Ex. 1031 ¶ 20). Petitioner further argues that, "because of the zones, the broadcast packets emitted by the newly added co-processors only reach other newly added co-processors and the memory with the task pool." *Id.* at 22 (citing Ex. 1006, 220; Ex. 1031 ¶ 20). Petitioner further argues this would result in the newly added co-processor not broadcasting packets outside its zone or communicating with the controller. *Id.* (citing Ex. 1031 ¶ 20).[9]

*d) Our Analysis*

Based on the evidence and arguments in the fully developed record, we are not persuaded by Petitioner's argument that AppleTalkBook, either alone or in combination with Leong, teaches adding a co-processor "on a plug-and-play basis without any communication with the controller" as recited in independent claims 1 and 3. Instead, as set forth in detail below, the combination of the relevant teachings of AppleTalkBook and Leong results in the additional co-processor communicating with Leong's

[9] Although Patent Owner generally addresses this limitation in its Sur-reply, Patent Owner does not address Petitioner's arguments regarding "without any communication with the controller." *See* PO Sur-reply 8–18. Because Patent Owner does not have the burden of persuasion, except in limited circumstances not present here, we do not infer anything from Patent Owner's decision not to discuss its theory in the page limited Sur-reply. *See In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1376 (Fed. Cir. 2016) ("[I]t is inappropriate to shift the burden to the patentee after institution to prove that the patent is patentable." ); *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) ("In an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentee.").

controller by sending a broadcast message to all components when it is added.

Leong describes a multi-tasking computer system shown in Figure 2 below, as annotated by Petitioner.




Leong FIG. 2 (Annotated)

Pet. 26. Figure 2 "is a block diagram of a multi-tasking computing system." Ex. 1005, 2:14–16. The computation system includes bulletin board 14A (identified in red), which may reside in memory 14. Pet. 26; Ex. 1005, 3:9–11. The computation system also includes a plurality of processing units 12 (identified in yellow) and Petitioner identifies processing unit 1 (yellow dotted rectangle) as the surveying unit. Pet. 26; Ex. 1005, 2:42–46, 4:9–16. Petitioner identifies the processing unit that acts as a surveying unit as the "controller" recited in claim 1 and, for purposes of this Decision, we treat it as such. *See* Pet. 24–28.

AppleTalkBook describes using a dynamic configuration and name binding protocol to add additional elements to a network. Ex. 1006, 104; *see also id.* at 104–10 (describing same). AppleTalkBook describes using broadcast packets, which travel to all of the nodes on the network: "A

broadcast packet doesn't travel to one particular node, *but is sent to every node on the network*. In turn, every node receives a broadcast packet and, if appropriate, responds to it." *Id.* at 108 (emphasis added). According to AppleTalkBook, "*[t]he broadcast packet is critical* to the ease-of-use of AppleTalk; it allows for simple configuration and reconfiguration of the network without complicated administration tasks." *Id.* at 109 (emphasis added). For example, when a new device is connected and turned on, it sends a broadcast packet in order to ensure that it has a unique node number:[10]

> The other factor in simplifying network administration is the ability for a network device to pick for itself a unique address. How does this happen? Consider a simple event, like turning on your Macintosh. One of the first things that happens when you turn your Macintosh on is it looks up what node number it had last time it was turned on. Say that node number was 25. The first thing the Mac does, then, is send out a number of packets to node 25. The content of that packet essentially says, "Hey, I'm node number 25 and I'm about to come online. Is anybody else using node number 25?" If there is another machine that's using 25, then it responds back to say ". . . wait a minute, I'm already using that number."
>
> If some other device responds to say node 25 is in use, the Mac then picks a random number within the valid range and sends out another packet. This time it says "I'll take, for example, node number 50—is anybody using that?" The Mac keeps doing that until it has a node number it knows is unique. This guarantees-as *long as the devices are connected to net when you turn them on-a* unique node number.

*Id.* at 109–10 (emphasis added).

[10] "Node numbers are established by each device as they power up and are guaranteed to be unique on each network." Ex. 1006, 110.

Using broadcast packets—which AppleTalkBook makes clear are sent to every node—is consistent with Petitioner's description of how an additional processor would be added to its proposed Leong-AppleTalkBook combination:

> *In one implementation, Leong's modified processing units*, when connected to a network *transmit a broadcast packet* seeking a bulletin board device type. Any of Leong's bulletin boards receiving this broadcast packet would respond with its address. The newly added Leong processing unit would then connect to the responding bulletin board(s) and obtain tasks. A [person having ordinary skill in the art] would have understood this to be an adding of the new processing unit "on a plug-and-play basis" because AppleTalkBook teaches any configuration is automatically handled by the Apple-Talk devices (e.g., the new processing unit and the bulletin board). This would have resulted in no manual system configuration being necessary and the bulletin board automatically connecting to the added processing unit.

Pet. 39 (emphases added) (footnotes omitted) (citing Ex. 1006, 104–9; Ex. 1003 ¶ 111). The Petition does not describe any other process for adding additional processors in the proposed Leong-AppleTalkBook combination. Because the additional processor will send a broadcast packet to every node in the Leong system, including the processing unit (aka surveying unit) Petitioner identifies as the controller, the Leong-AppleTalkBook combination does not teach "wherein the processing system is configured to dynamically accept . . . an additional co-processor into the processing system on a plug-and-play basis without any communication with

the controller" as recited in limitations [1.5] and [3.5]. *See* Ex. 2007 ¶¶ 128, 132.[11]

We are not persuaded by Petitioner's argument that a new processor sending a transmission packet to all of the nodes, including the one mapped to the controller, is not a communication. *See* Pet. Reply 19–20. Although Dr. Weissman testifies that "a [person having ordinary skill in the art] wouldn't have understood that a networked device 'communicates' with a downstream device when that networked device transmits broadcast packets," he does not cite any references to support his opinion. Ex. 1031 ¶ 18. We find such unsupported testimony to be not credible and give it no weight. *See* 37 C.F.R 42.65(a).

Nor are we persuaded by Petitioner's argument that a node does not always sent a response to the transmission packet. *See* Pet. Reply 19–20. Claims 1 and 3 are explicit in requiring the addition of an additional processor "without *any* communication with the controller." Ex. 1001, 14:31–32, 14: 64–65 (emphasis added). The use of "any" precludes both communication with a response and communication without a response.

Nor do the various sections of the specification of the '004 patent cited by Petitioner support its argument. *See* Pet. Reply 19–20. Instead, the sections discuss how sending a message is a communication. For example, the specification describes how a message is sent during a communication channel phase: "During the *communication* channel phase, the cell receives the task and begins to execute the task." Ex. 1001, 6:28–30 (emphasis

[11] Because Dr. Nelson's testimony on this point is consistent with the AppleTalkBook's disclosure identified above, we find the testimony highly credible.

added). There is no discussion of a reply. *See id.* And although, as Petitioner argues, communication encompasses two-way discussions in which both parties send messages, Petitioner has not cited sufficient evidence limiting the claims to excluding only two-way communication. *See* Pet. Reply 19–20. Instead, the use of "any" before communication in the claims implies a broad interpretation of communication that encompasses a one-way communication that does not require a response.

We are also not persuaded by Petitioner's argument that Patent Owner is engaging in an improper bodily incorporation. *See* Pet. Reply 19. First, this is not a case where Patent Owner is relying on a secondary or unrelated feature. Rather, AppleTalkBook describes how sending the transmission packet is "critical" for the plug-and-play functionality. Ex. 1006, 109.

Second, Petitioner itself relies on the transmission packet in describing how its proposed combination of Leong and AppleTalkBook would work:

> As modified by AppleTalkBook's teachings regarding the AppleTalk protocol, the new processing unit in Leong's system would independently discover the bulletin board and obtain work.
>
> In one implementation, *Leong's modified processing units, when connected to a network transmit a broadcast packet seeking a bulletin board device type*. Any of Leong's bulletin boards receiving this broadcast packet would respond with its address. The newly added Leong processing unit would then connect to the responding bulletin board(s) and obtain tasks. A [person having ordinary skill in the art] would have understood this to be an adding of the new processing unit "on a plug-and-play basis" because AppleTalkBook teaches any configuration is automatically handled by the Apple-Talk devices (e.g., the new processing unit and the bulletin board). This would have resulted in no manual system configuration being necessary and the

> bulletin board automatically connecting to the added processing unit.

Pet. 38–39 (emphasis added) (footnote omitted) (citing Ex. 1003 ¶¶ 110–111; Ex. 1006, 104–09). Petitioner goes on to explain why AppleTalkBook's transmission packets are consistent with Leong's decentralized operation and would enable the addition of new processors:

> AppleTalkBook's teachings are also consistent with Leong's decentralization focus. As modified, there's no need to contact a central server to coordinate participation in the Leong system. *In an AppleTalk network, a specific broadcast packet identifies available network resources, and each device can determine its own address*. By applying AppleTalkBook's teachings, adding processing power would require no configuration and each of the processing units would automatically associate with the bulletin board(s). Adding processing units in this manner would advance Leong's scalability and fault tolerant goals because it doesn't require any centralized server or system administration. *Each newly added processing unit can instead associate with the bulletin board by transmitting a broadcast packet when work is desired*. This same process could occur for other processing units reconnecting or returning from idle state as well. *For example, after reconnecting or returning from an idle state, one of Leong's processing units would transmit a broadcast packet to refresh its connection with a bulletin board.* Further, should a Leong bulletin board fail or otherwise become unresponsive, applying AppleTalkBook's teachings would have allowed the modified processing units to reassociate themselves with other available and responsive bulletin boards. A [person having ordinary skill in the art] would have therefore found it to have been obvious to modify Leong's system with AppleTalkBook's teachings.

*Id.* at 40–41 (emphases added) (footnotes omitted) (citing Ex. 1005, 1:49–52, 5:26–35; Ex. 1003 ¶¶ 113–116). Having affirmatively argued that the transmission packet is necessary for the operation of its proposed

combination of Leong and AppleTalkBook, Petitioner cannot now persuasively argue that Patent Owner improperly relies on the same feature.

We are also not persuaded by Petitioner's reliance on zones in the Petitioner's Reply. *See* Pet. Reply 20–22. First, this is a new argument that is improperly raised for the first time in Petitioner's Reply and, therefore, is not entitled to consideration.

It is well-settled that Petitioner's Reply may only respond to arguments raised in Patent Owner's Response. *See* 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in the corresponding opposition, patent owner preliminary response, patent owner response, or decision on institution."). Our Trial Practice Guide further expounds upon this principle stating, "Petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g. to make out a prima facie case of unpatentability." Patent Trial and Appeal Board Consolidated Trial Practice Guide 73 (Nov. 2019)[12] (citing *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1077–78 (Fed. Cir. 2015)). The Trial Practice Guide further explains that "'[r]espond,' in the context of 37 C.F.R. § 42.23(b), does not mean proceed in a new direction with a new approach as compared to the positions taken in a prior filing," and "[w]hile replies and sur-replies can help crystalize issues for decision, a reply or sur-reply that raises a new issue or belatedly presents evidence may not be considered." *Id.* at 74. The U.S. Court of Appeals for the Federal Circuit has cautioned that we must disregard such inappropriately presented argument and evidence. *See Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369–70 (Fed. Cir. 2016) (Board did not abuse its discretion in refusing to consider reply brief

[12] *Available at* https://www.uspto.gov/TrialPracticeGuideConsolidated.

arguments advocating a "new theory" of unpatentability under 37 C.F.R. § 42.23(b)).

In this proceeding, Petitioner discusses AppleTalkBook in detail in the Petition. However, the Petition does not mention or describe the use of zones. *See* Pet. Nor is there a reference to the pages in AppleTalkBook that Petitioner relies on for how a zone operates (pages 220 and 221) in the Petition. *See* Pet. Nor is there any suggestion that Leong's old processors and the additional processors should be separated into different zones. *See* Pet. Because the use of zones to separate Leong's various processors is a new theory raised for the first time in Petitioner's Reply, it is improper and we will not consider it.

Second, even if we did consider Petitioner's belated zone theory, it is inconsistent with the teachings of AppleTalkBook. AppleTalkBook describes using zones for two purposes: "to divide devices on an internetwork into logical groups, and to limit internetwork traffic." Ex. 1006, 219–20. AppleTalkBook further describes that, although a zone can include multiple networks, "*all devices in a single network will belong to the same zone*." *Id.* (emphasis added). Because all of the elements of Leong are part of a single network (Tr. 18:1–4[13]), AppleTalkBook teaches away from Petitioner's theory of placing the different processors of Leong, whether old processors or newly added processors, into different zones.

Nor is Petitioner's argument sufficiently supported by Dr. Weissman's testimony. Although Dr. Weissman discusses the purpose of

---

[13] "JUDGE HOWARD: And just be clear, though, when you were talking about the network, do you consider all of Leong and all its -- its coprocessors as -- as part of a single network? MR. SIGLER: Yes, Your Honor."

zones in AppleTalkBook, he ignores the requirement in the same paragraph that states that "all devices in a single network will belong to the same zone." *Compare* Ex. 1006, 219–20 ("Zones serve two purposes: to divide devices on an internetwork into logical groups, and to limit internetwork traffic. Zones are defined only at network boundaries, but do not need to be contiguous. A zone may consist of many networks, but all devices in a single network will belong to the same zone."), *with* Ex. 1031 ¶ 20 (discussing purpose of zones and not addressing restrictions (citing Ex. 1006, 220–21)). Because Dr. Weissman's testimony does not address the limitations on setting up zones explicitly disclosed in AppleTalkBook, we do not find his testimony on this particular issue credible.

Accordingly, Petitioner has not shown by a preponderance of the evidence that claims 1 or 3 are unpatentable over the combination of Leong and AppleTalkBook. Similarly, because Petitioner does not address that deficiency with regard to claims 2 and 4–12, which depend, either directly or indirectly, from either claim 1 or 3, Petitioner has not shown by a preponderance of the evidence that claims 2 and 4–12 are unpatentable over the combination of Leong and AppleTalkBook. *See* Pet. 41–78.

### *G. Asserted Obviousness in View of Leong, AppleTalkBook, and Ethernet Specification*

Petitioner argues that claims 3–12 would have been obvious over Leong and Ethernet Specification. *See* Pet. 78–81.

#### *1. Summary of Ethernet Specification*

Ethernet Specification "contains the specification of the Ethernet, a local area network." Ex. 1007, i. Ethernet Specification "is intended as a design reference document, rather than an introduction or tutorial." *Id.*

Chapter 6 provides the "Ethernet Data Link Layer Specification." Ex. 1007, 19–44. Figure 6-1 is reproduced below.




Figure 6-1: Data Link Layer Frame Format

Ex. 1007, 20. Figure 6-1 depicts a "Data Link Frame Format" which includes a destination, source, type, data, and frame check sequence. *Id.*

2. *Analysis of Claims 3–12*

Petitioner argues that claim 3 would have been obvious over Leong, AppleTalkBook, and Ethernet Specification. Pet. 78–81. Specifically, Petitioner relies on Ethernet Specification for details of "the specific values set in each of those data frame fields, as set forth in elements 3.8–3.13." *Id.* at 79. Because Petitioner does not rely on Ethernet Specification for limitation [3.5], for the reasons discussed above in Section II.F.3.d, *supra*, Petitioner has not demonstrated by a preponderance of the evidence that

claim 3, along with dependent claims 4–12, are unpatentable over Leong, AppleTalkBook, and Ethernet Specification.

*H. Asserted Obviousness in View of (1) Leong, AppleTalkBook, and Bates and (2) Leong, AppleTalkBook, Ethernet Specification, and Bates*

Petitioner argues that claim 9 would have been obvious over (1) Leong, AppleTalkBook, and Bates and (2) Leong, AppleTalkBook, Ethernet Specification, and Bates. *See* Pet. 81–86.

*1. Summary of Bates*

Bates is titled "SPU [synergistic processing units] Task Manager for Cell Processor" and is generally directed "to parallel processing and more particularly to managing tasks in cell processors." Ex. 1008, code (54), ¶ 6.

Bates teaches "[c]ell processor task management in a cell processor having a main memory, one or more power processor units (PPU) and one or more synergistic processing units (SPU), each SPU having a processor and a local memory." Ex. 1007, code (57). Both the PPU and SPU can add tasks to the task queue. *Id*. ¶ 36. The SPUs can automatically get more tasks whenever they run out. *Id.* ¶ 42.

*2. Analysis of Claim 9*

Claim 9, which indirectly depends from claim 3, recites a processing system wherein "the task pool is configured to notify the controller upon completion of the first task; and the task pool is further configured to notify the controller upon completion of the second task." Ex. 1001, 16:23–27. Although Petitioner relies on Bates for the additional limitations set forth in claim 9, Petitioner does not rely on Bates to cure the deficiency discussed above for claim 3. Pet. 81–86. Because Petitioner does not rely on Bates for limitation [3.5], for the reasons discussed above in Section II.F.3.d, *supra*,

Petitioner has not demonstrated by a preponderance of the evidence that claim 9 is unpatentable over Leong, AppleTalkBook, and Bates, either with or without Ethernet Specification.

### *I. Patent Owner's Revised Contingent Motion to Amend*

Patent Owner's Revised Contingent Motion to Amend is contingent on the Board determining claims 1 and/or 2 are unpatentable. Mot. 1. Because, as discussed above, Petitioner has not demonstrated by a preponderance of the evidence that claims 1 or 2 of the '004 patent are unpatentable, Patent Owner's Motion to Amend claims 1 and 2 and replace them with proposed substitute claims 13 and 14 is *dismissed* as moot.

## III. CONCLUSION

For the foregoing reasons, we conclude that Petitioner has not demonstrated by a preponderance of the evidence the unpatentability of claims 1–12 of the '004 patent. Specifically, Petitioner has not demonstrated by a preponderance of the evidence that (1) claims 1–12 would have been obvious under 35 U.S.C. § 103(a) in light of Leong and AppleTalkBook; (2) claims 3–12 would have been obvious under 35 U.S.C. § 103(a) in light of Leong, AppleTalkBook, and Ethernet Specification; and (3) claim 9 would have been obvious under 35 U.S.C. § 103(a) in light of Leong, AppleTalkBook, and Bates or, alternatively, Leong, AppleTalkBook, Ethernet Specification, and Bates. Additionally, Patent Owner's Revised Contingent Motion to Amend is *dismissed* as moot.

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–12 | 103(a) | Leong, AppleTalkBook | | 1–12 |
| 3–12 | 103(a) | Leong, AppleTalkBook, Ethernet Specification | | 3–12 |
| 9 | 103(a) | Leong, AppleTalkBook, Bates | | 9 |
| 9 | 103(a) | Leong, AppleTalkBook, Ethernet Specification, Bates | | 9 |
| **Overall Outcome** | | | | 1–12 |

| Motion to Amend Outcome | Claim(s) |
|---|---|
| Original Claims Cancelled by Amendment | |
| Substitute Claims Proposed in the Amendment | 13, 14 |
| Substitute Claims: Motion to Amend Granted | |
| Substitute Claims: Motion to Amend Denied | |
| Substitute Claims: Not Reached | 13, 14 |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, Petitioner has not shown by a preponderance of the evidence that claims 1–12 of the ’004 patent are unpatentable;

FURTHER ORDERED, that Patent Owner’s Revised Motion to Amend is *dismissed* as moot; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Kyle K. Tsui
Joseph F. Edell
Fisch Sigler LLP
kyle.tsui@fischllp.com
joe.edell.ipr@fischllp.com

FOR PATENT OWNER:

Daniel R. Pote
Jennings Strouss & Salmon PLC
dpote@jsslaw.com

Michael K. Kelly
Beus Gilbert McGroder PLLC
mkelly@beusgilbert.com

Daniel J. Anderson
Ernst, Brown & Draper, PLLC
daniel.anderson@andersonpatents.com

Trials@uspto.gov
571.272.7822

Paper 53
Date: April 26, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

JUNIPER NETWORKS, INC.,
Petitioner,

v.

SWARM TECHNOLOGY LLC,
Patent Owner.

---

IPR2022-00141
Patent 10,592,275 B2

---

Before MICHAEL R. ZECHER, GREGG I. ANDERSON, and SCOTT B. HOWARD, *Administrative Patent Judges*.

ZECHER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
Dismissing Patent Owner's Revised Contingent Motion to Amend
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

Petitioner, Juniper Networks, Inc. ("Juniper"), filed a Petition requesting an *inter partes* review ("IPR") of claims 1–7 and 9–17 of U.S. Patent No. 10,592,275 B2 (Ex. 1001, "the '275 patent"). Paper 1 ("Pet."). Patent Owner, Swarm Technology LLC ("Swarm"), filed a Preliminary Response. Paper 10 ("Prelim. Resp."). With our authorization, Juniper filed a Preliminary Reply (Paper 11) and Swarm filed a Preliminary Sur-reply (Paper 12), each of which were narrowly tailored to address the real party in interest ("RPI") and 35 U.S.C. § 325(d) arguments raised in Swarm's Preliminary Response. Taking into account the arguments presented in Swarm's Preliminary Response, Juniper's Preliminary Reply, and Swarm's Preliminary Sur-reply, we determined that the information presented in the Petition established that there was a reasonable likelihood that Juniper would prevail with respect to challenging at least one of claims 1–7 and 9–17 of the '275 patent as unpatentable. Pursuant to 35 U.S.C. § 314, we instituted this IPR on May 16, 2022, as to all challenged claims and all grounds raised in the Petition. Paper 14 ("Institution Decision" or "Dec. on Inst.").

During trial, Swarm filed a Patent Owner Response (Paper 17, "PO Resp."), Juniper filed a Reply to the Patent Owner Response (Paper 20, "Pet. Reply"), and PNC filed a Sur-reply to the Reply (Paper 24, "PO Sur-reply"). With our authorization (Paper 41), Swarm filed an additional brief (Paper 46, "PO Addt'l Brief") and Juniper filed an additional brief (Paper 49, "Pet. Addt'l Brief"), each of which were tailored narrowly to address the following two issues: (1) whether the combination of Leong and AppleTalkBook teaches or suggest adding a co-processer "on a plug-and-

play basis without any communication with the controller," as recited in each of independent claims 1, 6, and 11 of the '275 patent; and (2) whether the deficiencies noted in the Final Written Decision in IPR2021-01445 equally apply to Juniper's proposed combination of Leong and AppleTalkBook as set forth in the Petition filed in this proceeding.

After receiving Preliminary Guidance (Paper 22) from the panel regarding Swarm's Contingent Motion to Amend (Paper 18), Swarm filed a Revised Contingent Motion to Amend (Paper 23), Juniper filed an Opposition to the Revised Contingent Motion to Amend (Paper 33), Swarm filed a Reply to the Opposition to the Revised Contingent Motion to Amend (Paper 44), and Juniper filed a Sur-reply to the Reply to the Opposition to the Revised Contingent Motion to Amend (Paper 48). In addition, an oral argument was held on March 16, 2023, and a transcript of the hearing is included in the record. Paper 52 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of claims 1–7 and 9–17 of the '275 patent. For the reasons we identify below, we hold that Juniper has not demonstrated by a preponderance of the evidence that all challenged claims are unpatentable. As a result, we *dismiss* Swarm's Revised Contingent Motion to Amend as moot.

### *A. Real Parties in Interest*

Juniper identifies itself as the only RPI. Paper 7, 1 (Juniper's Updated Mandatory Notices). Swarm identifies itself as the only RPI. Paper 9, 1 (Swarm's Updated Mandatory Notices).

*B. Related Matters*

The parties identify the following two district court cases involving the ’275 patent: (1) *Juniper Networks, Inc. v. Swarm Technology LLC*, No. 3:20-cv-03137-JD (N.D. Cal.); and (2) *Swarm Technology LLC v. Amazon.com, Inc.*, No. 2:21-cv-00438-DJH (D. Az.). Paper 7, 1; Paper 42, 3 (Swarm’s Updated Mandatory Notices). In addition to this proceeding, Swarm identifies the ’275 patent as the subject of IPR2022-00633 filed by Amazon.com, Inc. and Amazon Web Services, Inc. Paper 42, 3. Swarm also identifies the following patents or patent application that claim or may claim the benefit of the earliest effective filing date—January 25, 2013—of the ’275 patent: (1) U.S. Patent No. 9,852,004 B2 (“the ’004 patent”), (2) U.S. Patent No. 9,146,777 B2 (“the ’777 patent”), and (3) U.S. Patent Application No. 16/788,122. Paper 42, 3–4. Swarm identifies the ’004 patent as the subject of IPR2021-01445 and the ’777 patent as the subject of IPR2021-01317. Prelim. Resp. 3–4.

*C. The ’275 Patent*

The ’275 patent is titled “System and Method for Swarm Collaborative Intelligence Using Dynamically Configurable Proactive Autonomous Agents,” issued from U.S. Patent Application No. 15/852,480 (“the ’480 application”), filed on December 22, 2017. Ex. 1001, codes (54), (21), (22). The ’480 application is a continuation of U.S. Patent Application No. 14/340,332, filed on July 24, 2014—now the ’004 patent—which, in turn, is a continuation of U.S. Patent Application No. 13/750,696 (“the ’696 application”), filed on January 25, 2013—now the ’777 patent. *Id.* at code (63), 1:8–13.

The ’275 patent generally is directed to “parallel-process computing, and collaborative intelligence, and particularly relates to a processing architecture which involves autonomous co-processors (such as robotic vehicles, Internet of Things (IoT) components, and networked devices) configured to proactively retrieve tasks from a task pool populated by a central processing unit [(“CPU”)].” Ex. 1001, 1:16–24. According to the ’275 patent, “[c]omputer processors traditionally execute machine coded instructions serially. To run a plurality of applications concurrently, a single processor interleaves instructions from various programs and executes them serially, although from the user’s perspective the applications appear to be processed in parallel.” *Id.* at 1:49–54. The ’275 patent further states that “[t]rue parallel or multi-core processing, on the other hand, is a computational approach that breaks large computational tasks into individual blocks of computations and distributes them among two or more processors.” *Id.* at 1:54–57. “A typical multiprocessor system includes a [CPU] . . . and one or more co-processors. The CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Completed threads are reported to the CPU, which continues to distribute additional threads to the co-processors as needed.” *Id.* at 1:63–2:1.

The ’275 patent identifies a problem with using the CPU to control the distribution of tasks:

> Presently known multiprocessing approaches are disadvantageous in that a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from

> co-processors when a task is completed; and responding to other messages from co-processors. In addition, co-processors often remain idle while waiting for a new task from the CPU.

Ex. 1001, 2:1–10. The '275 patent purportedly addresses this problem using a system that reduces CPU management overhead, and "more effectively harnesses and exploits available co-processing resources." *Id.* at 2:11–15.

Figure 1 of the '275 patent is reproduced below.




FIG. 1

Ex. 1001, Fig. 1. Figure 1 "is a schematic block diagram of a parallel processing architecture including a CPU, memory, task pool, and a plurality of co-processors configured to communicate through a fabric." *Id.* at 3:64–67. More specifically, Figure 1 shows the following:

> a single or multi-core CPU 11 and one or more solidarity or co-processing cells 12A-12[n] configured to communicate with a task pool 13 through a cross-bar switching fabric 14. The solidarity cells 12 may also communicate with each other

> through the switching fabric 14 or through a separate cell bus (not shown).

*Id.* at 4:43–49. "CPU 11 may communicate with the task pool 13 directly or through the switching fabric 14. One or more memory units 15 each contain data and/or instructions." *Id.* at 4:49–52.

### *C. Challenged Claims*

Of the challenged claims, claims 1, 6, and 11 are independent. Independent claims 1 and 6 are each directed to "[a] collaborative intelligence system," whereas independent claim 11 is directed to "[a] method of using collaborative intelligence to achieve an objective." Ex. 1001, 14:24, 15:8, 16:25–26. Claims 2–5 directly depend from independent claim 1; claims 7, 9, and 10 directly or indirectly depend from independent claim 6; and claims 12–17 directly depend from independent claim 11. *Id.* at 14:50–15:7, 16:8–11, 16:17–24, 16:42–64. Independent claim 1, reproduced below, is illustrative of the challenged claims.

> 1. A collaborative intelligence system, comprising:
>
> a task pool;
>
> a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;
>
> a first co-processor configured to successively: proactively retrieve a first task from the task pool; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and
>
> a second co-processor configured to successively: proactively retrieve a second task from the task pool; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any

communication between the second co-processor and the controller;

wherein the collaborative intelligence system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller;

the plurality of first tasks and the plurality of second tasks are associated with a common objective;

the first and second co-processors autonomously work together in solidarity with the task pool to complete the common objective.

*Id.* at 14:24–49.

### *D. Asserted Prior Art References*

Juniper relies on the prior art references set forth in the tables below.

| **Name**[1] | **Reference** | **Dates** | **Exhibit No.** |
|---|---|---|---|
| Leong | U.S. Patent No. 6,006,249 | issued Dec. 21, 1999; filed Aug. 19, 1997 | 1005 |

[1] For clarity and ease of reference, we only list the first named inventor.

| Printed Publication | Exhibit No. |
|---|---|
| Mike Rogers & Virginia Bare, *Hands-on AppleTalk* (1989) ("AppleTalkBook"). All citations are to the page numbers added by Juniper in the bottom, right-hand corner of each page. | 1006 |
| The Ethernet: A Local Area Network, Data Link Layer and Physical Layer Specifications (Sept. 30, 1980) ("Ethernet Specification"). All citations are to the native pagination in the top, left-hand or the top, right-hand corner of each page. | 1007 |
| Dinesh Datla et al., *Wireless Distributed Computing: A Survey of Research Challenges*, IEEE Communications Magazine, Jan. 2012, at 144–52 ("Datla"). All citations are to the page numbers added by Juniper in the bottom, right-hand corner of each page. | 1019 |

*E. Asserted Grounds of Unpatentability*

Juniper asserts that claims 1–7 and 9–17 of the '275 patent would have been unpatentable based on the grounds set forth in the table below. Pet. 3, 12–86.

| Claim(s) Challenged | 35 U.S.C. §[2] | Reference(s)/Basis |
|---|---|---|
| 1–7, 9–17 | 103(a) | Leong, AppleTalkBook |
| 1–7, 9–17 | 103(a) | Leong, AppleTalkBook, Ethernet Specification |
| 16 | 103(a) | Leong, AppleTalkBook, Datla |
| 16 | 103(a) | Leong, AppleTalkBook, Ethernet Specification, Datla |

[2] The Leahy-Smith America Invents Act ("AIA") included revisions to 35 U.S.C. §§ 102, 103 that became effective on March 16, 2013. Because the '275 patent claims the benefit of the priority date of the '696 application, which was filed before March 16, 2013, and neither party has argued that the provisions of the AIA apply, we apply the pre-AIA versions of the statutory bases for unpatentability. *See* Ex. 1001, code (63).

Juniper supports its arguments in the Petition with the testimony of Dr. Jon B. Weissman (Ex. 1003 (Declaration of Dr. Weissman in support of Petition)) and Sylvia D. Hall-Ellis, Ph.D. (Ex. 1018 (Declaration of Dr. Hall-Ellis)). Juniper supports its arguments in the Reply with the testimony of Dr. Weissman. Ex. 1031 (Declaration of Dr. Weissman in support of the Reply). Swarm supports its arguments in the Patent Owner Response with the testimony of Dr. Brent Nelson. Ex. 2018 (Declaration of Dr. Nelson in support of Patent Owner's Response).

Swarm supports its argument in the Revised Contingent Motion to Amend with the testimony of Dr. Nelson. Ex. 2028 (Declaration of Dr. Nelson in support of Revised Contingent Motion to Amend). Juniper supports its arguments in the Opposition to the Revised Contingent Motion to Amend with the testimony of Dr. Weissman. Ex. 1039 (Declaration of Dr. Weissman in Support of Opposition to Revised Contingent Motion to Amend).

## II. ANALYSIS

### *A. Claim Construction*

In an IPR based on a petition filed on or after November 13, 2018, such as here, claim terms are construed using the same claim construction standard as in a civil action under 35 U.S.C. § 282(b). *See* 37 C.F.R. § 42.100(b) (2021). That is, claim terms generally are construed in accordance with their ordinary and customary meaning, as would have been understood by a person of ordinary skill in the art, in view of the specification and the prosecution history pertaining to the patent at issue. *See id.* The ordinary and customary meaning of a claim term "is its meaning to the ordinary artisan after reading the entire patent," and "as of the

effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313, 1321 (Fed. Cir. 2005) (en banc).

In its Petition, Juniper states that, "[f]or the purposes of this proceeding, [Juniper] construes all terms as having their ordinary and customary meanings." Pet. 11. In its Patent Owner Response, Swarm identifies sixteen claim terms where there apparently is a dispute between the parties regarding their "ordinary and customary" meaning. PO Resp. 11. Swarm, however, does not explain what it believes to be the ordinary and customary meaning of those claim terms in the context of the '275 patent, nor does Swarm explain how those claim terms are implicated by its arguments and evidence presented during trial. *See id.*

In any event, we need not construe any of the sixteen claim terms identified by Swarm in its Patent Owner Response because, when evaluating the merits of Juniper's Petition in light of the arguments and evidence presented by Swarm during trial, the scope and meaning of the sixteen claim terms are not in controversy. Accordingly, it is not necessary to reach those particular issues for purposes of deciding whether Juniper has met its burden of demonstrating by a preponderance of the evidence that the challenged claims are unpatentable. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

In our obviousness evaluation below, we address the scope and meaning of the claim term "communication," as this term pertains to the combined teachings of Leong and AppleTalkBook contested by the parties.

More specifically, we address below whether Juniper's proposed combination of Leong and AppleTalkBook teaches or suggests adding a co-processer "on a plug-and-play basis without any communication with the controller," as recited in each of independent claims 1, 6, and 11 of the '275 patent.

### *B. Obviousness Over the Combined Teachings of Leong and AppleTalkBook*

Juniper contends that claims 1–7 and 9–17 of the '275 patent are unpatentable under § 103(a) as obvious over the combined teachings of Leong and AppleTalkBook. Pet. 12–78. Juniper contends that the teachings of Leong and AppleTalkBook account for the subject matter of each challenged claim, and provides reasoning as to why a person of ordinary skill in the art would have been prompted to combine the teachings of these references. *Id.* During trial, Swarm contends that Leong alone or in combination with AppleTalkBook does not teach or suggest adding a co-processer "on a plug-and-play basis without any communication with the controller," as recited in each of independent claims 1, 6, and 11 of the '275 patent. PO Resp. 35–37; PO Sur-reply 6–8; PO Addt'l Brief 1–4.

Based on the fully developed trial record, we determine that Juniper has not shown by a preponderance of the evidence that claims 1–7 and 9–17 of the '275 patent are unpatentable as obvious over the combined teachings of Leong and AppleTalkBook. We begin our analysis with the principles of law that generally apply to an obviousness ground, an assessment of the level of skill in the art, followed by brief overviews of Leong and AppleTalkBook, and then we address the dispositive issue with respect to independent claims 1, 6, and 11.

*1. Principles of Law*

A claim is unpatentable under § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of non-obviousness (i.e., secondary considerations, such as commercial success, long-felt but unsolved needs, failure of others, etc.). *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). We analyze the asserted grounds based on obviousness with the principles identified above in mind.

*2. Level of Skill in the Art*

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham*, 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). The "person having ordinary skill in the art" is a hypothetical construct, from whose vantage point obviousness is assessed. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).

Factors pertinent to a determination of the level of ordinary skill in the art include "(1) the educational level of the inventor; (2) type of problems

encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). "Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case." *Id.* at 696–97.

In its Petition, Juniper argues that a person of ordinary skill in the art "would've had at least a bachelor's degree in computer science, electrical engineering, computer engineering, or a closely related field, and one or more years of experience in the design and development of parallel or distributed processing systems." Pet. 11. Juniper further argues that a person of ordinary skill in the art could, alternatively, "have a master's degree or similar post-graduate work in computer science, electrical engineering, computer engineering, or a closely related field, and less design and development experience." *Id*. (citing Ex. 1003 ¶¶ 60, 61). In its Patent Owner Response, Swarm appears to agree with Juniper because it repeats verbatim the same assessment of the level of ordinary skill in the art offered by Juniper in its Petition. *Compare* PO Resp. 11, *with* Pet. 11.

Accordingly, based on the fully developed trial record, we maintain our preliminary determination regarding the level of ordinary skill in the art. Dec. on Inst. 10. That is, we adopt Juniper's proposed formulation of the level of ordinary skill in the art, except that we delete the qualifier "or more" to eliminate vagueness as to the amount of practical experience. The qualifier expands the range indefinitely without an upper bound and,

therefore, precludes a meaningful indication of the level of ordinary skill in the art. We apply this modified version of the level of ordinary skill in the art in our obviousness evaluations below.

### 3. *Overview of Leong*

Leong is titled "Method and Apparatus for Concurrent Data Processing." Ex. 1005, code (54). Leong is directed "to multi-tasking systems employing networked stand alone and independently operating micro-processing units each of which perform one or more tasks for manipulating electronic data." *Id.* at 1:7–11. Leong discloses it is an improvement on prior art multi-tasking computing systems that used a CPU coupled to a plurality of processing units. *Id.* at 1:19–24, Fig. 1.

Leong Figure 2 is reproduced below.

FIG. 2




Figure 2 "is a block diagram of a multi-tasking computing system." Ex. 1005, 2:14–16. Each processing unit 12 "is self controlled using a software application running on its own operating system" and "there is no central management and/or control unit." *Id.* at 2:43–48. One or more processing units 12 labeled a "surveying unit" determine which tasks need to

be performed and post status information about the tasks on bulletin board 14A. *Id*. at 4:9–16. Additionally, each processing unit 12 is capable of reading the tasks on bulletin board 14A and executing tasks that it is capable of performing. *Id*. at 3:6–18.

### *4. Overview of AppleTalkBook*

AppleTalkBook describes itself as "a practical book" that "is about the process of choosing and using an AppleTalk network." Ex. 1006, 11. Of particular importance to this proceeding, AppleTalkBook discusses "dynamic configuration." *Id.* at 104–10. Dynamic configuration refers to the "self-configuring, 'automatic' nature of AppleTalk" and is characterized by each device having "the ability to pick its own unique network address," and the ability of these devices "to look up across the network and identify, at any given time, what resources are available." *Id.* at 105.

AppleTalkBook discloses using broadcast packets "in browsing the network and identifying resources." Ex. 1006, 108. According to AppleTalkBook, "[a] broadcast packet . . . is sent to every node on the network," which, "[i]n turn, [results in] every node receiv[ing] a broadcast packet and, if appropriate, respond[ing] to it." *Id.* AppleTalkBook makes clear that "[t]he broadcast packet is critical to the ease-of-use of AppleTalk; it allows for simple configuration and reconfiguration of the network without complicated administration tasks." *Id.* at 109.

### *5. Claims 1, 6, and 11*

Independent claim 1 recites, in relevant part, "wherein the collaboration intelligence system is configured to dynamically accept . . . an additional co-processor into the processing system *on a plug-and-play basis without any communication with the controller*." Ex. 1001, 14:40–44

(emphasis added). Independent claims 6 and 11 recite similar limitations. *Id.* at 15:30–34, 16:30–34. Our analysis below focuses on the parties' arguments directed to the italicized language regarding "on a plug-and-play basis without any communication with the controller."

*a. Adding a co-processor "on a plug-and play basis without any communication with the controller"*

In its Petition, Juniper contends that the combined teachings of Leong and AppleTalkBook account for this limitation. Pet. 32–38. More specifically, Juniper argues that Leong teaches the need for a "readily scalable" computer system in which the number of processing units available to execute a given task changes. *Id.* at 32–33 (quoting Ex. 1005, 1:49–52) (citing Ex. 1005, 1:44–48, 4:30–5:11, 5:26–35, 6:62–7:34; Ex. 1003 ¶¶ 105–07). According to Juniper, a person of ordinary skill in the art "would've investigated techniques to introduce new processing units to Leong's bulletin board with minimal configuration, even if the new units have different hardware or software configurations." *Id.* at 33 (citing Ex. 1005, 6:4–14; Ex. 1003 ¶ 108). Juniper further argues that a person of ordinary skill in the art would have considered using plug-and-play technology, like that taught in AppleTalkBook, "to avoid the need for manual configuration when adding new processing units." *Id.* at 34–35 (citing Ex. 1003 ¶ 111); *see also* Ex. 1006, 104–105, 108–109 (discussing how AppleTalkBook works); Pet. 34–38 (arguing the same).

Juniper describes the relevant teachings of AppleTalkBook and its combination with Leong as follows:

> AppleTalkBook teaches implementing AppleTalk's dynamic configuration system wouldn't require any coordination with a central management computer or program because *each*

> *AppleTalk device obtains its own address and transmits a broadcast packet to identify available services*. This is consistent with Leong's decentralization teachings. As modified by AppleTalkBook's teachings regarding the AppleTalk protocol, a new processing unit in Leong's system would independently discover the bulletin board and obtain work. Leong, as modified by AppleTalkBook, therefore discloses a system configured to dynamically accept first and second co-processors, along with additional co-processors, on a plug-and-play basis without any communication with the controller (e.g., [Leong's] co-processor acting as the surveying agent).
>
> *In one implementation, Leong's modified processing units, when connected to the network, transmit a broadcast packet seeking bulletin board device type, as taught by AppleTalkBook*. Any bulletin board device receiving the broadcast packet would respond with its address. The newly added Leong processing unit would connect and obtain tasks.

Pet. 35–36 (emphases added) (footnotes omitted) (citing Ex. 1005, 5:66–6:3; Ex. 1006, 108–09; Ex. 1003 ¶ 111) According to Juniper, this would have resulted in "adding a new processing unit" to Leong's multi-tasking computing system "'on a plug-and-play basis' because the devices are automatically configured (e.g., the new processing unit and the bulletin board), as AppleTalkBook teaches." *Id.* at 36 (quoting Ex. 1001, 14:43–44) (citing Ex. 1006, 104–09; Ex. 1003 ¶ 112). Juniper further argues that applying AppleTalkBook's plug-and-play functionality to Leong's standard Ethernet network "would've been an exercise of routine skill by a [person of ordinary skill in the art] with a reasonable expectation of success." *Id.* at 36–37 (citing Ex. 1005, 5:21–25; Ex. 1006, 126–30; Ex. 1003 ¶ 113).

In its Patent Owner Response, Swarm contends that Leong alone does not teach or suggest adding a co-processor "on a plug-and-play basis without any communication with the controller," as recited in each of independent

claims 1, 6, and 11. PO Resp. 35–37. Swarm's arguments, however, focus on Leong's purported disclosure of reducing the number of net processing units and how Juniper purportedly misunderstood Leong's use of the phrase "readily scalable." *Id.* at 35–37 (citing Ex. 1005, 5:29–36; Ex. 1003 ¶ 105; Ex. 2018 ¶ 138). Swarm does not address squarely Juniper's position that adding an additional co-processor in the proposed combination of Leong and AppleTalkBook requires the use of broadcast packets. *See id.*

In it Reply, Juniper maintains its position set forth in the Petition that "AppleTalkBook describes network-connected devices that transmit broadcast packets to implement plug-and-play functionality." Pet. Reply 18 (citing Pet. 36–38). In addition, Juniper directs us to the testimony from Swarm's declarant, Dr. Nelson, that the "example implementation [set forth in the Petition] involving broadcast packets wouldn't satisfy the claims," but alleges that Dr. Nelson withdrew this testimony during cross-examination. *Id.* at 22 (citing Ex. 2018 ¶¶ 106–113; Ex. 1029, 17:5–18:6, 20:10–18). Juniper then argues that a person of ordinary skill in the art would have understood different techniques for limiting broadcast packets, such as by using the zones taught by AppleTalkBook. *Id.* (citing Ex. 1006, 220). Relying on the testimony of its declarant, Dr. Weissman, Juniper asserts that "[s]uch zones provide network optimization by limiting broadcast packet transmission to those devices working closely together." *Id.* (citing Ex. 1031 ¶ 36). Moreover, Juniper asserts that Dr. Weissman explains how a person of ordinary skill in the art would have understood that "downstream devices, like Leong's [surveying unit], often filter and drop broadcast packets to reduce CPU load." *Id.* With this in mind, Juniper argues that, even under Dr. Nelson's allegedly withdrawn theory, a person of ordinary

skill in the art would have appreciated "the benefits of having Leong's [multi-tasking computing] system accept co-processors on a plug-and-play basis while using zones or filtering so broadcast packets don't reach the [surveying unit]." *Id.*

In its Sur-reply, Swarm reiterates its contention that Leong alone does not teach or suggest adding a co-processor "on a plug-and-play basis without any communication with the controller," as recited in each of independent claims 1, 6, and 11. PO Sur-reply 6–8. Once again, Swarm does not address squarely Juniper's position that adding an additional co-processor in the proposed combination of Leong and AppleTalkBook requires the use of broadcast packets. *See id.*

After the filing of Swarm's Sur-reply on December 12, 2022, but before the oral argument was held on March 16, 2023, we entered a Final Written Decision in related IPR2021-01445 involving claims 1–12 of the '004 patent. *Juniper Networks, Inc. v. Swarm Technology LLC*, IPR2021-01445, Paper 62 (PTAB Feb. 7, 2023) (Final Written Decision). The very next day, on February 8, 2023, we entered an Order in this proceeding explaining that "the '004 patent and the '275 patent are continuations that share the same specification and similar claims," and there are "overlapping issues raised by the parties in IPR2021-01445 and this proceeding." Paper 41, 3. Based on our authority under 37 C.F.R. § 42.20(d), we requested that the parties provide additional briefing on the following two issues:
"(1) whether the combination of Leong and AppleTalkBook teaches or suggest adding a co-process[or] 'on a plug-and-play basis without any communication with the controller,' as recited in each of independent claims 1, 6, and 11 of the '275 patent; and (2) whether the deficiencies noted in the

Final Written Decision in IPR2021-01445 equally apply to Juniper's proposed combination of Leong and AppleTalkBook as set forth in the Petition filed in this proceeding." Paper 41, 3. Per our request, the parties filed additional briefs narrowly tailored to address these two issues. PO Addt'l Brief; Pet. Addt'l Brief. We also allowed the parties to raise the arguments presented and developed in their additional briefing at the oral argument.

As an initial matter, we reviewed and considered the parties' arguments and evidence presented in the Petition, Patent Owner Response, Reply, Sur-reply, and additional briefing with respect to adding a co-processor "on a plug-and-play basis without any communication with a controller," as recited in each of independent claims 1, 6, and 11 of the '275 patent, but we are not persuaded we should alter our analysis from the Final Written Decision in IPR2021-01445 that addresses the same limitation recited in each of independent claims 1 and 3 of the '004 patent. That is, we find that the combination of Leong and AppleTalkBook does not teach or suggest adding a co-processor "on a plug-and-play basis without any communication with the controller," as recited in each of independent claims 1, 6, and 11. We expressly adopt and incorporate by reference our analysis from the Final Written Decision and the Decision Denying Petitioner's Request for Rehearing of the Final Written Decision in the IPR2021-01145, and do not repeat it in full here. IPR2021-01445, Paper 62 at 21–30, Paper 64 at 6–14. We, however, take this opportunity to provide additional reasoning in support of our prior determination in IPR2021-01445 based on the arguments presented by the parties in the additional briefing filed in this

proceeding. We address the arguments presented by the parties in the additional briefing in turn.

*i. The record in this proceeding is essentially the same as the record in IPR2021-01445 and, therefore, justifies the same outcome*

In its additional brief, Swarm contends that the arguments and evidence advanced by Juniper in this proceeding to address adding a co-processor "on a plug-and-play basis without any communication with a controller," as recited in each of independent claims 1, 6, and 11 of the '275 patent, are the same as those advanced by Juniper in IPR2021-01445 to address the same limitation recited in each of independent claims 1 and 3 of the '004 patent. PO Addt'l Brief 1–3 (*comparing* Pet. 35–37, *with* IPR2021-01445, Paper 1 at 38–41). Stated differently, like the proposed combination of Leong and AppleTalkBook asserted by Juniper against the challenged claims of the '004 patent, the proposed combination of Leong and AppleTalkBook asserted by Juniper against the challenged claims of the '275 patent "expressly require AppleTalk broadcast packets to facilitate the integration/configuration of co-processors on a plug-and-play basis." *Id.* at 3.

Swarm then argues that, when considering the "critical nature of broadcast packets for network configuration as highlighted by AppleTalkBook," Juniper's proposed combination of Leong and AppleTalkBook clearly requires that "a newly added processing unit must necessarily communicate with [Leong's] surveying unit because broadcast packets are read by all nodes on the network." PO Addt'l Brief 3. As a result, Swarm concurs with our determination in the Final Written Decision in IPR2021-01445 that "AppleTalk's broadcast packets constitute a

communication with or without a response, in part because both [Juniper] and [AppleTalkBook] expressly confirm that the broadcast packets are not only *sent to every node*, but they are also *received by every node*." *Id.* at 4 (citing Pet. 35–37; IPR2021-01445, Paper 4 at 38–40).

In response, Juniper contends that the record in this proceeding "materially differs" from the record in IPR2021-01445 and "more fully supports [Juniper's] interpretation of 'without any communication,'" as claimed. Pet. Addt'l Brief 1. During cross-examination of Swarm's declarant, Dr. Nelson, Juniper alleges that he offered "unprompted" testimony that, in the context of AppleTalkBook, communication does not occur when a broadcast is sent but a particular processor does not respond. *Id.* a 1–2 (citing 1029, 17:14–18:2). Juniper further alleges that, when Dr. Nelson was questioned about his cross-examination testimony on this particular issue, he confirmed that "'communication' requires two-way messaging." *Id.* at 2 (citing Ex. 1029, 20:12–18, 22:13–18). According to Juniper, Dr. Nelson's cross-examination testimony is consistent with how a person of ordinary skill in the art would have understood "communication" in the context of the '275 patent. *Id.* Juniper also argues that its declarant, Dr. Weissman, confirms that "communication" in the context of the '275 patent requires two-way messaging (i.e., a transmission and a response). *Id.* (citing Ex. 1003 ¶¶ 111, 112; Ex. 2021, 247:2–7). Juniper asserts that Swarm cannot disavow Dr. Nelson's cross-examination testimony that communication requires two-way messaging only now that it has the Final Written Decision in IPR2021-01445 in hand. *Id.* at 3.

With one exception that applies to Dr. Nelson's cross-examination testimony, we agree with Swarm that the arguments and evidence advanced

by Juniper in IPR2021-01445 are essentially the same as the arguments and evidenced advanced in this proceeding. There is no dispute that Juniper asserted the same combination of Leong and AppleTalkBook against both the challenged claims of the ’004 patent and the challenged claims of the ’275 patent. More importantly, we agree with Swarm that each of Juniper’s proposed combination of Leong and AppleTalkBook “expressly require AppleTalk broadcast packets to facilitate the integration/configuration of co-processors on a plug-and-play basis.” *Compare* Pet. 35–36, *with* IPR2021-01445, Paper 1 at 38–39. Given that Juniper’s formulation of its proposed grounds common to both proceedings is based, in relevant part, on the same exact disclosures in Leong and AppleTalkBook, we see no reason to deviate from our analysis in the Final Written Decision in IPR2021-01445.

Turning to the cross-examination testimony of Swarm’s declarant, Dr. Nelson, we find that his testimony on this particular issue should be accorded little to no weight for two reasons. First, Dr. Nelson offers inconsistent testimony in this proceeding. On the one hand, Dr. Nelson offers the following testimony in his declaration supporting the Patent Owner Response:

> a [person of ordinary skill in the art] would understand that the combination of [AppleTalkBook] with Leong requires the use of broadcast packets among all of Leong’s processing units, including the “surveying unit.” As a result, a newly added processing unit would necessarily communicate with [Leong’s] surveying unit by transmitting a broadcast packet to the surveying unit. This communication would necessarily be read by the surveying unit (broadcast packets are read by all the nodes on the network).

Ex. 2018 ¶ 108. This testimony, at the very least, implies that communication simply requires a message to be sent and received (i.e., that communication includes one-way communication).

On the other hand, during Dr. Nelson's cross-examination, he offers the following testimony:

> [w]hen – in the context of AppleTalkBook, there's two cases of broadcast that goes on. *And in the first case, the broadcast is sent but a particular processor does not respond. And I would classify that as not a communication between the broadcaster and the particular process*.
>
> The second case is when a broadcast occurs and a particular processor does respond. And I would classify that as a communication between the broadcaster and the particular processor. And that would be in the context of AppleTalk.

Ex. 1029, 17:14–18:2 (emphasis added); *see also id.* at 20:10–18, 22:13–16 (testifying to the same). Dr. Nelson appears to have changed his testimony without prompting to indicate that only two-way messaging was a communication in the context of AppleTalkBook (i.e., that a communication requires both the broadcast message and a response to that message). For this reason alone, we decline to credit Dr. Nelson's cross-examination testimony as providing sufficient support for Juniper's position that "communication" in the context of the '275 patent requires two-way messaging (i.e., a transmission and a response).

Second, the aforementioned cross-examination testimony from Dr. Nelson appears to be directed to what qualifies as a communication in the context of AppleTalkBook. Ex. 1029, 17:14–18:2 (explicitly stating "in the context of AppleTalkBook" before discussing "two cases of broadcast," and concluding with "that would be in the context of AppleTalk").

Dr. Nelson, however, does not address the pivotal issue—namely, what qualifies as a "communication" in the context of the of the '275 patent. Absent any references to the intrinsic record, such as the plain language of the challenged claims, the specification of the '275 patent, or the prosecution history of the '275 patent, we give Dr. Nelson's cross-examination testimony that, in the context of AppleTalkBook, a broadcast message without a response does not qualify as a communication little to no weight.[3] Put simply, Dr. Nelson's cross-examination testimony as to how a person of ordinary skill in the art would have interpreted the "communication" in the context of AppleTalkBook has little to no bearing on how the same term

[3] In its additional brief, Swarm directs us to the same declaration testimony from Dr. Nelson in support of the Patent Owner Response and his same cross-examination testimony, but asserts that, "[w]hile Dr. Nelson acted in good faith, his clarification during his deposition lacked any citation or reference, and should therefore be accorded little weight." PO Addt'l Brief 9. This strikes us as unusual. Swarm is the party who offered Dr. Nelson as its declarant in this proceeding, yet requests that we don't credit his cross-examination testimony. Whereas Juniper didn't offer Dr. Nelson as a declarant in this proceeding, yet requests that we credit the same cross-examination testimony. Nevertheless, as we explain below, because the intrinsic record (e.g., the plain language of the challenged claims and the specification of the '275 patent) is sufficient to determine the scope and meaning of "communication" as that term is used in the context of the '275 patent, we need not rely on Dr. Nelson's conclusory, unsupported assertions regarding what constitutes communication. *See Phillips*, 415 F.3d at 318 (stating that "a court should discount expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent'" (quoting *Key Pharms. v. Hercon Labs Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).

should be interpreted by a person of ordinary skill in the art in the challenged claims.

*ii. The ’275 patent does not limit "communication" to two-way messaging*

In its additional brief, Juniper contends that the ’275 patent uses "communication" to describe two-way messaging. Pet. Addt'l Brief 4. More specifically, Juniper argues that the ’275 patent "describes a sequence of events including a 'poll phase' and an acknowledge message." *Id.* (quoting Ex. 1001, 6:33–43) (citing Ex. 2042 ¶ 19 (discussing the same disclosure in the ’004 patent)). In addition, Juniper argues that, when the ’275 patent discusses the "communication channel" phase, it states that "the cell receives the task." *Id.* (quoting Ex. 1001, 6:43–45) (citing Ex. 2042 ¶ 19 (discussing the same disclosure in the ’004 patent)). According to Juniper, the disclosures in the ’275 patent of "[t]he acknowledgement message and receipt of the task confirm the [’275] patent's usage of 'communication' means two-way messaging, with an outgoing transmission and a response." *Id.* Juniper further asserts that the negative limitation in the claims of "without any communication with the controller" "excludes such communication, but doesn't implicate general broadcasts that don't elicit a response from the controller." *Id.* at 4–5.

We begin our analysis with the plain language of independent claims 1, 6, and 11. Each of these independent claims explicitly requires adding a co-processor "without *any* communication with the controller." Ex. 1001, 14:40–44, 15:30–34, 16:30–34 (emphasis added). As we explained in the Final Written Decision in IPR2021-01445, the use of the word "any" precludes both communication with a response and communication without a response. IPR2021-01445, Paper 62 at 25.

Turning to the disclosure in the specification of the ’275 patent cited by Juniper, we do not agree that those disclosures support limiting “communication” to only two-way messaging. The relevant passage in the specification states the following:

> Each cell 12 [is] configured to perform one or a plurality of specialized tasks, as illustrated in the following sequence of events. During *a poll phase* each cell periodically sends an agent to the task pool until a matching task is found. To facilitate this matching, both the cell and the task pool may be equipped with a transceiver. In the case of the task pool, the transceiver maybe [sic] located in the task pool itself or in the switching fabric to which the task pool is connected. When a task match is found within a task pool, the task pool transmits *an acknowledgement* to the cell. The next step is *the “communication channel” phase*. During the communication channel phase, *the cell receives the task* and begins to execute the task. In one implementation, once the first task is completed, the communication channel is maintained so that the solidar[it]y cell can fetch another task without having to repeat the “poll” and “acknowledge” phase.

Ex. 1001, 6:33–48 (emphases added). We fail to see how each cell 12 transmitting an acknowledgement message during the “poll phase” or each cell 12 receiving a task during the “communication channel” phase implicates adding a co-processor “on a plug-and-play basis,” as required by each of independent claims 1, 6, and 11. Regardless, we do not view the cited disclosure in the specification as limiting the “communication” required by these independent claims to only two-way messaging. Instead, we view the cited disclosure as merely examples of how each cell 12 may communicate with the task pool. The U.S. Court of Appeal for the Federal Circuit “has repeatedly ‘cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.’” *Williamson v. CitrixOnline, LLC*, 792 F.3d 1339, 1346–47 (Fed. Cir. 2015)

(quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002)). Stated differently, these two examples of transmitting an acknowledgment message and receiving a task in the specification, by themselves, are not enough to prevent a broad interpretation of "communication" that includes, among other things, one-way messaging that does not require a response.

In its additional brief, Juniper urges us to provide an express construction for the claim term "communication" as that term is used in the context of the '275 patent. Pet. Addt'l Brief 5–6. Juniper alleges that we declined to construe expressly any claim terms in the Final Written Decision in IPR2021-01445, yet the outcome of that case turned on the construction of "communication," and how Juniper's proposed combination of Leong and AppleTalkBook failed to account properly for that term. *Id.* at 6.

Contrary to Juniper's characterization of our Final Written Decision in IPR2021-01445, we took a position as to the scope and meaning of "communication" as that term is used in the context of the '004 patent. Similar to its Petition filed in this proceeding, Juniper's petition in IPR2021-01445 did not identify any claim terms in the '004 patent that required an express construction. IPR2021-01445, Paper 1 at 11–12; *see also SAS Institute Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) (stating that a petitioner is "master of its compliant"). As a result, Juniper correctly notes that we did not construe expressly any claim terms in that Final Written Decision under the header "*Claim Construction*." IPR2021-01445, Paper 62 at 11–12.

Juniper, however, fails to mention that we addressed the scope and meaning of the claim term "communication," as this term pertains to the

combined teachings of Leong and AppleTalkBook contested by the parties. IPR2021-01445, Paper 62 at 25–26. Indeed, when addressing the explicit requirement in each of independent claims 1 and 3 of the ’004 patent of adding a co-processor “without any communication with the controller,” we stated that “the use of ‘any’ precludes both communication with a response and communication without a response.” *Id.* at 25. After addressing various disclosures in the specification of the ’004 patent, we also stated that “the use of ‘any’ before communication in the claims implies a broad interpretation of communication that encompasses a one-way communication that does not require a response.” *Id.* at 26.

Together, these two statements make clear that our intent was to broadly construe the claim term “communication” in the context of the ’004 patent as including, among other things, one-way messaging that does not require a response. As we explain above, we see no reason to deviate from construing the claim term “communication” in the ’275 patent in the same way, especially because it complies with the Federal Circuit’s instruction to construe “communication” consistently across the ’004 patent and the ’275 patent. *See, e.g., SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015) (stating that, “[w]here multiple patents ‘derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents’” (quoting *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Circ. 2005)).

*iii. Juniper’s downstream and zone theories are belated, but nevertheless, they are not persuasive*

Beginning with Juniper’s downstream theory, in its Reply Juniper relies on Dr. Weissman’s testimony to argue that a person of ordinary skill

in the art would have understood that "downstream devices, like Leong's [surveying unit], often filter or drop broadcast packets to reduce CPU load." Pet. Reply 22 (citing Ex. 1031 ¶ 36). In its additional briefing, Swarm contends that Juniper improperly raised its downstream theory for the first time in the Reply. PO Addt'l Brief 5. In any event, Swarm asserts that we should not credit Dr. Weissman's supporting testimony on this particular issue because, similar to our analysis of the same issue in the Final Written Decision in IPR2021-01445, his testimony is conclusory and unsupported. *Id.*

As an initial matter, we agree with Swarm that Juniper's downstream theory is a new argument raised for the first time in the Reply. At no point in its Petition does Juniper explain how Leong's surveying unit may be capable of filtering or dropping broadcast packets to reduce CPU load. *See* Pet. 35–38. Nor does Juniper attempt to explain why we should consider this belated argument in its additional briefing. *See* Pet. Addt'l Brief.

Our Trial Practice Guide is clear—"[Juniper] may not submit new evidence or argument in reply that it could have presented earlier, e.g. to make out a prima facie case of unpatentability." Patent Trial and Appeal Board Consolidated Trial Practice Guide 73 (Nov. 2019)[4] (citing *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1077–78 (Fed. Cir. 2015)). The Trial Practice Guide further explains that "'[r]espond,' in the context of 37 C.F.R. § 42.23(b), does not mean proceed in a new direction with a new approach as compared to the positions taken in a prior filing," and "[w]hile replies and

---

[4] *Available at* https://www.uspto.gov/TrialPracticeGuideConsolidated.

sur-replies can help crystalize issues for decision, a reply or sur-reply that raises a new issue or belatedly presents evidence may not be considered." *Id.* at 74. The Federal Circuit has cautioned that we must disregard such inappropriately presented argument and evidence. *See Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369–70 (Fed. Cir. 2016) (holding that the Board did not abuse its discretion in refusing to consider reply brief arguments advocating a "new theory" of unpatentability under 37 C.F.R. § 42.23(b)).

In any event, even if we were to consider Juniper's downstream theory, we do not find this belated argument persuasive. To support its downstream theory, Juniper relies on the Dr. Weissman's testimony that "[t]echniques for avoiding [broadcast packets flooding the network] are well known in the art and may include downstream devices dropping, or filtering, broadcast packets to minimize processing load." Ex. 1031 ¶ 36. We decline to credit this testimony for two reasons. First, apart from generically asserting that dropping or filtering broadcast packets minimizes processing load, Dr. Weissman does not attempt to explain how Leong's surveying unit would be considered a "downstream device" from a newly added co-processor, much less why Leong's surveying unit would need to filter or drop a broadcast packet sent by the newly added co-processor. Second, Dr. Weissman does not cite to any underlying evidence to support his testimony. *See* 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight.").

Turning to Juniper's zone theory, in its Reply Juniper argues that a person having ordinary skill in the art would have understood different

techniques for limiting broadcast packets, such as by using the zones taught by AppleTalkBook. Pet. Reply 22 (citing Ex. 1006, 220). Relying on the testimony of Dr. Weissman, Juniper asserts that "[s]uch zones provide network optimization by limiting broadcast packet transmission to those devices working closely together." *Id.* (citing Ex. 1031 ¶ 36).

In its additional briefing, Swarm contends that Juniper improperly raised its zone theory for the first time in the Reply. PO Addt'l Brief 5. Swarm argues that the "Petition never mentions zones," nor does it cite to the pages of AppleTalkBook that discuss using zones. *Id.* Swarm also argues that the Petition never suggests dividing Leong's processing units into separate networks, but instead states that "Leong discloses [its] processing units are computers coupled over a standard network." *Id.* (quoting Pet. 23) (citing Pet. 24 (presenting an annotated version of Leong's Fig. 2 illustrating direct network coupling between the surveying unit and the other processing units)). In any event, Swarm contends that, even if we were to consider Juniper's zone theory, it fails for the same reasons discussed in the Final Written Decision in IPR2021-01445. *Id.* That is, Swarm asserts that the processing units in Leong's multi-tasking computing system are part of a single network. *Id.* (citing Pet. 24; Ex. 2041, 18:1–4).

In response, Juniper contends that its zone theory was properly raised in the Reply for the following reasons: (1) Swarm did not construe "without any communication" in its Patent Owner Response; (2) Dr. Nelson provides declaration testimony that general broadcast packets that don't receive responses constitute a communication; (3) Juniper replies on AppleTalkBook's discussion of zones to explain, and contradict Dr. Nelson's declaration testimony, that not every node would necessarily

receive broadcast packets; and (4) to explain the general background knowledge in the art with respect to limiting the reach of broadcast packets. Pet. Addt'l Brief 8–9 (citing PO Resp. 11; Ex. 2018 ¶¶ 106–113).

We agree with Swarm that Juniper's zone theory is a new argument raised for the first time in the Reply. Similar to our analysis above, at no point in its Petition does Juniper explain how Leong's surveying unit and processing units may be separated into different zones to limit the reach of broadcast packets. *See* Pet. 35–38. Nor are there any citations in the Petition to the pages of AppleTalkBook (i.e., pages 2020 and 2021) that explain how a zone operates. *See id.* For these reasons alone, Juniper's zone theory is a new argument that was improperly raised in the Reply and, therefore, is not entitled to consideration.

We also do not agree with the reasons Juniper outlines in its additional briefing to support its contention that the zone theory was properly raised in the Reply. As the Petitioner with the burden of persuasion, Juniper is responsible for identifying what claim terms may require an express construction—not Swarm. *See* 37 C.F.R. § 42.104(b)(3) ("the petition must set forth . . [h]ow the challenged claim is to be construed"). In addition, Dr. Nelson's declaration testimony identified by Juniper (Ex. 2018 ¶¶ 106–113) was not presented nor developed by Swarm in its Patent Owner Response. *See* PO Resp. As such, Juniper cannot rely on this declaration testimony as sufficient justification for introducing its belated zone theory. Finally, for the reasons set forth above, we decline to credit Dr. Nelson's cross-examination testimony that, in the context of AppleTalkBook, general broadcast packets that don't receive responses do not constitute a communication because it is inconsistent with his declaration testimony that

general broadcast packets that don't receive responses constitute a communication. *See supra* Section II.B.5.a.i.

In any event, even if we were to consider Juniper's zone theory, we do not find this belated argument persuasive. AppleTalkBook discloses using zones for the following two purposes: (1) "to divide devices on an internetwork into logical groups," and (2) "to limit internetwork traffic." Ex. 1006, 219–20. AppleTalkBook further discloses that, although a zone may include multiple networks, "*all devices on a single network will belong to the same zone*." *Id.* (emphasis added). Based on these disclosures, we find that AppleTalkBook teaches that, if all devices are on a single network, they will belong to the same zone.

Leong discloses that micro-processing units 12 are stand alone computers that "are coupled over *a standard network* (such as an Ethernet, Local Area Network, or the like)." Ex. 1005, 5:20–24 (emphasis added); *see also* Ex. 2041, 18:1–4 (during oral argument in IPR2021-01445, Juniper's counsel admitted that all of Leong's processing units are part of a single network). Based on this disclosure in Leong together with Juniper's admission, we find that Leong teaches its processing units are part of a single network. Juniper does not reconcile how its zone theory applies to Leong's multi-tasking computing system, especially when each of Leong's processing units are part of a single network and, therefore, would all belong to the same zone in Juniper's proposed combination.

*b. Summary*

In summary, based on the fully developed record, Juniper's proposed combination of Leong and AppleTalkBook does not teach or suggest adding a co-processor "on a plug-and-play basis without any communication with

the controller," as recited in each of independent claims 1, 6, and 11. Accordingly, Juniper has not demonstrated by a preponderance of the evidence that the subject matter of independent claims 1, 6, and 11 would have been obvious over the combined teachings of Leong and AppleTalkBook.

*6. Claims 2–5, 7, 9, 10, and 12–17*

By virtue of their dependency, claims 2–5, 7, 9, 10, and 12–17 include the same limitations as at least one of independent claims 1, 6, and 11. Juniper does not present additional arguments and evidence with respect to these dependent claims that remedy the deficiency in its analysis of the combined teachings of Leong and AppleTalkBook. *See* Pet. 41–56, 69–71, 74–78. Accordingly, for the same reasons discussed above, Juniper has not demonstrated by a preponderance of the evidence that the subject matter of dependent claims 2–5, 7, 9, 10, and 12–17 would have been obvious over the combined teachings of Leong and AppleTalkBook.

*C. Remaining Obviousness Grounds*

Juniper also contends that (1) claims 1–7 and 9–17 of the '275 patent are unpatentable under § 103(a) as obvious over the combined teachings of Leong, AppleTalkBook, and Ethernet Specification; (2) claim 16 of the '275 patent is unpatentable under § 103(a) as obvious over the combined teachings of Leong, AppleTalkBook, and Datla; and (3) claim 16 of the '275 patent is unpatentable under § 103(a) as obvious over the combined teachings of Leong, AppleTalkBook, Ethernet Specification, and Datla. Pet. 79–86. Juniper does not present additional arguments and evidence with respect to these remaining grounds that remedy the deficiency in its analysis of the combined teachings of Leong and AppleTalkBook. *See id.*

Accordingly, for the same reasons discussed above, Juniper has not demonstrated by a preponderance of the evidence that (1) the subject matter of claims 1–7 and 9–17 of the ’275 patent would have been obvious over the combined teachings of Leong, AppleTalkBook, and Ethernet Specification; (2) the subject matter of claim 16 of the ’275 patent would have been obvious over the combined teachings of Leong, AppleTalkBook, and Datla; and (3) the subject matter of claim 16 of the ’275 patent would have been obvious over the combined teachings of Leong, AppleTalkBook, Ethernet Specification, and Datla.

### *D. Swarm’s Revised Contingent Motion to Amend*

Swarm’s Revised Contingent Motion to Amend is contingent on the us determining that originally challenged claims 1 and 3 are unpatentable. Mot. 1. As we discuss above, because Juniper has not demonstrated by a preponderance of the evidence that claims 1 and 3 of the ’275 patent are unpatentable under § 103(a) as obvious, Swarm’s request to amend originally challenged claims 1 and 3 and replace them with proposed substitute claims 18 and 19 is *dismissed* as moot.

## III. CONCLUSIONS

Based on the fully developed record, Juniper has not demonstrated by a preponderance of the evidence that claims 1–7 and 9–17 of the ’275 patent are unpatentable under § 103(a) as obvious. A summary of our conclusions is set forth in the table below.

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–7, 9–17 | 103(a) | Leong, AppleTalkBook | | 1–7, 9–17 |
| 1–7, 9–17 | 103(a) | Leong, AppleTalkBook, Ethernet Specification | | 1–7, 9–17 |
| 16 | 103(a) | Leong, AppleTalkBook, Datla | | 16 |
| 16 | 103(a) | Leong, AppleTalkBook, Ethernet Specification, Datla | | 16 |
| **Overall Outcome** | | | | 1–7, 9–17 |

| Motion to Amend Outcome | Claim(s) |
|---|---|
| Original Claims Cancelled by Amendment | |
| Substitute Claims Proposed in the Amendment | 18, 19 |
| Substitute Claims: Motion to Amend Granted | |
| Substitute Claims: Motion to Amend Denied | |
| Substitute Claims: Not Reached | 18, 19 |

## IV. ORDER

In consideration of the foregoing, it is

ORDERED that claims 1–7 and 9–17 of the '275 patent have not been shown to be unpatentable;

FURTHER ORDERED that Swarm's Revised Motion to Amend is *dismissed* as moot; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Kyle K. Tsui
Andrew L. Ramos
R. William Sigler (admitted *pro hac vice*)
Ken K. Fung (admitted *pro hac vice*)
FISCH SIGLER LLP
kyle.tsui@fischllp.com
andrew.ramos@fischllp.com
bill.sigler@fischllp.com
ken.fung@fischllp.com

FOR PATENT OWNER:

Daniel Pote
JENNINGS STROUSS & SALMON PLC
dpote@hsslaw.com

Michael K. Kelly
Christine N. Jones (admitted *pro hac vice*)
BEUS GILBERT MCGRODER PLLC
mkelly@beusgilbert.com
cjones@beusgilbert.com

Daniel J. Anderson
Ernst, Brown & Draper, PLLC
daniel.anderson@andersonpatents.com

US009852004B2

(12) **United States Patent**
**Iniguez**

(10) **Patent No.: US 9,852,004 B2**
(45) **Date of Patent: *Dec. 26, 2017**

(54) **SYSTEM AND METHOD FOR PARALLEL PROCESSING USING DYNAMICALLY CONFIGURABLE PROACTIVE CO-PROCESSING CELLS**

(71) Applicant: **Swarm Technology LLC**, Mesa, AZ (US)

(72) Inventor: **Alfonso Iniguez**, Mesa, AZ (US)

(73) Assignee: **Swarm Technology LLC**, Mesa, AZ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 453 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/340,332**

(22) Filed: **Jul. 24, 2014**

(65) **Prior Publication Data**

US 2014/0337850 A1 Nov. 13, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/750,696, filed on Jan. 25, 2013, now Pat. No. 9,146,777.

(51) **Int. Cl.**

***G06F 9/46*** (2006.01)
***G06F 9/48*** (2006.01)
***G06F 9/54*** (2006.01)
***G06F 9/50*** (2006.01)

(52) **U.S. Cl.**

CPC .......... ***G06F 9/4843*** (2013.01); ***G06F 9/5044*** (2013.01); ***G06F 9/54*** (2013.01); ***G06F 9/544*** (2013.01); *G06F 2209/5017* (2013.01)

(58) **Field of Classification Search**

None

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,330,583 | B1 | 12/2001 | Reiffin |
| 7,082,604 | B2 | 7/2006 | Schneiderman |
| 7,159,215 | B2 | 1/2007 | Shavit et al. |
| 7,174,381 | B2 | 2/2007 | Guiko et al. |
| 7,665,117 | B2 | 2/2010 | Sequeria |
| 8,037,474 | B2 | 10/2011 | Bates et al. |
| 8,108,867 | B2 | 1/2012 | Robison |
| 8,209,702 | B1 | 6/2012 | Roytman et al. |
| 8,284,206 | B2 | 10/2012 | State |
| 8,533,729 | B2 | 9/2013 | Yao |

(Continued)

OTHER PUBLICATIONS

Tozlu et al. ("Wi-Fi Enabled Sensors for Internet of Things: A Practical Approach", IEEE Communications Magazine, Jun. 2012).*

*Primary Examiner* — Wissam Rashid

(74) *Attorney, Agent, or Firm* — Jennings, Strouss & Salmon, PLC; Michael K. Kelly

(57) **ABSTRACT**

A parallel processing architecture includes a CPU, a task pool populated by the CPU, and a plurality of autonomous co-processing cells each having an agent configured to proactively interrogate the task pool to retrieve tasks appropriate for a particular so-processor. Each co-processor communicates with the task pool through a switching fabric, which facilitates connections for data transfer and arbitration between all system resources. Each so-processor notifies the task pool when a task or task thread is completed, whereupon the task pool notifies the CPU.

**12 Claims, 6 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 8,732,713 | B2 | 5/2014 | Coon et al. | |
| 8,949,853 | B2 | 2/2015 | Zimmermann | |
| 8,990,833 | B2 | 3/2015 | Kuesel et al. | |
| 2005/0188372 | A1 | 8/2005 | Inoue et al. | |
| 2006/0026377 | A1 | 2/2006 | Sikdar et al. | |
| 2007/0074207 | A1* | 3/2007 | Bates | G06F 9/4881 718/1 |
| 2008/0168318 | A1* | 7/2008 | DeMent | G01R 31/3004 714/745 |

* cited by examiner




FIG. 1

FIG. 2


13
Thread Complete
30C
21A
21B
21
22A
22B
22C
22D
22
Descriptor
First Type
Second Type
Third Type
Completed
Ready
Not Ready
OR
AND


312
A
314
B
316
C
318
A,B
A
320
B
322
C
324
A,B
322
340
C
C
342
334
B
B
336
330
A
A
332
308
310
306
302
304
300

FIG. 3




FIG. 4




FIG. 5


600
602
Populate task pool
604
Proactively dispatch agent from cell to task pool
606
Retrieve and process task
608
Notify task pool and CPU when task complete
610
Incorporate additional co-processor

FIG. 6

# SYSTEM AND METHOD FOR PARALLEL PROCESSING USING DYNAMICALLY CONFIGURABLE PROACTIVE CO-PROCESSING CELLS

## PRIORITY DATA

This application is a continuation of U.S. application Ser. No. 13/750,696, filed Jan. 25, 2013, which is incorporated herein by reference.

## FIELD OF INVENTION

The present invention generally relates to parallel-process computing, and particularly to a processing architecture which involves autonomous co-processors configured to proactively retrieve tasks from a task pool populated by a central processing unit.

## BACKGROUND

The Internet of Things (also referred to as the Cloud of Things) refers to an ad hoc network of uniquely identifiable embedded computing devices within the existing Internet infrastructure. The internet of things (IoT) portends advanced connectivity of devices, systems, and services that goes beyond machine-to-machine communications (M2M). The scope of things contemplated by the IoT is unlimited, and may include devices such as heart monitoring implants, biochip transponders, automobile sensors, aerospace and defense field operation devices, and public safety applications that assist fire-fighters in search and rescue operations, for example. Current market examples include home based networks that involve smart thermostats, light bulbs, and washer/dryers that utilize wifi for remote monitoring. Due to the ubiquitous nature of connected objects in the IoT, it is estimated that more than 30 billion devices will be wirelessly connected to the Internet of Things by 2020. Harnessing the processing capacity of the controllers and processors associated with these devices is one of the objectives of the present invention.

Computer processors traditionally execute machine coded instructions serially. To run a plurality of applications concurrently, a single processor interleaves instructions from various programs and executes them serially, although from the user's perspective the applications appear to be processed in parallel. True parallel or multi-core processing, on the other hand, is a computational approach that breaks large computational tasks into individual blocks of computations and distributes them among two or more processors. A computing architecture that uses task parallelism (parallel processing) divides a large computational requirement into discrete modules of executable code. The modules are then executed concurrently or sequentially, based on their respective priorities.

A typical multiprocessor system includes a central processing unit ("CPU") and one or more co-processors. The CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Completed threads are reported to the CPU, which continues to distribute additional threads to the co-processors as needed. Presently known multiprocessing approaches are disadvantageous in that a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to



other messages from co-processors. In addition, co-processors often remain idle while waiting for a new task from the CPU.

A multiprocessor architecture in thus needed which reduces CPU management overhead, and which also more effectively harnesses and exploits available co-processing resources.

## SUMMARY OF THE INVENTION

Various embodiments of a parallel processing computing architecture include a CPU configured to populate a task pool, and one or more co-processors configured to proactively retrieve threads (tasks) from the task pool. Each co-processor notifies the task pool upon completion of a task, and pings the task pool until another task becomes available for processing. In this way, the CPU communicates directly with the task pool, and communicates indirectly with the co-processors through the task pool.

The co-processors may also be capable of acting autonomously; that is, they may interact with the task pool independently of the CPU. In a preferred embodiment, each co-processor includes an agent that interrogates the task pool to seek a task to perform. As a result, the co-processors work together "in solidarity" with one another and with the task pool to complete aggregate computational requirements by autonomously retrieving and completing individual tasks which may or may not be inter-related. By way of non-limiting example, suppose a task B involves computing an average temperature over time. By defining a task A to include capturing temperature readings over time, and further by defining task B to including obtaining the captured readings, the CPU and the various co-processors may thereby inferentially communicate with each other via the task pool.

In various embodiments the co-processors are referred to as autonomous, proactive solidarity cells. In this context, the term autonomous implies that a co-processor may interact with the task pool without being instructed to do so by the CPU or by the task pool. The term proactive suggests that each co-processor may be configured (e.g., programmed) to periodically send an agent to monitor the task pool for available tasks appropriate to that co-processor. The term solidarity implies that co-processing cells share a common objective in monitoring and executing all available tasks within the task pool.

A solidarity cell (co-processor) may be a general purpose or special purpose processor, and therefore may have the same or different instruction set, architecture, and microarchitecture as compared to the CPU and other solidarity cells in the system. Moreover, the software programs to be executed and data to be processed may be contained within one or more memory units. In a typical computer system, for example, a software program consists of a series of instructions that may require data to be used by the program. For example, if the program corresponds to a media player, then the data contained in memory may be compressed audio data which is read by a co-processor and eventually played on a speaker.

Each solidarity cell in the system may be configured to communicate, ohmically or wirelessly, with the task pool through a crossbar switch, also known as fabric. In a purely wireless mesh topology, the radio signals themselves may constitute the fabric. In various embodiments, the co-processors may also communicate directly with the CPU. The switching fabric facilitates communication among system resources. Each solidarity cell is proactive, in that it obtains

a task to perform by sending its agent to the task pool when the solidarity cell has no processing to perform or, alternatively, when the solidarity cell is able to contribute processing cycles without impeding its normal operation. By way of non-limiting example, in the context of the Internet-of-Things (discussed in greater detail below), a co-processor associated with a device such as a light bulb may be programmed to listen for "on" and "off" commands from a master device (such as a smartphone) as its normal operation, but its processing resources may also be harnessed through a task pool.

In the context of various embodiments described herein, the term agent refers to a software module, analogous to a network packet, associated with a co-processor that interacts with the task pool to thereby obtain available tasks which are appropriate for that co-processor cell. The solidarity cells may execute the tasks sequentially, when the tasks are contingent on the execution of a previous task, or in parallel, when more than one solidarity cell is available and more than one matching tasks are available for execution. The tasks may be executed independently or collaboratively, depending on the task thread restrictions (if any) provided by the CPU. Interdependent tasks within the task pool may be logically combined. The task pool notifies the CPU when a task thread is completed. If a task thread is composed of a single task, then the task pool may notify the CPU at completion of such task. If a task thread is composed of multiple tasks, the task pool may notify the CPU at completion of such chain of tasks. Since task threads may be logically combined, it is conceivable to have a case in which the task pool notifies the CPU after completion of logically combined task threads.

Those skilled in the art will appreciate that interoperability among the CPU and co-processors may be facilitated by configuring the CPU to compose and/or structure tasks at a level of abstraction which is independent of the instruction set architecture associated with the various co-processors, thereby allowing the components to communicate at a task level rather than at an instruction level. As such, devices and their associated co-processors may be added to a network on a "plug and play" basis. Another aspect of this invention provides interoperability within a heterogeneous array of CPUs with different instruction set architectures.

Various features of the invention are applicable to, inter alia, a network of Internet-of-Things devices and sensors; heterogeneous computing environments; high performance computing, two dimensional and three dimensional monolithic integrated circuits; and motion control and robotics.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will hereinafter be described in conjunction with the appended drawing figures, wherein like numerals denote like elements, and:

FIG. **1** is a schematic block diagram of a parallel processing architecture including a CPU, memory, task pool, and a plurality of co-processors configured to communicate through a fabric in accordance with an embodiment;

FIG. **2** is a schematic block diagram illustrating details of an exemplary task pool in accordance with an embodiment;

FIG. **3** is a schematic block diagram of a network including co-processing cells and their corresponding agents interacting with a task pool in accordance with an embodiment;

FIG. **4** is a schematic layout of an internet of things network including available plug and play devices in accordance with an embodiment; and

FIG. **5** is a schematic layout diagram of an exemplary internet of things use case illustrating dynamic harnessing of nearby devices in accordance with an embodiment; and

FIG. **6** is a flow chart illustrating the operation of an exemplary parallel computing environment in accordance with an embodiment.

## DETAILED DESCRIPTION

Various embodiments relate to parallel processing computing systems and environments, from simple switching and control functions to complex programs and algorithms including, without limitation: data encryption; graphics, video, and audio processing; direct memory access; mathematical computations; data mining; game algorithms; ethernet packet and other network protocol processing including construction, reception and transmission of data the outside network; financial services and business methods; search engines; internet data streaming and other web-based applications; execution of internal or external software programs; switching on and off and/or otherwise controlling or manipulating appliances, light bulbs, consumer electronics, and the like, e.g., in the context of the Internet-of-Things.

Various features may be incorporated into any presently known or later-developed computer architecture. For example, parallel processing concerns relating to synchronization, data security, out-of-order execution, and main processor interrupts may be addressed using the inventive concepts described herein.

Referring now to FIG. **1**, a distributed processing system **10** includes a single or multi-core CPU **11** and one or more solidarity or co-processing cells **12**A-**12** configured to communicate with a task pool **13** through a cross-bar switching fabric **14**. The solidarity cells **12** may also communicate with each other through the switching fabric **14** or through a separate cell bus (not shown). The CPU **11** may communicate with the task pool **13** directly or through the switching fabric **14**. One or more memory units **15** each contain data and/or instructions. In this context, the term "instructions" include a software program that may be compiled for execution by the CPU **11**. The memory units **15**, cells **12**, and the task pool **13** may be ohmically or wirelessly interconnected to communicate with the CPU and/or with each other via the switching fabric **14**. In some embodiments, the CPU **11** communicates with the cells **12** only indirectly through the task pool. In other embodiments, the CPU **11** may also communicate directly with the cells **12** without using the task pool as an intermediary.

In some embodiments the system **10** may include more than one CPU **11** and more than one task pools **13**, in which case a particular CPU **11** may interact exclusively with a particular task pool **13**, or multiple CPUs **11** may share one or more task pools **13**. Moreover, each solidarity cell may be configured to interact with more than one task pool **13**. Alternatively, a particular cell may be configured to interact with a single designated task pool, for example, in a high performance or high security context.

In various embodiments cells may be dynamically paired, ohmically (plug and play) or wirelessly (on the fly), with a task pool when the following three conditions are meet:

1) The cell is able to communicate, ohmically or wirelessly, with the task pool. The connection to the task pool can be through a port in the task pool itself, or through a switching fabric that is connected to the task pool;
2) The task pool recognizes the agent sent by the cell as trustworthy, for example, using input from the user,

with or without password, through traditional Wi-Fi, Blootooth or similar pairing, manually through a graphical software program running on a smartphone or tablet, or by any other secure or unsecure method; and

3) At least one of the available tasks within the task pool is compatible with the capabilities of the solidarity cell.

In the case of a multi-processor environment with multiple task pools, the foregoing dynamic pairing conditions apply, except that a given cell may be locked or restricted to work with only one of the task pools; otherwise, the cells may connect with one or more task pools, using a first found basis, round robin basis or any other selection scheme. It is also possible to assign priorities to the tasks within the task pools, whereby the cells give preference to the high priority tasks and serve the lower priority tasks when not otherwise engaged by the higher priority tasks.

The CPU **11** may be any single or multi-core processor, applications processor or microcontroller, used to execute a software program. The system **10** may be implemented on a personal computer, smart phone, tablet, or Internet-of-Things device, in which case the CPU **11** may be any personal computer, central processor, or processor cluster, such as an Intel® Pentium® or multi-core processor local to or remote from the immediate computing environment. Alternatively, the system **10** may be implemented on a supercomputer and the CPU **11** may be a reduced instruction set computer ("RISC") processor, applications processor, a microcontroller, or the like.

In other embodiments, the system **10** may be implemented on a locally connected series of personal computers, such as a Beowulf cluster, in which case the CPU **11** may include the central processors of all, a subset, or one of the networked computers. Alternatively, the system **10** may be implemented on a network of remotely connected computers, in which case the CPU **11** may be a presently known or later developed central processor for a server or mainframe. The particular manner in which the CPU **11** performs the subject parallel processing methods within the presently described system **10** may be influenced by the CPU's operating system. For example, the CPU **11** may be configured for use within the system **10** by programing it to recognize and communicate with the task pool **13** and divide the computing requirements into threads, as described below.

It is further contemplated that the system **10** may be implemented retroactively on any computer or computer network having an operating system that may be modified or otherwise configured to implement the functionality described herein. As is known in the art, the data to be processed is contained within the memory units **15**, for example in the context of addressable regions or sectors of random access or read-only memory, cache memory for the CPU **11**, or other forms of data storage such as flash memory and magnetic storage. The memory units **15** contain the data to be processed as well as the location to place the results of the processed data. Not every task is required to access the memory units **15**, as in the case of, for example, smart meters and automotive instrumentation, which may return data to the system **10**, or as in the case of a robot and motor controllers which may actuate a mechanism.

Each cell **12** is a conceptually or logically independent computational unit capable of executing one or more tasks/threads. A cell **12** may be a microcontroller, a microprocessor, application processor, a "dumb" switch, or a standalone computer such as a machine in a Beowulf cluster.

A cell **12** may be a general or special purpose coprocessor configured to supplement, perform all of, or perform a limited range of functions of the CPU, or functions that are foreign to the CPU **11** such as ambient monitoring and robotic actuators, for example. A special-purpose processor may be a dedicated hardware module designed, programmed, or otherwise configured to perform a specialized task, or it may be a general-purpose processor configured to perform specialized tasks such as graphics processing, floating-point arithmetic, or data encryption.



In an embodiment, any cell **12** that is a special-purpose processor may also be configured to access and write to memory and execute descriptors, as described below, as well as other software programs.

Moreover, any number of cells **12** may comprise a heterogeneous computing environment; that is, a system that uses more than one kind of processor such as an AMD-based and/or an Intel-based processor, or a mixture of 32-bit and 64-bit processors.

Each cell **12** configured to perform one or a plurality of specialized tasks, as illustrated in the following sequence of events. During a poll phase each cell periodically sends an agent to the task pool until a matching task is found. To facilitate this matching, both the cell and the task pool may be equipped with a transceiver. In the case of the task pool, the transceiver maybe located in the task pool itself or in the switching fabric to which the task pool is connected. When a task match is found within a task pool, the task pool transmits an acknowledgement to the cell. The next step is the "communication channel" phase. During the communication channel phase, the cell receives the task and begins to execute the task. In one implementation, once the first task is completed, the communication channel is maintained so that the solidary cell can fetch another task without having to repeat the "poll" and "acknowledge" phases.

The system **10** may include a plurality of cells, wherein some of the cells are capable of performing the same task types as other cells, to thereby create redundancy in the system **10**. The set of task types performed by a given cell **12** may be a subset of the set of task types performed by another cell. For example, in FIG. **1**, the system **10** may divides an aggregate computational problem into a group of tasks, and populate the task pool **13** with a first type, a second type, and a third type of tasks. A first cell **12**A may capable of performing only tasks of the first type; a second cell **12**B may be capable of perform tasks of the second type; a third cell **12**C may be capable of performing tasks of the third type; a fourth cell **12**D may be capable of performing tasks of the second or third types; and a fifth cell **12**N may be capable of performing all three task types. The system **10** may be configured with this redundancy so that if a given cell is removed from the system **10** (or currently busy or otherwise unavailable), the system **10** may continue to function seamlessly. Furthermore, if a cell is dynamically added to the system **10**, the system **10** may continue to function seamlessly with the benefit of increased performance.

Referring now to FIGS. **1** and **2**, the task pool **13** may occupy a region of physical memory that is accessible by the CPU **11**. Alternatively, the task pool **13** may be accessible by MAC address or IP address. Multiple embodiments are envisioned for the task pool **13**; it may be physically located with the CPU in the same 2D or 3D monolithic IC, or it may be implemented as a stand-alone IC and be physically interconnected to a computer board, smart phone, tablet, router or Internet-of-Things device. In a further alternative embodiment, the task pool may be a stand-alone multi-port, wired and/or wireless connected device which may be shared among multiple CPU **11** systems, or dedicated to a

given CPU **11**. The task pool **13** may also be addressable by the cells **12**. The task pool **13** may be disposed in a dedicated hardware block to provide maximum access speed by the CPU **11** and cells **12**. Alternatively, the task pool **13** may be software based, wherein the contents of the task pool **13** are stored in memory, analogous to the hardware-based embodiment, but represented by data structures.

Upon being populated by the CPU **11**, the task pool **13** contains one or more task threads **21**. Each task thread **21** represents a computational task that may be a component or subset of the larger aggregate computational requirement imposed on the CPU **11**. In one embodiment, the CPU **11** may initialize and then populate the task pool **13** with concurrently executable threads **21**. Each thread **21**may include one or more discrete tasks **22**. A task **22** may have a task type and a descriptor. The task type indicates which cells **12** are capable of performing the task **22**. The task pool **13** may also use the task type to prioritize tasks **22** having the same type. In one embodiment, the task pool **13** may maintain a prioritization table (not shown) that documents the solidarity cells **12** present in the system **10**, the types of tasks **22** each cell is capable of performing, and whether or not each cell is presently processing a task **22**. The task pool **13** may use the prioritization table to determine which of the eligible tasks **22** to assign to a requesting cell, as described below.

In some embodiments, the CPU **11** may retrieve and execute a task or thread from the task pool. Moreover, the CPU **11** may abort any task that is determined to be stale, broken, stuck, or erroneous. In such case, the CPU **11** may refresh the task, making available for subsequent processing. Nothing precludes the CPU **11** from implementing adaptive task management, for example, as may be required by Artificial Intelligence, whereupon the CPU **11** may add, remove, or change tasks within an unfinished existing thread **21**.

The descriptor may contain one or more of a specific instruction to be executed, a mode of execution, the location (e.g., address) of the data to be processed, and the location for placement of the task results, if any. The location for placement of results is optional, such as in the case of animation and multimedia tasks that often present results to a display rather than storing them in memory. Moreover, task descriptors may be chained together, as in a linked list, so that the data to be processed may be accessed with fewer memory calls than if the descriptors were not chained together. In an embodiment, the descriptor is a data structure containing a header and a plurality of reference pointers to memory locations, and the task **22** includes the memory address of the data structure. The header defines the function or instruction to be executed. A first pointer references the location of the data to be processed. A second, optional pointer, references the location for placement of processed data. If the descriptor is linked to another descriptor to be sequentially executed, the descriptor may include a third pointer that references the next descriptor. In an alternative embodiment where the descriptor is a data structure, the task **22** may include the full data structure.

A thread **21** may further comprise a "recipe" describing the order in which the tasks **22** may be performed and any conditions that affect the order of performance. According to the recipe, the tasks **22** may be executed sequentially, concurrently, out-of order, interdependently, or conditionally according to Boolean operations. For example, in FIG. **2**, thread **21**A comprises four tasks: **22**A, **22**B, **22**C, and **22**D. In the illustrated embodiment, the first task **22**A must be completed before either the second task **22**B or the third task **22**C can begin. According to the recipe, once either the second task **22**B or third task **22**C is complete, the fourth task **22**D may begin.



Threads **21** may also be interdependent. For example, as shown in FIG. **2**, due to the Boolean operation in thread **21**B, a completed task **22**C may allow processing of tasks in thread **21**B to continue. The task pool **13** may lock a task **22** while the task **22** is waiting for completion of another task **22** upon which it depends. When a task **22** is locked, it cannot be acquired by a cell. When the tasks **22** of a thread **21** are completed, the task pool **13** may notify the CPU **11** of the completion. The CPU may then advance processing beyond the completed thread **21**.

The cells advantageously maintain solidarity with each other and with the CPU **11**, thereby helping the system **10** to perform complex computations by autonomously and proactively retrieving tasks from the task pool **13**. The cells **12** act autonomously in that they may act independently of the CPU **11** or any other coprocessor. Alternatively, a cell may be acted upon or instructed directly by the CPU. Each cell acts proactively in that it seeks a task **22** from the task pool **13** as soon as the cell becomes available for further processing.

More particularly, in an embodiment, a cell **12** acquires a task from the task pool by sending an agent **30** to interrogate (search for) the task pool and retrieve an available task **22** that requires completion, is not locked, and that has a task type that can be performed by the cell. Typically, the system **10** has the same number of agents as solidarity co-processing cells. In this context, an agent is generally analogous to a data frame in the networking sense, in that an agent may be equipped with a source address, a destination address, and a payload. In an embodiment, the destination address is the address of the task pool **13** when the agent **30** is seeking a task **22**, and the destination address is the address of the corresponding cell **12** when the agent **30** is returning to its cell with a task **22**. Correspondingly, the source address is the address of the cell **12** when the agent **30** is seeking a task **22**, and the source address is the address of the task pool **13** when the agent **30** is returning to its cell with a task **22**.

In addition, the source and destination addresses may facilitate frame synchronization. That is, the system **10** may be configured to unequivocally differentiate addresses from payload data, so that when the contents of an agent **30** are read, the destination address indicates the beginning of the frame and the source address indicates the end of the frame, or vice versa. This allows the payload to vary in size when it is placed between the addresses. In another embodiment of a variable-size payload, an agent **30** may include a header that indicates the payload size. The header information may be compared to the payload to verify the data integrity. In still another embodiment, the payload may be a fixed length. When an agent **30** is dispatched to the task pool **13** by its co-processor cell, the payload contains identifying information of the types of tasks the cell **12** can perform. When the agent **30** returns from the task pool **13**, the payload contains the descriptor of the task **22**, either in the form of a memory location or the full descriptor data structure.

In other embodiments, some or all of the agents **30** are autonomous representatives of their respective corresponding cells **12**. That is, each agent **30** may be dispatched by its corresponding cell **12** to retrieve a task **22** any time the cell is idle or capable of performing additional processing. In this way, the processing capacity of the solidarity cells **12** may be more fully exploited, inasmuch as the cells need not wait idly for an instruction from the CPU **11**. This approach has the additional benefit of reducing CPU overhead by reliev-

ing the CPU of the need to send a request to a cell to retrieve a task from the task pool. These advantages render the system **10** more efficient than traditional computer architectures in which auxiliary modules and co-processors are dependent on instructions from the main CPU.

Further, the solidarity cells **12**A-**12***n* are ambivalent as to the particular composition of the thread itself Rather, an agent is only concerned about finding a match between the capabilities of its corresponding cell and an available task **22** to be completed in the task pool **13**. That is, as long as there are available tasks **22** in the task pool **13**, and an available task **22** matches the capability of the cell, then the system may effectively harness the processing capacity of the cell.

Some or all of the solidarity cells **12**A-**12***n* may work independently of each other, or may communicate with each other directly, through the switching fabric **14**, through the task pool **13**, or pursuant to a command or request from the CPU to invoke another solidarity cell to assist in processing, moving, or transmitting data. In one embodiment, the agent **30**A may search for a match between the task type of the ready tasks **22** and the types of tasks that the cell **12**A is able to perform. This architecture may involve hard-coding of the types of tasks that the CPU **11** is configured to create. Thus, if the task pool **13** contains three types of tasks **22**, and the large computational requirement includes a task of a fourth type, this fourth type of task may not be placed in the task pool **13** even if a cell capable of performing tasks of the fourth type is included in or added to the system **10**. Consequently, the CPU **11** may be configured to "learn" or be taught how to create tasks of the fourth type in order to more fully exploit the available processing resources.

In another embodiment, the agent **30**A searches the task **22** descriptors for an executable instruction that matches one of the instructions that that cell **12**A is capable of executing. When a matching task **22** is found, the agent **30**A delivers the descriptor of the matching task **22** to the cell **12**A, whereupon the cell **12**A begins to process the task **22**. In particular, the agent **30**A may deliver the memory address of the descriptor to the cell **12**A, and the cell **12**A retrieves the data structure from memory. Alternatively, where the descriptor's entire data structure is contained in the task **22**, the agent **30**A may deliver the complete data structure to the cell **12**A for processing. The descriptor informs the cell **12**A which instruction to execute, the location in memory units **15** where the data to be processed may be found, and the location in memory **15** where the results are to be placed. Upon completion of the task **22**, the cell **12**A notifies the task pool **13** to change the status of the selected task **22** from 'to be completed' to 'completed.' Further, once the cell **12**A finishes a task **22**, the cell may dispatch its agent **30**A to the task pool **13** to seek another task **22**.

Some or all of the agents **30**A-**30***n* may travel through the system **10** by wire or wirelessly, for example, using a Wi-Fi network, wireless Ethernet, wireless USB, wireless bridge, wireless repeater, wireless router, Zigbee®, ANT+® or Bluetooth® pairing, according to the particular architecture and/or implementation of the system **10**. In an embodiment, an agent **30** may be guided to the task pool **13** wirelessly by including a receptor feature at the task pool **13** and further by including a transmitter feature with the cell **12**. Similarly, the task pool may answer wirelessly to the cells by equipping the task pool with a transmitter and the solidarity cells with a receiver. In this manner, the cells may communicate wirelessly with the task pool with or without use of the switching fabric.

In a preferred embodiment, however, some form of switching fabric **14** is used. The switching fabric **14** facili-



tates connections for data transfer and arbitration between system resources. The switching fabric **14** may be a router or crossbar switch that provides connectivity between the various cells and the task pool. The switching fabric **14** may further provide connectivity between each solidarity cell **12**A-**12***n* and system resources such as the CPU **11**, memory units **15**, and traditional system components including, without limitation: direct memory access units, transmitters, hard disks and their controllers, display and other input/output devices, and other coprocessors. The cells **12**A-**12***n* may be connected physically to the switching fabric **14**, or the cells may be connected wirelessly.

The wireless connection of cells into the system **10** facilitates the dynamic addition and/or removal of cells for use in the system **10**. For example, the CPU **11** may recruit cells from other cell systems, allowing for dynamic expansion and increased performance. In this manner, two or more cell systems (e.g., networks) may share solidarity cells. In one embodiment, a cell that becomes idle may look for and/or be recruited by another system that has a need for additional processing resources, i.e., it has available processing tasks that need to be completed. Similarly, the system **10** may expand performance by incorporating clusters of additional cells for a particular task. For example, the system **10** may enhance performance of an encryption/decryption function, or the processing of audio and/or video data, by incorporating nearby cells capable of performing these tasks.

To guard against undesirable connections, the CPU **11** may provide the task pool **13** with a list of or, alternatively, criteria for identifying trusted and/or untrusted cells as well as authentication requirements or protocols. Moreover, the task pool itself may exclude particular cells on the basis of low performance, unreliable connection, poor data throughput, or suspicion of malicious or otherwise inappropriate activity. In various embodiments, cells **12** may be added to a task pool **13**, or excluded from a task pool **13**, by a user through the use of a smartphone, tablet or other device or application. In one embodiment, a graphical application interface may provide the user with useful statistical and/or iconic information such as location of available cells and other devices, performance gain, or performance penalty, as a result of adding or removing particular cells from a network.

In an alternative embodiment, some or all of the co-processing cells may connect directly to the task pool **13**, such as by a wired configuration that does not require a switching fabric **14** for communication. The wired connection of cells may further facilitate dynamic expansion and contraction of the system **10** analogous to the wireless configuration discussed above, although wired connections may physical (e.g., manual) integration and extraction of peripheral devices. In either case, scalability of the system is greatly enhanced over conventional parallel processing schemes, as co-processors may be added and removed without reprogramming the CPU **11** to account for the changes to the system **10**.

Referring now to FIG. **3**, a network **300** includes a CPU **302**, a first memory **304**, a second memory **306**, a task pool **308**, a switching fabric **310**, a first co-processing cell **312** configured to perform (execute) type A tasks, a second cell **314** configured to perform type B tasks, a third cell **316** configured to perform type C tasks, and a fourth cell **318** configured to perform both type A and type B tasks. As shown, the task pool **308** is populated (e.g., by the CPU **302**) with tasks (or task threads) **330** and **332** of task type A; tasks **334** and **336** of task type B; and tasks **340** and **342** of task

type C. In an embodiment, each cell preferably has a unique, dedicated agent. In particular, cell **312** includes an agent **320**; cell **314** includes an agent **322**; cell **316** includes an agent **324**; and cell **318** includes an agent **326**. Each agent preferably includes an information field or header which identifies the type of tasks its associated cell is configured to perform, for example, a single task or combination of tasks A, B, C.

During operation, when a cell is either idle or otherwise has available processing capacity, its agent proactively interrogates the task pool to determine whether any tasks are in the task queue which are appropriate for that particular cell. For example, cell **312** may dispatch its agent **320** to retrieve one or both of tasks **330** and **332** corresponding to task type A. Similarly, cell **314** may dispatch its agent **322** to retrieve either task **334** or **336** (depending on their relative priorities) corresponding to task type B, and so on. For cells which are capable of performing more than one task type, such as cell **318** configured to perform task types A and B, agent **326** may retrieve any one of tasks **330**, **332**, **334**, and/or **336**.

Upon retrieving a task from the task pool, a cell may then process that task, typically by retrieving data from a particular location in first memory **304**, processing that data, and storing the processed data at a particular location within second memory **306**. When a task is completed, the cell notifies the task pool, the task pool marks the task as completed, and the task pool notifies the CPU that the task is completed. Alternatively, the task pool may notify the CPU when a task thread is completed, inasmuch as a task thread may comprise a single task, a series of tasks, or Boolean combination of tasks. Significantly, the retrieval of tasks and the processing of data by the cells may occur without direct communication between the CPU and the various cells.

Referring now to FIG. **4**, an internet of things network **400** includes a controller (CPU) **402**, a task pool **408**, and various devices **410-422**, some or all of which include an associated or embedded microcontroller, such as an integrated circuit (IC) chip or other component which embodies processing capacity. By way of non-limiting example, the devices may include a light bulb **410**, a thermostat **412**, an electrical receptacle **414**, a power switch **416**, an appliance (e.g., toaster) **418**, a vehicle **420**, a keyboard **422**, and virtually any other plug and play device or application capable of interfacing with a network.

In the illustrated embodiment, the controller **402** may be a smartphone, tablet, laptop, or other device which may include a display **404** and a user interface (e.g., keypad) **406** for facilitating user interaction with the various devices on the network. To the extent the processing capacity (e.g., bandwidth) of the controller **402** may be insufficient to adequately support the network, the controller may effectively harvest or recruit processing resources from the peripheral devices via the task pool, for example as explained below in conjunction with FIG. **5**.

Referring now to FIG. **5**, an internet of things network **500** use case illustrates the dynamic harnessing of nearby (or otherwise available) devices. Network **500** includes a primary control unit **502** (e.g., a laptop, tablet, or gaming device), a task pool **504**, a first co-processor device **506**, and a second co-processor device **508**. An exemplary use case in the context of network **500** will now be described.

Suppose a user is playing a video game on her laptop computer **502**. The video game requires detailed computer-generated imagery, and perhaps the processing power in laptop **502** is sufficient to render a single realistic-looking character, but when a second character is introduced onto the screen, the image quality degrades, and the movement of the characters is no longer continuous. The present invention proposes a method to harness the processing power of underutilized computer resources located within the vicinity of, or otherwise available to, the user.



To address the need for additional processing power, the laptop **502** connects to the task pool **504**. In this regard, the laptop itself may be equipped with a task pool, or the task pool may be in the form an external device or application located within wireless reach from the laptop **502**. In the case of an external task pool, the task pool itself could perform the duties of a switching fabric with ports to allow connection to multiple co-processing cells. The laptop **502** populates the task pool **504** with computationally intensive tasks. A nearby underutilized device, such as a smartphone **508**, subsequently connects to the task pool **504** and sends its agent to fetch a matching task type. Consequently, the smart phone **508** becomes a co-processor seamlessly assisting the laptop **502**, thereby enhancing the video game experience. The same method may be repeated in the event other underutilized processing resources exist and are needed. Indeed, even the processing power of an available light-bulb **506** may become a co-processor to the laptop.

FIG. **6** is a flow chart illustrating the operation of an exemplary parallel computing environment. In particular, a method **600** includes populating a task pool with tasks (Step **602**), proactively dispatching one or more agents from one or more corresponding cells to the task pool (Step **604**), retrieving and processing a task (Step **606**), and notifying the task pool and the CPU that the task thread has been performed (Step **608**). The method **600** further includes dynamically incorporating (Step **610**) an additional device into the network, as needed.

A processing system is thus provided which includes a task pool, a controller configured to populate the task pool with a first task, and a first co-processor configured to proactively retrieve the first task from the task pool.

In an embodiment, the first co-processor comprises a first agent configured to retrieve the first task from the task pool without communicating with the controller.

In an embodiment, the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first type, and the first agent is configured to search the task pool for a task of the first type.

In an embodiment, the first co-processor is further configured to process the first and notify the task pool upon completion of the first task, and the task pool is configured to notify the controller upon completion of the first task.

In an embodiment, the controller and the first co-processor are configured communicate with each other only through the task pool.

In an embodiment, the controller and the first co-processor are configured communicate with each other directly and through the task pool.

In an embodiment, the first co-processor is configured to determine that it has available processing capacity, and to dispatch the agent to the task pool in response to the determination.

In an embodiment, the controller is further configured to populate the task pool with a second task, and wherein the system further comprises a second co-processor having a second agent configured to proactively retrieve the second task from the task pool.

In an embodiment, the second task includes indicia of a second task type, the second co-processor is configured to

perform tasks of the second type, and the second agent is configured to search the task pool for a task of the second type.

In an embodiment, the controller and the task pool reside on a monolithic integrated circuit (IC), and the first co-processor does not reside on the IC.

In another embodiment, the controller, the task pool, and the first and second co-processors reside on a monolithic integrated circuit (IC).

A method is also provided for dynamically controlling processing resources in a network of the type including a central processing unit (CPU) configured to populate a task pool with a first task having a first task type. The method includes the steps of: programming a first cell to perform the first task type; adding the programmed first cell to the network; proactively sending a first agent from the first cell to the task pool; searching the task pool, by the first agent, for a task of the first type; retrieving, by the first agent, the first task from the task pool; transporting, by the first agent, the first task to the first cell; processing, by the first cell, the first task; and sending a notification from the first cell to the task pool that the first task is completed.

In an embodiment, the method also includes: marking, by the task pool, the first task as being completed; and sending a notification from the task pool to the CPU that the first task is completed.

In an embodiment, the method also includes configuring the first cell to determine that the first cell has available processing capacity as a predicate to proactively sending the first agent to the task pool.

In an embodiment, the method also includes integrating the first cell into a first device prior to adding the programmed first cell to the network.

In an embodiment, the first device comprises one of a sensor, light bulb, power switch, appliance, biometric device, medical device, diagnostic device, lap top, tablet, smartphone, motor controller, and a security device.

In an embodiment, adding the programmed first cell to the network comprises establishing a communication link between the first cell and the task pool.

In an embodiment, the (CPU) is further configured to populate the task pool with a second task having a second task type, the method further comprising the steps of: programming the second cell to perform the second task type; establishing a communication link between the second cell and the task pool; proactively sending a second agent from the second cell to the task pool; searching the task pool, by the second agent, for a task of the second type; retrieving, by the second agent, the second task from the task pool; transporting, by the second agent, the second task to the second cell; processing, by the second cell, the second task; sending a notification from the second cell to the task pool that the second task is completed; marking, by the task pool, the second task as being completed; and sending a notification from the task pool to the CPU that the second task is completed.

A system is also provided for controlling distributed processing resources in an internet of things (IoT) computing environment, including: a CPU configured to partition an aggregate computing requirement into a plurality of tasks and place the tasks in a pool; and a plurality of devices each having a unique dedicated agent configured to proactively retrieve a task from the pool without direct communication with the CPU.

While there has been illustrated an enabling description of various embodiments including the best mode known to the inventors, it will be understood by those skilled in the art that various changes and modifications may be made and equivalents may be substituted for various elements without departing from the scope of the invention. Therefore, it is intended that the inventions disclosed herein not be limited to the particular embodiments disclosed, but that the invention will include all embodiments falling within the literal and equivalent scope of the appended claims.

I claim:

**1**. A processing system, comprising:

a task pool;

a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;

a first co-processor configured to successively: retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

a second co-processor configured to successively: retrieve a second task from the task pool; deliver the second task to the second co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

wherein the processing system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller.

**2**. The processing system of claim **1**, wherein:

the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first type, and the first agent is configured to search the task pool for a task of the first type; and

the second task includes indicia of a second task type, the second co-processor is configured to perform tasks of the second type, and the second agent is configured to search the task pool for a task of the second type.

**3**. A processing system, comprising:

a task pool;

a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;

a first co-processor configured to successively: retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

a second co-processor configured to successively: retrieve a second task from the task pool; deliver the second task to the second co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

wherein:

the processing system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller;

the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first

type, and the first agent is configured to search the task pool for a task of the first type;

the second task includes indicia of a second task type, the second co-processor is configured to perform tasks of the second type, and the second agent is configured to search the task pool for a task of the second type;

the first co-processor includes a first agent comprising a first source address, a first destination address, and a first payload; and

the second co-processor includes a second agent comprising a second source address, a second destination address, and a second payload;

and further wherein:

when the first agent is retrieving the first task from the task pool, the first source address corresponds to an address associated with the first co-processor, the first destination address corresponds to an address associated with the task pool, and the first payload includes a first function which the first co-processor is configured to perform;

when the first agent is returning from the task pool, the first source address is the task pool's address, the first destination address is the first co-processor's address, and the first payload includes a descriptor of the first task;

when the second agent is retrieving the second task from the task pool, the second source address corresponds to an address associated with the second co-processor, the second destination address corresponds to an address associated with the task pool, and the second payload includes a second function which the second co-processor is configured to perform; and

when the second agent is returning from the task pool, the second source address is the task pool's address, the second destination address is the second co-processor's address, and the second payload includes a descriptor of the second task.

**4**. The processing system of claim **3**, wherein the controller and the task pool reside on a monolithic integrated circuit (IC), and the first and second co-processors do not reside on the IC.



**5**. The processing system of claim **3**, wherein the controller, the task pool, and the first and second co-processors reside on a single monolithic integrated circuit (IC).

**6**. The processing system of claim **3**, further comprising:

a first device associated with the first co-processor; and

a second device associated with the second co-processor;

wherein the first and second devices each comprise one of a sensor, light bulb, power switch, appliance, biometric device, medical device, diagnostic device, lap top, tablet, smartphone, motor controller, and security device.

**7**. The processing system of claim **3**, wherein the first co-processor is configured to modify a task within the task pool.

**8**. The processing system of claim **3**, wherein:

the first co-processor is further configured to process the first and notify the task pool upon completion of the first task; and

the second co-processor is further configured to process the second task and notify the task pool upon completion of the second task.

**9**. The processing system of claim **8**, wherein:

the task pool is configured to notify the controller upon completion of the first task; and

the task pool is further configured to notify the controller upon completion of the second task.

**10**. The processing system of claim **3**, wherein the controller is configured to communicate with the first co-processor and the second co-processor only indirectly through the task pool.

**11**. The processing system of claim **3**, wherein the first co-processor is configured to deposit a new task into the task pool.

**12**. The processing system of claim **3**, wherein the first co-processor is configured to determine when it has available processing capacity, and to dispatch the first agent to the task pool in response to the determination.

* * * * *

US010592275B2

(12) **United States Patent**
**Iniguez**

(10) **Patent No.: US 10,592,275 B2**
(45) **Date of Patent: *Mar. 17, 2020**

(54) **SYSTEM AND METHOD FOR SWARM COLLABORATIVE INTELLIGENCE USING DYNAMICALLY CONFIGURABLE PROACTIVE AUTONOMOUS AGENTS**

(71) Applicant: **Swarm Technology LLC**, Mesa, AZ (US)

(72) Inventor: **Alfonso Iniguez**, Mesa, AZ (US)

(73) Assignee: **Swarm Technology LLC**, Mesa, AZ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/852,480**

(22) Filed: **Dec. 22, 2017**

(65) **Prior Publication Data**

US 2018/0121238 A1 May 3, 2018
US 2018/0293096 A2 Oct. 11, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 14/340,332, filed on Jul. 24, 2014, now Pat. No. 9,852,004, which is a (Continued)

(51) **Int. Cl.**
***G06F 9/46*** (2006.01)
***G06F 9/48*** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... ***G06F 9/4843*** (2013.01); ***G06F 9/5044*** (2013.01); ***G06F 9/54*** (2013.01); ***G06F 9/544*** (2013.01); *G06F 2209/5017* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,330,583 B1 12/2001 Reiffin
7,082,604 B2 7/2006 Schneiderman
(Continued)

FOREIGN PATENT DOCUMENTS

WO WO 00/11561 3/2000

OTHER PUBLICATIONS

Tozlu et al. ("Wi-Fi Enabled Sensors for Internet of Things: A Practical Approach", IEEE Communications Magazine, Jun. 2012).*
(Continued)

*Primary Examiner* — Wissam Rashid
(74) *Attorney, Agent, or Firm* — Jennings, Strouss & Salmon PLC; Michael K. Kelly; Daniel R. Pote

(57) **ABSTRACT**

A parallel processing architecture includes a CPU, a task pool populated by the CPU, and a plurality of autonomous co-processing cells each having an agent configured to proactively interrogate the task pool to retrieve tasks appropriate for a particular co-processor. Each co-processor communicates with the task pool through a switching fabric, which facilitates connections for data transfer and arbitration between all system resources. Each co-processor notifies the task pool when a task or task thread is completed, whereupon the task pool notifies the CPU.

**17 Claims, 6 Drawing Sheets**



**Related U.S. Application Data**

continuation of application No. 13/750,696, filed on Jan. 25, 2013, now Pat. No. 9,146,777.

(51) **Int. Cl.**

| | |
|---|---|
| ***G06F 9/54*** | (2006.01) |
| ***G06F 9/50*** | (2006.01) |

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 7,159,215 | B2 | 1/2007 | Shavit et al. | |
| 7,174,381 | B2 | 2/2007 | Gulko et al. | |
| 7,665,117 | B2 | 2/2010 | Sequeria | |
| 7,908,313 | B2 | 3/2011 | Lurie | |
| 8,037,474 | B2 | 10/2011 | Bates et al. | |
| 8,108,867 | B2 | 1/2012 | Robison | |
| 8,209,702 | B1 | 6/2012 | Roytman et al. | |
| 8,284,206 | B2 | 10/2012 | State | |
| 8,533,729 | B2 | 9/2013 | Yao | |
| 8,732,713 | B2 | 5/2014 | Coon et al. | |
| 8,949,853 | B2 | 2/2015 | Zimmermann | |
| 8,990,833 | B2 | 3/2015 | Kuesel et al. | |
| 9,325,575 | B2 | 4/2016 | Gray | |
| 2005/0188372 | A1 | 8/2005 | Inoue et al. | |
| 2006/0026377 | A1 | 2/2006 | Sikdar et al. | |
| 2007/0074207 | A1* | 3/2007 | Bates | G06F 9/4881 718/1 |
| 2011/0310977 | A1 | 12/2011 | Nishihara et al. | |


OTHER PUBLICATIONS

Beni G., Wang J. (1993) Swarm Intelligence in Cellular Robotic Systems. In: Dario P., Sandini G., Aebischer P. (eds) Robots and Biological Systems: Towards a New Bionics?. NATO ASI Series (Series F: Computer and Systems Sciences), vol. 102. Springer, Berlin, Heidelberg.*

US-2008/0168318 A1 Jul. 2008 Dement, Jonathan J.; Wi-Fi Enabled Sensors for the Internet of Things: A Practical Approach; IEEE Communications Magazine—Jun. 2012, pp. 134-143.

Extended European Search Report, dated Feb. 13, 2018; 11pgs.

Kennedy, J.; "Swarm Intelligence", Zomaya, Handbook of Nature—Inspired and Innovative Computing. Springer, Boston, MA (2006), Chap. 6, 35pgs.

Ron Hipschman, "SETI@Home The Search for Extraterrestrial Intelligence", UC Berkeley SETI Project (online), 1997, Available at http://seticlassic.ssl.berkeley.edu/about_seti/about_seti_at_home_1.html.

Julia Evangelou Strait, "Computational biology project aims to better understand protein folding Crowd-sourced computer network delves into protein structure, seeks new disease therapies", The Source (online), Feb. 26, 2019, Washington University in St. Louis, Available at https://source.wustl.edu/2019/02/computational-biology-project-aims-to-better-understand-protein-folding/.

* cited by examiner




FIG. 1


13
Thread Complete
30C
21A
21B
21
22A
Descriptor
First Type
Completed
22B
Descriptor
Third Type
Completed
22C
Descriptor
Second Type
Completed
22D
Descriptor
Third Type
Completed
OR
AND
22
Descriptor
Third Type
Ready
Descriptor
First Type
Ready
Descriptor
First Type
Not Ready
Descriptor
Second Type
Not Ready
Descriptor
Third Type
Not Ready
Descriptor
Second Type
Completed

FIG. 2



300
302
304
306
308
310
312
314
316
318
320
322
324
322
330
332
334
336
340
342
A
B
C
A,B
A
B
C
A,B
A
A
B
B
C
C


FIG. 3




FIG. 4




FIG. 5


600
602
Populate task pool
604
Proactively dispatch agent from cell to task pool
606
Retrieve and process task
608
Notify task pool and CPU when task complete
610
Incorporate additional co-processor

FIG. 6

# SYSTEM AND METHOD FOR SWARM COLLABORATIVE INTELLIGENCE USING DYNAMICALLY CONFIGURABLE PROACTIVE AUTONOMOUS AGENTS

## PRIORITY DATA

This application is a continuation of U.S. application Ser. No. 14/340,332, filed Jul. 24, 2014, now U.S. Pat. No. 9,852,004, issued on Dec. 26, 2017, which is a continuation of U.S. application Ser. No. 13/750,696, filed Jan. 25, 2013, now U.S. Pat. No. 9,146,777, issued on Sep. 29, 2015, which are incorporated herein by reference.

## FIELD OF INVENTION

The present invention generally relates to parallel-process computing, and collaborative intelligence, and particularly relates to a processing architecture which involves autonomous co-processors (such as robotic vehicles, Internet of Things (IoT) components, and networked devices) configured to proactively retrieve tasks from a task pool populated by a central processing unit.

## BACKGROUND

The Internet of Things (also referred to as the Cloud of Things) refers to an ad hoc network of uniquely identifiable embedded computing devices within the existing Internet infrastructure. In addition to or in conjunction with IoT, collaborative intelligence portends advanced connectivity of devices, systems, and robotic vehicles. The scope of things contemplated by collaborative intelligence and the IoT is unlimited, and may include devices such as heart monitoring implants, biochip transponders, automobile sensors, aerospace and defense field operation devices, unmanned ground vehicle (UGVs), unmanned aerial vehicles (UAVs), and public safety applications that assist fire-fighters in search and rescue operations, for example. Current market examples include home based networks that involve smart thermostats, light bulbs, and washer/dryers that utilize wifi for remote monitoring. Due to the ubiquitous nature of connected objects in the IoT, it is estimated that more than 30 billion devices will be wirelessly connected to the Internet of Things by 2020. Harnessing the processing capacity of the controllers and processors associated with these devices is one of the objectives of the present invention.

Computer processors traditionally execute machine coded instructions serially. To run a plurality of applications concurrently, a single processor interleaves instructions from various programs and executes them serially, although from the user's perspective the applications appear to be processed in parallel. True parallel or multi-core processing, on the other hand, is a computational approach that breaks large computational tasks into individual blocks of computations and distributes them among two or more processors. A computing architecture that uses task parallelism (parallel processing) divides a large computational requirement into discrete modules of executable code. The modules are then executed concurrently or sequentially, based on their respective priorities.

A typical multiprocessor system includes a central processing unit ("CPU") and one or more co-processors. The CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Completed threads are reported to the CPU, which continues to distribute additional threads to the co-processors as needed. Presently known multiprocessing approaches are disadvantageous in that a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors. In addition, co-processors often remain idle while waiting for a new task from the CPU.

A multiprocessor architecture in thus needed which reduces CPU management overhead, and which also more effectively harnesses and exploits available co-processing resources.

## SUMMARY OF THE INVENTION

Various embodiments of a parallel processing computing architecture include a CPU configured to populate a task pool, and one or more co-processors configured to proactively retrieve threads (tasks) from the task pool. Each co-processor notifies the task pool upon completion of a task, and pings the task pool until another task becomes available for processing. In this way, the CPU communicates directly with the task pool, and communicates indirectly with the co-processors through the task pool.

The co-processors may also be capable of acting autonomously; that is, they may interact with the task pool independently of the CPU. In a preferred embodiment, each co-processor includes an agent that interrogates the task pool to seek a task to perform. As a result, the co-processors work together "in solidarity" with one another and with the task pool to complete aggregate computational requirements by autonomously retrieving and completing individual tasks which may or may not be inter-related. By way of non-limiting example, suppose a task B involves computing an average temperature over time. By defining a task A to include capturing temperature readings over time, and further by defining task B to including obtaining the captured readings, the CPU and the various co-processors may thereby inferentially communicate with each other via the task pool.

In various embodiments the co-processors are referred to as autonomous, proactive solidarity cells. In this context, the term autonomous implies that a co-processor may interact with the task pool without being instructed to do so by the CPU or by the task pool. The term proactive suggests that each co-processor may be configured (e.g., programmed) to periodically send an agent to monitor the task pool for available tasks appropriate to that co-processor. The term solidarity implies that co-processing cells share a common objective in monitoring and executing all available tasks within the task pool.

A solidarity cell (co-processor) may be a general purpose or special purpose processor, and therefore may have the same or different instruction set, architecture, and microarchitecture as compared to the CPU and other solidarity cells in the system. Moreover, the software programs to be executed and data to be processed may be contained within one or more memory units. In a typical computer system, for example, a software program consists of a series of instructions that may require data to be used by the program. For example, if the program corresponds to a media player, then the data contained in memory may be compressed audio data which is read by a co-processor and eventually played on a speaker.

Each solidarity cell in the system may be configured to communicate, ohmically or wirelessly, with the task pool through a crossbar switch, also known as fabric. In a purely wireless mesh topology, the radio signals themselves may constitute the fabric. In various embodiments, the co-processors may also communicate directly with the CPU. The switching fabric facilitates communication among system resources. Each solidarity cell is proactive, in that it obtains a task to perform by sending its agent to the task pool when the solidarity cell has no processing to perform or, alternatively, when the solidarity cell is able to contribute processing cycles without impeding its normal operation. By way of non-limiting example, in the context of the Internet-of-Things (discussed in greater detail below), a co-processor associated with a device such as a light bulb may be programmed to listen for "on" and "off" commands from a master device (such as a smartphone) as its normal operation, but its processing resources may also be harnessed through a task pool.

In the context of various embodiments described herein, the term agent refers to a software module, analogous to a network packet, associated with a co-processor that interacts with the task pool to thereby obtain available tasks which are appropriate for that co-processor cell. The solidarity cells may execute the tasks sequentially, when the tasks are contingent on the execution of a previous task, or in parallel, when more than one solidarity cell is available and more than one matching tasks are available for execution. The tasks may be executed independently or collaboratively, depending on the task thread restrictions (if any) provided by the CPU. Interdependent tasks within the task pool may be logically combined. The task pool notifies the CPU when a task thread is completed. If a task thread is composed of a single task, then the task pool may notify the CPU at completion of such task. If a task thread is composed of multiple tasks, the task pool may notify the CPU at completion of such chain of tasks. Since task threads may be logically combined, it is conceivable to have a case in which the task pool notifies the CPU after completion of logically combined task threads.

Those skilled in the art will appreciate that interoperability among the CPU and co-processors may be facilitated by configuring the CPU to compose and/or structure tasks at a level of abstraction which is independent of the instruction set architecture associated with the various co-processors, thereby allowing the components to communicate at a task level rather than at an instruction level. As such, devices and their associated co-processors may be added to a network on a "plug and play" basis. Another aspect of this invention provides interoperability within a heterogeneous array of CPUs with different instruction set architectures.

Various features of the invention are applicable to, inter alia, a network of Internet-of-Things devices and sensors; heterogeneous computing environments; high performance computing, two dimensional and three dimensional monolithic integrated circuits; and motion control and robotics.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will hereinafter be described in conjunction with the appended drawing figures, wherein like numerals denote like elements, and:

FIG. **1** is a schematic block diagram of a parallel processing architecture including a CPU, memory, task pool, and a plurality of co-processors configured to communicate through a fabric in accordance with an embodiment;



FIG. **2** is a schematic block diagram illustrating details of an exemplary task pool in accordance with an embodiment;

FIG. **3** is a schematic block diagram of a network including co-processing cells and their corresponding agents interacting with a task pool in accordance with an embodiment;

FIG. **4** is a schematic layout of an internet of things network including available plug and play devices in accordance with an embodiment; and

FIG. **5** is a schematic layout diagram of an exemplary internet of things use case illustrating dynamic harnessing of nearby devices in accordance with an embodiment; and

FIG. **6** is a flow chart illustrating the operation of an exemplary parallel computing environment in accordance with an embodiment.

## DETAILED DESCRIPTION

Various embodiments relate to parallel processing computing systems and environments (such as IoT and collaborative intelligence environments), ranging from simple switching and control functions to complex programs and algorithms including, without limitation: robot control, data encryption; graphics, video, and audio processing; direct memory access; mathematical computations; data mining; game algorithms; ethernet packet and other network protocol processing including construction, reception and transmission of data the outside network; financial services and business methods; search engines; internet data streaming and other web-based applications; execution of internal or external software programs; switching on and off and/or otherwise controlling or manipulating appliances, light bulbs, consumer electronics, robotic vehicles, and the like, e.g., in the context of the Internet-of-Things and/or collaborative intelligence systems.

Various features may be incorporated into any presently known or later-developed computer architecture. For example, parallel processing concerns relating to synchronization, data security, out-of-order execution, and main processor interrupts may be addressed using the inventive concepts described herein.

Referring now to FIG. **1**, a distributed processing system **10** for use in connection with, for example, an IoT network or collaborative intelligence system includes a single or multi-core CPU **11** and one or more solidarity or co-processing cells **12**A-**12** configured to communicate with a task pool **13** through a cross-bar switching fabric **14**. The solidarity cells **12** may also communicate with each other through the switching fabric **14** or through a separate cell bus (not shown). The CPU **11** may communicate with the task pool **13** directly or through the switching fabric **14**. One or more memory units **15** each contain data and/or instructions. In this context, the term "instructions" include a software program that may be compiled for execution by the CPU **11**. The memory units **15**, cells **12**, and the task pool **13** may be ohmically or wirelessly interconnected to communicate with the CPU and/or with each other via the switching fabric **14**. In some embodiments, the CPU **11** communicates with the cells **12** only indirectly through the task pool. In other embodiments, the CPU **11** may also communicate directly with the cells **12** without using the task pool as an intermediary.

In some embodiments the system **10** may include more than one CPU **11** and more than one task pools **13**, in which case a particular CPU **11** may interact exclusively with a particular task pool **13**, or multiple CPUs **11** may share one or more task pools **13**. Moreover, each solidarity cell may be configured to interact with more than one task pool **13**.

Alternatively, a particular cell may be configured to interact with a single designated task pool, for example, in a high performance or high security context.

In various embodiments cells may be dynamically paired, ohmically (plug and play) or wirelessly (on the fly), with a task pool when the following three conditions are meet:

1) The cell is able to communicate, ohmically or wirelessly, with the task pool. The connection to the task pool can be through a port in the task pool itself, or through a switching fabric that is connected to the task pool;
2) The task pool recognizes the agent sent by the cell as trustworthy, for example, using input from the user, with or without password, through traditional Wi-Fi, Bluetooth or similar pairing, manually through a graphical software program running on a smartphone or tablet, or by any other secure or unsecure method; and
3) At least one of the available tasks within the task pool is compatible with the capabilities of the solidarity cell.

In the case of a multi-processor environment with multiple task pools, the foregoing dynamic pairing conditions apply, except that a given cell may be locked or restricted to work with only one of the task pools; otherwise, the cells may connect with one or more task pools, using a first found basis, round robin basis or any other selection scheme. It is also possible to assign priorities to the tasks within the task pools, whereby the cells give preference to the high priority tasks and serve the lower priority tasks when not otherwise engaged by the higher priority tasks.

The CPU **11** may be any single or multi-core processor, applications processor or microcontroller, used to execute a software program. The system **10** may be implemented on a personal computer, smart phone, tablet, or Internet-of-Things device, in which case the CPU **11** may be any personal computer, central processor, or processor cluster, such as an Intel® Pentium® or multi-core processor local to or remote from the immediate computing environment. Alternatively, the system **10** may be implemented on a supercomputer and the CPU **11** may be a reduced instruction set computer ("RISC") processor, applications processor, a microcontroller, or the like.

In other embodiments, the system **10** may be implemented on a locally connected series of personal computers, such as a Beowulf cluster, in which case the CPU **11** may include the central processors of all, a subset, or one of the networked computers. Alternatively, the system **10** may be implemented on a network of remotely connected computers, in which case the CPU **11** may be a presently known or later developed central processor for a server or mainframe. The particular manner in which the CPU **11** performs the subject parallel processing methods within the presently described system **10** may be influenced by the CPU's operating system. For example, the CPU **11** may be configured for use within the system **10** by programming it to recognize and communicate with the task pool **13** and divide the computing requirements into threads, as described below.

It is further contemplated that the system **10** may be implemented retroactively on any computer or computer network having an operating system that may be modified or otherwise configured to implement the functionality described herein. As is known in the art, the data to be processed is contained within the memory units **15**, for example in the context of addressable regions or sectors of random access or read-only memory, cache memory for the CPU **11**, or other forms of data storage such as flash memory and magnetic storage. The memory units **15** contain the data to be processed as well as the location to place the results of the processed data. Not every task is required to access the memory units **15**, as in the case of, for example, smart meters and automotive instrumentation, which may return data to the system **10**, or as in the case of a robot and motor controllers which may actuate a mechanism.



Each cell **12** is a conceptually or logically independent computational unit capable of executing one or more tasks/threads. A cell **12** may be a microcontroller, a microprocessor, application processor, a "dumb" switch, or a standalone computer such as a machine in a Beowulf cluster.

A cell **12** may be a general or special purpose coprocessor configured to supplement, perform all of, or perform a limited range of functions of the CPU, or functions that are foreign to the CPU **11** such as ambient monitoring and robotic actuators, for example. A special-purpose processor may be a dedicated hardware module designed, programmed, or otherwise configured to perform a specialized task, or it may be a general-purpose processor configured to perform specialized tasks such as graphics processing, floating-point arithmetic, or data encryption.

In an embodiment, any cell **12** that is a special-purpose processor may also be configured to access and write to memory and execute descriptors, as described below, as well as other software programs.

Moreover, any number of cells **12** may comprise a heterogeneous computing environment; that is, a system that uses more than one kind of processor such as an AMD-based and/or an Intel-based processor, or a mixture of 32-bit and 64-bit processors.

Each cell **12** configured to perform one or a plurality of specialized tasks, as illustrated in the following sequence of events. During a poll phase each cell periodically sends an agent to the task pool until a matching task is found. To facilitate this matching, both the cell and the task pool may be equipped with a transceiver. In the case of the task pool, the transceiver maybe located in the task pool itself or in the switching fabric to which the task pool is connected. When a task match is found within a task pool, the task pool transmits an acknowledgement to the cell. The next step is the "communication channel" phase. During the communication channel phase, the cell receives the task and begins to execute the task. In one implementation, once the first task is completed, the communication channel is maintained so that the solidary cell can fetch another task without having to repeat the "poll" and "acknowledge" phases.

The system **10** may include a plurality of cells, wherein some of the cells are capable of performing the same task types as other cells, to thereby create redundancy in the system **10**. The set of task types performed by a given cell **12** may be a subset of the set of task types performed by another cell. For example, in FIG. **1**, the system **10** may divides an aggregate computational problem into a group of tasks, and populate the task pool **13** with a first type, a second type, and a third type of tasks. A first cell **12**A may capable of performing only tasks of the first type; a second cell **12**B may be capable of perform tasks of the second type; a third cell **12**C may be capable of performing tasks of the third type; a fourth cell **12**D may be capable of performing tasks of the second or third types; and a fifth cell **12**N may be capable of performing all three task types. The system **10** may be configured with this redundancy so that if a given cell is removed from the system **10** (or currently busy or otherwise unavailable), the system **10** may continue to function seamlessly. Furthermore, if a cell is dynamically

added to the system **10**, the system **10** may continue to function seamlessly with the benefit of increased performance.

Referring now to FIGS. **1** and **2**, the task pool **13** may occupy a region of physical memory that is accessible by the CPU **11**. Alternatively, the task pool **13** may be accessible by MAC address or IP address. Multiple embodiments are envisioned for the task pool **13**; it may be physically located with the CPU in the same 2D or 3D monolithic IC, or it may be implemented as a stand-alone IC and be physically interconnected to a computer board, smart phone, tablet, router or Internet-of-Things device. In a further alternative embodiment, the task pool may be a stand-alone multi-port, wired and/or wireless connected device which may be shared among multiple CPU **11** systems, or dedicated to a given CPU **11**. The task pool **13** may also be addressable by the cells **12**. The task pool **13** may be disposed in a dedicated hardware block to provide maximum access speed by the CPU **11** and cells **12**. Alternatively, the task pool **13** may be software based, wherein the contents of the task pool **13** are stored in memory, analogous to the hardware-based embodiment, but represented by data structures.

Upon being populated by the CPU **11**, the task pool **13** contains one or more task threads **21**. Each task thread **21** represents a computational task that may be a component or subset of the larger aggregate computational requirement imposed on the CPU **11**. In one embodiment, the CPU **11** may initialize and then populate the task pool **13** with concurrently executable threads **21**. Each thread **21** may include one or more discrete tasks **22**. A task **22** may have a task type and a descriptor. The task type indicates which cells **12** are capable of performing the task **22**. The task pool **13** may also use the task type to prioritize tasks **22** having the same type. In one embodiment, the task pool **13** may maintain a prioritization table (not shown) that documents the solidarity cells **12** present in the system **10**, the types of tasks **22** each cell is capable of performing, and whether or not each cell is presently processing a task **22**. The task pool **13** may use the prioritization table to determine which of the eligible tasks **22** to assign to a requesting cell, as described below.

In some embodiments, the CPU **11** may retrieve and execute a task or thread from the task pool. Moreover, the CPU **11** may abort any task that is determined to be stale, broken, stuck, or erroneous. In such case, the CPU **11** may refresh the task, making available for subsequent processing. Nothing precludes the CPU **11** from implementing adaptive task management, for example, as may be required by Artificial Intelligence, whereupon the CPU **11** may add, remove, or change tasks within an unfinished existing thread **21**.

The descriptor may contain one or more of a specific instruction to be executed, a mode of execution, the location (e.g., address) of the data to be processed, and the location for placement of the task results, if any. The location for placement of results is optional, such as in the case of animation and multimedia tasks that often present results to a display rather than storing them in memory. Moreover, task descriptors may be chained together, as in a linked list, so that the data to be processed may be accessed with fewer memory calls than if the descriptors were not chained together. In an embodiment, the descriptor is a data structure containing a header and a plurality of reference pointers to memory locations, and the task **22** includes the memory address of the data structure. The header defines the function or instruction to be executed. A first pointer references the location of the data to be processed. A second, optional pointer, references the location for placement of processed data. If the descriptor is linked to another descriptor to be sequentially executed, the descriptor may include a third pointer that references the next descriptor. In an alternative embodiment where the descriptor is a data structure, the task **22** may include the full data structure.

A thread **21** may further comprise a "recipe" describing the order in which the tasks **22** may be performed and any conditions that affect the order of performance. According to the recipe, the tasks **22** may be executed sequentially, concurrently, out-of order, interdependently, or conditionally according to Boolean operations. For example, in FIG. **2**, thread **21**A comprises four tasks: **22**A, **22**B, **22**C, and **22**D. In the illustrated embodiment, the first task **22**A must be completed before either the second task **22**B or the third task **22**C can begin. According to the recipe, once either the second task **22**B or third task **22**C is complete, the fourth task **22**D may begin.

Threads **21** may also be interdependent. For example, as shown in FIG. **2**, due to the Boolean operation in thread **21**B, a completed task **22**C may allow processing of tasks in thread **21**B to continue. The task pool **13** may lock a task **22** while the task **22** is waiting for completion of another task **22** upon which it depends. When a task **22** is locked, it cannot be acquired by a cell. When the tasks **22** of a thread **21** are completed, the task pool **13** may notify the CPU **11** of the completion. The CPU may then advance processing beyond the completed thread **21**.

The cells advantageously maintain solidarity with each other and with the CPU **11**, thereby helping the system **10** to perform complex computations by autonomously and proactively retrieving tasks from the task pool **13**. The cells **12** act autonomously in that they may act independently of the CPU **11** or any other coprocessor. Alternatively, a cell may be acted upon or instructed directly by the CPU. Each cell acts proactively in that it seeks a task **22** from the task pool **13** as soon as the cell becomes available for further processing.

More particularly, in an embodiment, a cell **12** acquires a task from the task pool by sending an agent **30** to interrogate (search for) the task pool and retrieve an available task **22** that requires completion, is not locked, and that has a task type that can be performed by the cell. Typically, the system **10** has the same number of agents as solidarity co-processing cells. In this context, an agent is generally analogous to a data frame in the networking sense, in that an agent may be equipped with a source address, a destination address, and a payload. In an embodiment, the destination address is the address of the task pool **13** when the agent **30** is seeking a task **22**, and the destination address is the address of the corresponding cell **12** when the agent **30** is returning to its cell with a task **22**. Correspondingly, the source address is the address of the cell **12** when the agent **30** is seeking a task **22**, and the source address is the address of the task pool **13** when the agent **30** is returning to its cell with a task **22**.

In addition, the source and destination addresses may facilitate frame synchronization. That is, the system **10** may be configured to unequivocally differentiate addresses from payload data, so that when the contents of an agent **30** are read, the destination address indicates the beginning of the frame and the source address indicates the end of the frame, or vice versa. This allows the payload to vary in size when it is placed between the addresses. In another embodiment of a variable-size payload, an agent **30** may include a header that indicates the payload size. The header information may be compared to the payload to verify the data integrity. In still another embodiment, the payload may be a fixed length.

When an agent **30** is dispatched to the task pool **13** by its co-processor cell, the payload contains identifying information of the types of tasks the cell **12** can perform. When the agent **30** returns from the task pool **13**, the payload contains the descriptor of the task **22**, either in the form of a memory location or the full descriptor data structure.

In other embodiments, some or all of the agents **30** are autonomous representatives of their respective corresponding cells **12**. That is, each agent **30** may be dispatched by its corresponding cell **12** to retrieve a task **22** any time the cell is idle or capable of performing additional processing. In this way, the processing capacity of the solidarity cells **12** may be more fully exploited, inasmuch as the cells need not wait idly for an instruction from the CPU **11**. This approach has the additional benefit of reducing CPU overhead by relieving the CPU of the need to send a request to a cell to retrieve a task from the task pool. These advantages render the system **10** more efficient than traditional computer architectures in which auxiliary modules and co-processors are dependent on instructions from the main CPU.

Further, the solidarity cells **12**A-**12***n* are ambivalent as to the particular composition of the thread itself. Rather, an agent is only concerned about finding a match between the capabilities of its corresponding cell and an available task **22** to be completed in the task pool **13**. That is, as long as there are available tasks **22** in the task pool **13**, and an available task **22** matches the capability of the cell, then the system may effectively harness the processing capacity of the cell.

Some or all of the solidarity cells **12**A-**12***n* may work independently of each other, or may communicate with each other directly, through the switching fabric **14**, through the task pool **13**, or pursuant to a command or request from the CPU to invoke another solidarity cell to assist in processing, moving, or transmitting data. In one embodiment, the agent **30**A may search for a match between the task type of the ready tasks **22** and the types of tasks that the cell **12**A is able to perform. This architecture may involve hard-coding of the types of tasks that the CPU **11** is configured to create. Thus, if the task pool **13** contains three types of tasks **22**, and the large computational requirement includes a task of a fourth type, this fourth type of task may not be placed in the task pool **13** even if a cell capable of performing tasks of the fourth type is included in or added to the system **10**. Consequently, the CPU **11** may be configured to "learn" or be taught how to create tasks of the fourth type in order to more fully exploit the available processing resources.

In another embodiment, the agent **30**A searches the task **22** descriptors for an executable instruction that matches one of the instructions that that cell **12**A is capable of executing. When a matching task **22** is found, the agent **30**A delivers the descriptor of the matching task **22** to the cell **12**A, whereupon the cell **12**A begins to process the task **22**. In particular, the agent **30**A may deliver the memory address of the descriptor to the cell **12**A, and the cell **12**A retrieves the data structure from memory. Alternatively, where the descriptor's entire data structure is contained in the task **22**, the agent **30**A may deliver the complete data structure to the cell **12**A for processing. The descriptor informs the cell **12**A which instruction to execute, the location in memory units **15** where the data to be processed may be found, and the location in memory **15** where the results are to be placed. Upon completion of the task **22**, the cell **12**A notifies the task pool **13** to change the status of the selected task **22** from 'to be completed' to 'completed.' Further, once the cell **12**A finishes a task **22**, the cell may dispatch its agent **30**A to the task pool **13** to seek another task **22**.



Some or all of the agents **30**A-**30***n* may travel through the system **10** by wire or wirelessly, for example, using a Wi-Fi network, wireless Ethernet, wireless USB, wireless bridge, wireless repeater, wireless router, Zigbee®, ANT+® or Bluetooth® pairing, according to the particular architecture and/or implementation of the system **10**. In an embodiment, an agent **30** may be guided to the task pool **13** wirelessly by including a receptor feature at the task pool **13** and further by including a transmitter feature with the cell **12**. Similarly, the task pool may answer wirelessly to the cells by equipping the task pool with a transmitter and the solidarity cells with a receiver. In this manner, the cells may communicate wirelessly with the task pool with or without use of the switching fabric.

In a preferred embodiment, however, some form of switching fabric **14** is used. The switching fabric **14** facilitates connections for data transfer and arbitration between system resources. The switching fabric **14** may be a router or crossbar switch that provides connectivity between the various cells and the task pool. The switching fabric **14** may further provide connectivity between each solidarity cell **12**A-**12***n* and system resources such as the CPU **11**, memory units **15**, and traditional system components including, without limitation: direct memory access units, transmitters, hard disks and their controllers, display and other input/output devices, and other coprocessors. The cells **12**A-**12***n* may be connected physically to the switching fabric **14**, or the cells may be connected wirelessly.

The wireless connection of cells into the system **10** facilitates the dynamic addition and/or removal of cells for use in the system **10**. For example, the CPU **11** may recruit cells from other cell systems, allowing for dynamic expansion and increased performance. In this manner, two or more cell systems (e.g., networks) may share solidarity cells. In one embodiment, a cell that becomes idle may look for and/or be recruited by another system that has a need for additional processing resources, i.e., it has available processing tasks that need to be completed. Similarly, the system **10** may expand performance by incorporating clusters of additional cells for a particular task. For example, the system **10** may enhance performance of an encryption/decryption function, or the processing of audio and/or video data, by incorporating nearby cells capable of performing these tasks.

To guard against undesirable connections, the CPU **11** may provide the task pool **13** with a list of or, alternatively, criteria for identifying trusted and/or untrusted cells as well as authentication requirements or protocols. Moreover, the task pool itself may exclude particular cells on the basis of low performance, unreliable connection, poor data throughput, or suspicion of malicious or otherwise inappropriate activity. In various embodiments, cells **12** may be added to a task pool **13**, or excluded from a task pool **13**, by a user through the use of a smartphone, tablet or other device or application. In one embodiment, a graphical application interface may provide the user with useful statistical and/or iconic information such as location of available cells and other devices, performance gain, or performance penalty, as a result of adding or removing particular cells from a network.

In an alternative embodiment, some or all of the co-processing cells may connect directly to the task pool **13**, such as by a wired configuration that does not require a switching fabric **14** for communication. The wired connection of cells may further facilitate dynamic expansion and contraction of the system **10** analogous to the wireless configuration discussed above, although wired connections

may physical (e.g., manual) integration and extraction of peripheral devices. In either case, scalability of the system is greatly enhanced over conventional parallel processing schemes, as co-processors may be added and removed without reprogramming the CPU **11** to account for the changes to the system **10**.

Referring now to FIG. **3**, a network **300** includes a CPU **302**, a first memory **304**, a second memory **306**, a task pool **308**, a switching fabric **310**, a first co-processing cell **312** configured to perform (execute) type A tasks, a second cell **314** configured to perform type B tasks, a third cell **316** configured to perform type C tasks, and a fourth cell **318** configured to perform both type A and type B tasks. As shown, the task pool **308** is populated (e.g., by the CPU **302**) with tasks (or task threads) **330** and **332** of task type A; tasks **334** and **336** of task type B; and tasks **340** and **342** of task type C. In an embodiment, each cell preferably has a unique, dedicated agent. In particular, cell **312** includes an agent **320**; cell **314** includes an agent **322**; cell **316** includes an agent **324**; and cell **318** includes an agent **326**. Each agent preferably includes an information field or header which identifies the type of tasks its associated cell is configured to perform, for example, a single task or combination of tasks A, B, C.

During operation, when a cell is either idle or otherwise has available processing capacity, its agent proactively interrogates the task pool to determine whether any tasks are in the task queue which are appropriate for that particular cell. For example, cell **312** may dispatch its agent **320** to retrieve one or both of tasks **330** and **332** corresponding to task type A. Similarly, cell **314** may dispatch its agent **322** to retrieve either task **334** or **336** (depending on their relative priorities) corresponding to task type B, and so on. For cells which are capable of performing more than one task type, such as cell **318** configured to perform task types A and B, agent **326** may retrieve any one of tasks **330**, **332**, **334**, and/or **336**.

Upon retrieving a task from the task pool, a cell may then process that task, typically by retrieving data from a particular location in first memory **304**, processing that data, and storing the processed data at a particular location within second memory **306**. When a task is completed, the cell notifies the task pool, the task pool marks the task as completed, and the task pool notifies the CPU that the task is completed. Alternatively, the task pool may notify the CPU when a task thread is completed, inasmuch as a task thread may comprise a single task, a series of tasks, or Boolean combination of tasks. Significantly, the retrieval of tasks and the processing of data by the cells may occur without direct communication between the CPU and the various cells.

Referring now to FIG. **4**, an internet of things network **400** includes a controller (CPU) **402**, a task pool **408**, and various devices **410**-**422**, some or all of which include an associated or embedded microcontroller, such as an integrated circuit (IC) chip or other component which embodies processing capacity. By way of non-limiting example, the devices may include a light bulb **410**, a thermostat **412**, an electrical receptacle **414**, a power switch **416**, an appliance (e.g., toaster) **418**, a vehicle **420**, a keyboard **422**, and virtually any other plug and play device or application capable of interfacing with a network.

In the illustrated embodiment, the controller **402** may be a smartphone, tablet, laptop, or other device which may include a display **404** and a user interface (e.g., keypad) **406** for facilitating user interaction with the various devices on the network. To the extent the processing capacity (e.g., bandwidth) of the controller **402** may be insufficient to adequately support the network, the controller may effectively harvest or recruit processing resources from the peripheral devices via the task pool, for example as explained below in conjunction with FIG. **5**.

Referring now to FIG. **5**, an internet of things network **500** use case illustrates the dynamic harnessing of nearby (or otherwise available) devices. Network **500** includes a primary control unit **502** (e.g., a laptop, tablet, or gaming device), a task pool **504**, a first co-processor device **506**, and a second co-processor device **508**. An exemplary use case in the context of network **500** will now be described.

Suppose a user is playing a video game on her laptop computer **502**. The video game requires detailed computer-generated imagery, and perhaps the processing power in laptop **502** is sufficient to render a single realistic-looking character, but when a second character is introduced onto the screen, the image quality degrades, and the movement of the characters is no longer continuous. The present invention proposes a method to harness the processing power of underutilized computer resources located within the vicinity of, or otherwise available to, the user.

To address the need for additional processing power, the laptop **502** connects to the task pool **504**. In this regard, the laptop itself may be equipped with a task pool, or the task pool may be in the form an external device or application located within wireless reach from the laptop **502**. In the case of an external task pool, the task pool itself could perform the duties of a switching fabric with ports to allow connection to multiple co-processing cells. The laptop **502** populates the task pool **504** with computationally intensive tasks. A nearby underutilized device, such as a smartphone **508**, subsequently connects to the task pool **504** and sends its agent to fetch a matching task type. Consequently, the smart phone **508** becomes a co-processor seamlessly assisting the laptop **502**, thereby enhancing the video game experience. The same method may be repeated in the event other underutilized processing resources exist and are needed. Indeed, even the processing power of an available light-bulb **506** may become a co-processor to the laptop.

FIG. **6** is a flow chart illustrating the operation of an exemplary parallel computing environment. In particular, a method **600** includes populating a task pool with tasks (Step **602**), proactively dispatching one or more agents from one or more corresponding cells to the task pool (Step **604**), retrieving and processing a task (Step **606**), and notifying the task pool and the CPU that the task thread has been performed (Step **608**). The method **600** further includes dynamically incorporating (Step **610**) an additional device into the network, as needed.

A processing system is thus provided which includes a task pool, a controller configured to populate the task pool with a first task, and a first co-processor configured to proactively retrieve the first task from the task pool.

In an embodiment, the first co-processor comprises a first agent configured to retrieve the first task from the task pool without communicating with the controller.

In an embodiment, the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first type, and the first agent is configured to search the task pool for a task of the first type.

In an embodiment, the first co-processor is further configured to process the first and notify the task pool upon completion of the first task, and the task pool is configured to notify the controller upon completion of the first task.

In an embodiment, the controller and the first co-processor are configured communicate with each other only through the task pool.

In an embodiment, the controller and the first co-processor are configured communicate with each other directly and through the task pool.

In an embodiment, the first co-processor is configured to determine that it has available processing capacity, and to dispatch the agent to the task pool in response to the determination.

In an embodiment, the controller is further configured to populate the task pool with a second task, and wherein the system further comprises a second co-processor having a second agent configured to proactively retrieve the second task from the task pool.

In an embodiment, the second task includes indicia of a second task type, the second co-processor is configured to perform tasks of the second type, and the second agent is configured to search the task pool for a task of the second type.

In an embodiment, the controller and the task pool reside on a monolithic integrated circuit (IC), and the first co-processor does not reside on the IC.

In another embodiment, the controller, the task pool, and the first and second co-processors reside on a monolithic integrated circuit (IC).

A method is also provided for dynamically controlling processing resources in a network of the type including a central processing unit (CPU) configured to populate a task pool with a first task having a first task type. The method includes the steps of: programming a first cell to perform the first task type; adding the programmed first cell to the network; proactively sending a first agent from the first cell to the task pool; searching the task pool, by the first agent, for a task of the first type; retrieving, by the first agent, the first task from the task pool; transporting, by the first agent, the first task to the first cell; processing, by the first cell, the first task; and sending a notification from the first cell to the task pool that the first task is completed.

In an embodiment, the method also includes: marking, by the task pool, the first task as being completed; and sending a notification from the task pool to the CPU that the first task is completed.

In an embodiment, the method also includes configuring the first cell to determine that the first cell has available processing capacity as a predicate to proactively sending the first agent to the task pool.

In an embodiment, the method also includes integrating the first cell into a first device prior to adding the programmed first cell to the network.

In an embodiment, the first device comprises one of a sensor, light bulb, power switch, appliance, biometric device, medical device, diagnostic device, lap top, tablet, smartphone, motor controller, and a security device.

In an embodiment, adding the programmed first cell to the network comprises establishing a communication link between the first cell and the task pool.

In an embodiment, the (CPU) is further configured to populate the task pool with a second task having a second task type, the method further comprising the steps of: programming the second cell to perform the second task type; establishing a communication link between the second cell and the task pool; proactively sending a second agent from the second cell to the task pool; searching the task pool, by the second agent, for a task of the second type; retrieving, by the second agent, the second task from the task pool; transporting, by the second agent, the second task to the second cell; processing, by the second cell, the second task; sending a notification from the second cell to the task pool that the second task is completed; marking, by the task pool, the second task as being completed; and sending a notification from the task pool to the CPU that the second task is completed.



A system is also provided for controlling distributed processing resources in an internet of things (IoT) computing environment, including: a CPU configured to partition an aggregate computing requirement into a plurality of tasks and place the tasks in a pool; and a plurality of devices each having a unique dedicated agent configured to proactively retrieve a task from the pool without direct communication with the CPU.

While there has been illustrated an enabling description of various embodiments including the best mode known to the inventors, it will be understood by those skilled in the art that various changes and modifications may be made and equivalents may be substituted for various elements without departing from the scope of the invention. Therefore, it is intended that the inventions disclosed herein not be limited to the particular embodiments disclosed, but that the invention will include all embodiments falling within the literal and equivalent scope of the appended claims.

I claim:

**1**. A collaborative intelligence system, comprising:

a task pool;

a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;

a first co-processor configured to successively: proactively retrieve a first task from the task pool; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

a second co-processor configured to successively: proactively retrieve a second task from the task pool; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

wherein the collaborative intelligence system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller;

the plurality of first tasks and the plurality of second tasks are associated with a common objective;

the first and second co-processors autonomously work together in solidarity with the task pool to complete the common objective.

**2**. The collaborative intelligence system of claim **1**, wherein the first co-processor is configured to perform at least one of depositing a new task into the task pool and modifying an existing task within the task pool.

**3**. The collaborative intelligence system of claim **1**, wherein:

the first co-processor includes a first agent;

the second co-processor includes a second agent;

the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first type, and the first agent is configured to search the task pool for a task of the first type; and

the second task includes indicia of a second task type, the second co-processor is configured to perform tasks of the second type, and the second agent is configured to search the task pool for a task of the second type.

**4**. The collaborative intelligence system of claim **1**, wherein the first co-processor is configured to determine

when it has available processing capacity, and to dispatch the first agent to the task pool in response to the determination.

**5**. The collaborative intelligence system of claim **1**, wherein the controller and the task pool reside on a monolithic integrated circuit (IC) that is not a component of either the first or second co-processors.

**6**. A collaborative intelligence system, comprising:

a task pool;

a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;

a first co-processor configured to successively: proactively retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

a second co-processor including a second agent comprising a second source address, a second destination address, and a second payload, the second co-processor configured to successively: proactively retrieve a second task from the task pool; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

wherein:

the processing system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the collaborative intelligence system on a plug-and-play basis without any communication with the controller;

the first co-processor includes a first agent comprising a first source address, a first destination address, and a first payload;

the second co-processor includes a second agent comprising a second source address, a second destination address, and a second payload;

the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first type, and the first agent is configured to search the task pool for a task of the first type;

the second task includes indicia of a second task type, the second co-processor is configured to perform tasks of the second type, and the second agent is configured to search the task pool for a task of the second type;

further wherein:

when the first agent is retrieving the first task from the task pool, the first source address corresponds to an address associated with the first co-processor, the first destination address corresponds to an address associated with the task pool, and the first payload includes a first function which the first co-processor is configured to perform;

when the first agent is returning from the task pool, the first source address is the task pool's address, the first destination address is the first co-processor's address, and the first payload includes a descriptor of the first task;

when the second agent is retrieving the second task from the task pool, the second source address corresponds to an address associated with the second co-processor, the second destination address corresponds to an address associated with the task pool, and the second payload includes a second function which the second co-processor is configured to perform; and

when the second agent is returning from the task pool, the second source address is the task pool's address, the second destination address is the second co-processor's address, and the second payload includes a descriptor of the second task.



**7**. The collaborative intelligence system of claim **6**, wherein the first co-processor is configured to perform at least one of depositing a new task into the task pool and modifying a task within the task pool.

**8**. The collaborative intelligence system of claim **7**, wherein the first co-processor is an unmanned autonomous vehicle configured to operate as at least one of a ground vehicle and an aerial vehicle in connection with defense field operations.

**9**. The collaborative intelligence system of claim **7**, wherein the first co-processor is configured to determine when it has available processing capacity, and to dispatch the first agent to the task pool in response to the determination.

**10**. The collaborative intelligence system of claim **7**, wherein neither the controller nor the task pool are incorporated into either the first or second co-processor.

**11**. A method of using collaborative intelligence to achieve an objective, comprising:

populating a task pool, with a controller, such that the task pool includes a plurality of tasks associated with the objective, wherein each of the tasks has a respective task type; and

dynamically introducing into an environment, on a plug-and-play basis without any communication with the controller, a plurality of autonomous co-processors, each of which is compatible with one or more of the task types,

wherein, upon introduction into the environment, the plurality of autonomous co-processors operate in solidarity with each other and the task pool to complete the objective, without communication with the controller, by: proactively retrieving a task having a compatible task type from the task pool; completing the task; and updating the task pool to reflect completion of the task.

**12**. The method of claim **11**, wherein at least one of the plurality of autonomous co-processors are configured to modify an existing task in the task pool.

**13**. The method of claim **11**, wherein at least one of the plurality of autonomous co-processors are configured to add a task to the task pool.

**14**. The method of claim **11**, wherein:

at least one of the plurality of co-processors includes an agent configured to select from the task pool a task of a compatible type and deliver the selected task to the at least co-processors.

**15**. The method of claim **11**, wherein the at least one co-processor is configured to determine whether it has available processing capacity, and to dispatch the agent to the task pool in response to the determination.

**16**. The method of claim **11**, wherein the plurality of autonomous co-processors retrieve the tasks from the task pool via a wireless data connection.

**17**. The method of claim **11**, wherein:

at least one of the plurality of co-processors includes an agent configured to instruct the task pool to select a task of a compatible type and deliver the selected task to the at least co-processors.

* * * * *