Nos. 23-1980, 23-2076

# United States Court of Appeals for the Federal Circuit

**JUNIPER NETWORKS, INC.,**
*Appellant*,

v.

**SWARM TECHNOLOGY LLC,**
*Appellee*.

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, in *Inter Partes* Reviews Nos. IPR2021-01445, IPR2022-00141

## APPELLEE SWARM TECHNOLOGY LLC'S RESPONSE BRIEF

Michael K. Kelly
Christine N. Jones
Daniel J. Anderson
NEWMAN JONES, PLLC
14747 N. Northsight Blvd. Ste. 111-143
Scottsdale, AZ 85260
(480) 686-7762

January 22, 2024 Attorneys for Appellee

**EXEMPLARY PATENT CLAIMS**

**U.S. Patent No. 9,852,004 ("'004 Patent"), Claim 1:**

1. A processing system, comprising:

a task pool;

a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;

a first co-processor configured to successively: retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

a second co-processor configured to successively: retrieve a second task from the task pool; deliver the second task to the second co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

wherein the processing system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller.

Appx107 (14:24-49).

**U.S. Patent No. 10,592,275 ("'275 Patent"), Claim 1:**

1. A collaborative intelligence system, comprising:

a task pool;

a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;

a first co-processor configured to successively; proactively retrieve a first task from the task pool; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

a second co-processor configured to successively: proactively retrieve a second task from the task pool; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

wherein the collaborative intelligence system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller;

the plurality of first tasks and the plurality of second tasks are associated with a common objective;

the first and second co-processors autonomously work together in solidarity with the task pool to complete the common objective.

Appx91 (14:10-32).

## CERTIFICATE OF INTEREST

**Case Numbers** 23-1980, 23-2076

**Short Case Caption** Juniper Networks, Inc., v. Swarm Technology LLC

**Filing Party/Entity** Swarm Technology LLC, Appellee

I certify the following information is accurate and complete to the best of my knowledge.

Date: January 22, 2024

Signature: */s/ Michael K. Kelly*
Name: Michael K. Kelly

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

 **Swarm Technology LLC**

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

 **None/Not Applicable**

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

 **None/Not Applicable**

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

**Daniel R. Pote, Jennings Strouss & Salmon**

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

**Yes. *See* Docket No. 8 (Swarm's Notice of Related Case Information); Statement of Related Cases, *infra*.**

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

**None/Not Applicable**

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ........ i
TABLE OF AUTHORITIES ........ v
STATEMENT OF RELATED CASES ........ viii
STATEMENT OF THE ISSUES ........ 1
INTRODUCTION ........ 1
STATEMENT OF THE CASE ........ 4
A. The Parties ........ 4
B. The ’004 and ’275 Patents ........ 5
C. The Prior Art ........ 9
1. Leong ........ 9
2. AppleTalkBook ........ 12
D. The IPR Proceedings ........ 14
1. The ’777 Patent IPR Proceeding ........ 14
2. The ’004 and ’275 IPR Proceedings ........ 15
3. The Final Written Decisions and Denial of Juniper’s Request for Rehearing ........ 19
SUMMARY OF ARGUMENT ........ 22
ARGUMENT ........ 27
I. STANDARD OF REVIEW ........ 27
II. THE BOARD CORRECTLY CONSTRUED “WITHOUT ANY COMMUNICATION” ........ 28
A. The Board’s Construction Was Procedurally Proper ........ 28
B. The Board’s Construction is Supported by The Intrinsic Evidence ........ 30
C. Extrinsic Evidence Was Unnecessary to Construe “without any communication” ........ 38
III. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD’S FINDING OF NON-OBVIOUSNESS ........ 42

A. Juniper's Information Theory ....................................................... 44

B. The Board Correctly Rejected Juniper's Zones Theory as New, Belated, and Improperly Raised ....................................................... 46

1. Juniper's Petitions Do Not Mention, Describe, or Rely on AppleTalkBook's Zones ....................................................... 48

2. Juniper's Replies Were an Improper Attempt to Fix the Deficiencies of its Petitions ....................................................... 53

C. Substantial Evidence Supports the Board's Finding that Juniper's Zone Theory Fails on the Merits ....................................................... 56

CONCLUSION ....................................................... 61

**TABLE OF AUTHORITIES**

*Apple Inc. v. Andrea Elecs. Corp.*,
949 F.3d 697 (Fed. Cir. 2020) ....................................................................47

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015)....................................................................47

*Axonics, Inc. v. Medtronic, Inc.*,
75 F.4th 1374 (Fed. Cir. 2023)...............................................................29, 56

*Bradium Techs, LLC v. Iancu*,
923 F.3d 1032 (Fed. Cir. 2019)....................................................................28

*Corephotonics, Ltd. v. Apple Inc.*,
84 F.4th 990 (Fed. Cir. 2023)..................................................................46, 50

*Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*,
881 F.3d 1354 (Fed. Cir. 2018)....................................................................27

*Ericsson Inc. v. Intell. Ventures I LLC,*
901 F.3d 1374 (Fed. Cir. 2018)....................................................................47

*Free Stream Media Corp. v. Alphonso Inc.*,
996 F.3d 1355 (Fed. Cir. May 11, 2021)..................................................35, 36

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
849 F.3d 1034 (Fed. Cir. 2017)....................................................................27

*Immunex Corp. v. Sanofi-Aventis U.S. LLC*,
977 F.3d 1212 (Fed. Cir. 2020)....................................................................39

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001)....................................................................34

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
456 U.S. 844 (1982)....................................................................................27

*In re Jolley*,
308 F.3d 1317 (Fed. Cir. 2002)..........27

*In re Mouttet*,
686 F.3d 1322 (Fed. Cir. 2012)..........27

*In re Watts*,
354 F.3d 1362 (Fed. Cir. 2004)..........28

*Key Pharms. v. Hercon Lab'ys Corp.*,
161 F.3d 709 (Fed. Cir. 1998)..........41

*Nexpoint Advisors, L.P. v. TICC Cap. Corp.*,
No. 3:15-cv-1465, 2015 WL 6408117 (D. Conn. Oct. 23, 2015)..........35

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)..........1, 22, 30, 31, 32, 41

*Redline Detection, LLC v. Star Envirotech, Inc.*,
811 F.3d 435 (Fed. Cir. 2015)..........27

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
8 F.4th 1285 (Fed. Cir. 2021)..........38

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002)..........33

*Trs. of Columbia Univ. v. Illumina, Inc.*,
620 Fed.Appx. 916 (Fed. Cir. 2015)..........27

*Ultratec, Inc. v. Sorenson Commc'ns, Inc.*,
45 F. Supp. 3d 881 (W.D. Wis. 2014)..........36

*United States v. Castro*,
837 F.2d 441 (11th Cir. 1988)..........37

*USA Choice Internet Servs., LLC v. United States*,
522 F.3d 1332 (Fed. Cir. 2008) ........................................ 37

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed. Cir. 1997) ........................................ 28

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ........................................ 38

*WesternGeco LLC v. Ion Geophysical Corp.*,
889 F.3d 1308 (Fed. Cir. 2018) ........................................ 28

*Williamson v. CitrixOnline, LLC*,
792 F.3d 1339 (Fed. Cir. 2015) ........................................ 33

*Yorkey v. Diab*,
601 F.3d 1279 (Fed. Cir. 2010) ........................................ 28

## STATEMENT OF RELATED CASES

The following case titles and numbers represent cases known to Counsel for Appellee that are pending in this Court or another court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal.

*Juniper Networks, Inc. v. Swarm Technology LLC*,
N.D. Cal. No. 3:20-cv-3137

*Swarm Technology LLC v. Amazon.com, Inc.*,
D. Ariz. No. 2:21-cv-438

*Swarm Technology LLC v. Amazon.com, Inc.*,
Fed. Cir. No. 23-2323 (consolidated with Fed. Cir. No. 24-1095)

## STATEMENT OF THE ISSUES

1. Whether the Board correctly construed the claim term "any communication" to include one-way messaging that does not require a response.

2. Whether substantial evidence supports the Board's finding that the combination of Leong and AppleTalkBook does not teach or suggest adding a co-processor "on a plug-and-play basis without any communication with the controller."

## INTRODUCTION

The Board's construction of "any communication" involved "little more than the application of the widely accepted meaning of commonly understood words," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005), and was entirely consistent with the ordinary and customary meaning of "any communication" in the context of the claims and in light of the specification. Because the Board correctly construed the claim element "any communication" to include both one-way and two-way communications, this Court should affirm.

In particular, the Board reviewed all portions of the specification cited by Juniper and found none of them to suggest a special definition given to "any communication" by the patentee that differs from its ordinary and customary meaning. Moreover, the Board's construction of "any communication" is consistent with that of other courts' decisions, including those cited by Juniper.

The Board specifically found that the intrinsic record was sufficient to determine the scope and meaning of "without any communication." Significantly, Juniper's appeal does not challenge that finding, nor does Juniper argue that the intrinsic evidence is insufficient to support the Board's construction.

While reliance on extrinsic evidence was neither necessary nor appropriate to support the Board's construction, Juniper nonetheless focuses on a single isolated statement by Dr. Nelson regarding the meaning of "communication" in the context of AppleTalkBook. Yet Juniper ignores inconsistent statements of its own expert on the same issue. The Board carefully evaluated both experts' statements on the issue and found both to be unsupported and not credible. Notably, Juniper does not challenge the Board's credibility finding as it relates to the experts' testimony on the construction of "any communication." Accordingly, there is no basis to disturb the Board's credibility findings in this appeal.

Moreover, Juniper's Petitions suffer from insurmountable deficiencies of Juniper's own making. First, the Petitions fail to address how the claim limitation of adding new coprocessors "without any communication with the controller" is met by the prior art. Second, the Petitions advance a Leong-AppleTalkBook combination that *requires* communication with the controller, via broadcast packets, when adding new co-processors to the network.

After Swarm identified the Petitions' deficiencies in its Patent Owner Response ('004 IPR Proceeding) and its Preliminary Patent Owner Response ('275 IPR Proceeding), Juniper advanced a new theory of obviousness (the "zones theory") in its Reply briefs premised upon a new embodiment from the prior art not previously raised in the Petitions. The zones theory was rightly rejected by the Board as a new theory, improperly raised for the first time in Juniper's Replies. This Court should not disturb this finding either.

Juniper's violation of the "newness" restriction is further compounded in its appeal brief, where for the first time Juniper suggests incorporating AppleTalkBook "bridges" into its evolving Leong-AppleTalkBook combination. Juniper's new, new zones theory is particularly duplicitous because Juniper previously represented to the Board that Juniper did not propose physically incorporating AppleTalkBook into Leong's system. Appx20. Notwithstanding disavowing physically incorporating AppleTalk into Leong's system, the heart of Juniper's appeal now advocates physically incorporating bridges into a Leong-AppleTalkBook network.

Under any reasonable analysis, the Leong-AppleTalkBook combination fails to teach or suggest adding a co-processor "on a plug-and-play basis without any communication with the controller" as recited in the claims. The Board's non-obviousness decision is supported by substantial evidence and therefore must be affirmed.

## STATEMENT OF THE CASE

### A. The Parties

Alfonso Íñiguez was born in Tijuana, Mexico, in 1965 and received a Bachelor of Science degree in Computer Engineering from the *Universidad Autónoma de Guadalajara, México,* in 1989. He thereafter emigrated to the United States to pursue graduate studies in electrical engineering at the University of Arizona. Appx3339-3340. Mr. Íñiguez was awarded a Master of Science in Electrical Engineering in 1995 and has since enjoyed a brilliant career working for the nation's most prestigious semiconductor companies. Appx3340-3341.

Mr. Íñiguez and his wife, Alejandra, founded Swarm Technology LLC more than a decade ago in Mesa, Arizona. Swarm currently designs, develops, and markets solutions for solving complex computational problems using multi-processor parallel computing systems. Appx3337; Appx 85 (1:14-19).

Mr. Íñiguez and his family have presented his patented technology at trade shows and other industry events, such as the: i) "Internet of Things World Conference 2018," Santa Barbara California, May 14–17, 2018; ii) "IoT Tech Expo North America 2017," Santa Clara, California, November 29–30, 2017; iii) "International Conference on Intelligent Robots and Systems (IROS) 2017," Vancouver, Canada, September 24–28, 2017; and iv) "Internet of Things World Conference 2017," Santa Clara, California, May 16–18, 2017. Appx3343.

Mr. Íñiguez is also the author of a peer reviewed research paper published by the International Conference on Agents and Artificial Intelligence held in Porto, Portugal, in 2017. The International Conference on Agents and Artificial Intelligence is the most prestigious Artificial Intelligence conference in the World. It is extremely rare to include a company researcher (as opposed to a university researcher) as a featured author at this Conference. Appx3345.

Juniper Networks is a Delaware Corporation operating in Sunnyvale, California. Juniper acquired Apstra in 2022 as a wholly owned subsidiary. Appx3155; Appx3196.

**B. The ’004 and ’275 Patents**

Prior to Mr. Íñiguez’s invention, conventional multiprocessing systems included a central processing unit (“CPU”) and one or more co-processors. Appx85 (1:56-57); Appx101 (1:63-64).[1] That is, the processing “architecture” consisted of a primary controller which distributed tasks directly to a plurality of co-processors. This conventional approach is disadvantageous in that a significant amount of the CPU’s processing cycles (bandwidth) is consumed by managing task distribution, while the co-processors often remain idle as they wait for a new task from the CPU. Appx85 (1:61-2:3); Appx101 (2:1-11).

---

[1] The ’004 and ’275 Patents share a common priority application and substantially similar specifications.

Mr. Íñiguez's invention modifies the arrangement, operation, and interrelationship (i.e. the architecture) of the components of multiprocessing systems by interposing an intermediate device – the task pool – between the CPU and the co-processors. Appx85 (2:11-35); Appx101 (2:18-43). As a result, Mr. Íñiguez's invention constitutes a revolutionary new multiprocessor system architecture. Appx3336.

On January 25, 2013, Mr. Iñiguez filed the first in a series of patent applications with the United States Patent and Trademark Office. Appx3341. The United States Patent and Trademark Office subsequently awarded the following Patents to Mr. Íñiguez: i) U.S. Patent No. 9,852,004 issued December 26, 2017, and entitled "System and Method for Parallel Processing Using Dynamically Configurable Proactive Co-Processing Cells" (the '004 Patent); ii) U.S. Patent No. 10,592,275 issued March 17, 2020, and entitled "System and Method for Swarm Collaborative Intelligence Using Dynamically Configurable Proactive Autonomous Agents" (the '275 Patent); and iii) U.S. Patent No. 9,146,777 issued September 29, 2015, and entitled "Parallel Processing With Solidarity Cells By Proactively Retrieving From a Task Pool a Matching Task for the Solidarity Cell to Process" (the '777 Patent). Appx3336.

The '004 Patent identifies several problems with conventional systems. For example:

> Presently known multiprocessing approaches are disadvantageous in that a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors. In addition, co-processors often remain idle while waiting for a new task from the CPU.

Appx85 (1:61-2:3); *see also* Appx101 (2:1-11).

The claims recite various improvements to the function and operation of a multiprocessor computing system. For example, the claims recite a system architecture that reduces the communications burden on the CPU during task retrieval and processing, and during the integration of new co-processors:

> a [first/second] co-processor configured to successively: retrieve a [first/second] task from the task poo; deliver the [first/second] task to the [first/second] co-processors; process the [first/second] task; generate [first/second] resulting data; and update the task pool to reflect completion of the [first/second] task, *all without any communication between the [first/second] co-processor and the controller;*
>
> …
>
> wherein the processing system is *configured to dynamically accept* the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis *without any communication with the controller*.

Appx91 (14:14-32) (emphasis added); *see also* Appx107 (14:28-45).

With regard to the addition of co-processors to the processing system "without any communication with the controller" limitation, the specification describes in one embodiment that the controller may delegate to the task pool the communications burden of admitting new co-processors into the system. Specifically, the '004 patent states that "[t]o guard against undesirable connections, the CPU 11 may provide the task pool 13 with a list of or, alternatively, criteria for identifying trusted and/or trusted cells as well as authentication requirements or protocols." Appx89 (10:29-32); Appx105 (10:45-48).

In another example, the specification describes an architecture that altogether removes the communication paths between the controller and the newly added co-processors. Specifically, the '004 patent discloses that "some or all of the co-processing cells may connect directly to the task pool 13, such as by a wired configuration that does not require a switching fabric 14 for communications." Appx89 (10:45-48); Appx105 (61-64). Describing this passage, Swarm's expert, Dr. Nelson, stated that "[b]y removing the switching fabric between the co-processors and the CPU, and by having the co-processors connect directly to the task pool, a POSITA would understand that the co-processors are integrated into the system without any communication with the CPU. Indeed, a POSITA would understand that in such a configuration, the co-processors are inherently incapable of

communicating with the CPU directly." Appx9092 (¶49). *See also* Appx9091-9097 (¶¶48-59).

In the interest of completeness, the patents' specifications also mention the term communication in a context wholly unrelated to the dynamic addition of co-processors. Specifically, the patents' specification states that "[d]uring the communication channel phase, the [co-processor] receives the task and begins to execute the task." Appx86 (6:28-30). This passage simply stands for the unremarkable proposition that sending a message constitutes a communication.

### C. The Prior Art

The Leong reference (Appx677-694) and the AppleTalkBook reference (Appx695-1151) are at issue in this appeal. Specifically, the Board found the claims of the '004 and '275 Patents were not shown to be unpatentable over the combination of Leong and AppleTalkBook. Appx30; Appx33; Appx48; Appx71-73.

#### 1. Leong

Leong is a 1999 patent, originally assigned to The Chase Manhattan Bank, titled "Method and Apparatus for Concurrent Data Processing." Appx677. At a high-level, Leong describes a "micro-processing system … employing networked stand alone and independently operating micro-processing units each of which perform one or more tasks for manipulating electronic data." Appx688 (1:7-11). More specifically, Leong describes a micro-processing system "suitable for use in

the banking industry," for the processing of bank reports, bank promotional material, and check image data. Appx691 (8:8-20); *see also* Appx686.

Leong touts as its advancement the idea that its multi-tasking computing system uses "no central management and/or control unit." Appx688 (2:47-48). Instead, Leong employs a group of "processing units 12, each of which is self controlled using a software application running on its own operating system." Appx688 (2:45-47).

Leong Figure 2, which "is a block diagram of the multi-tasking computing system," (Appx688 (2:14-15)) is reproduced below.




Appx678.

In contrast to other systems that suffer from the disadvantage of "special network switching technology" (Appx688 (1:42-44)), Leong's processing units 12 "are coupled over a standard network (such as an Ethernet, Local Area Network, or

the like).” Appx690 (5:20-24). The ability for the processing units to communicate freely is an important requirement of Leong. Appx688 (1:49-52) (“there is a need in the art for a multi-tasking computing system which utilizes a standard network over which a plurality of processing units communicate ….”).

Electronic data that is to be processed by the system will enter the system via the memory 14 “which acts as a queue for storing the data until a micro-processing unit 12 can manipulate the data.” Appx689 (4:4-6). One or more of the processing units 12 can act as “[surveying] agents to ‘survey’ the queue in memory,” “determine what task(s) need to be performed on the data,” “define the status information for those tasks,” and “post the status information for the tasks on the bulletin board 14a.” *Id.* (4:9-16). Some of the surveying agents are “general agents,” meaning, “[i]f there is no new data in the queue, then the micro-processing unit 12 preferably goes on to another task ….” Appx690 (6:24-29). For example, a general agent may read the task status information from the bulletin board and complete a task “based on the priority of the posted tasks.” Appx689 (4:25-29). After completing the task, the processing unit may return to the bulletin board to “alter[] the status information to indicate that that particular task is complete.” Appx689 (3:55-59).

The above description highlights the varied roles played by the processing units 12 and their close interactions within Leong’s system. This is consistent with Juniper’s description of Leong from its Petition:

> Leong's processing units, when acting as either surveying agents (i.e., controllers) or as general processing agents (i.e., co-processors), review the status information of tasks in the bulletin board, including the status information for completed tasks. And Leong's bulletin board notifies the processing units, including the processing unit(s) acting as controllers, of task completion because the status information of tasks is updated to reflect task completion wherein the status information is held by the bulletin board, and the processing units continually read the status information.

Appx271.

### 2. AppleTalkBook

AppleTalkBook describes itself as "a practical book" that "is about the process of choosing and using an AppleTalk network." Appx705. The AppleTalk network can act as "the foundation for a LAN, a Local Area Network," and consists of Apple's "cables, hardware, and software." Appx711.

With regard to the AppleTalk hardware, Apple "provided networking hardware with every Macintosh delivered." Appx724. Consequently, "[t]he serial ports [of a Macintosh] can be used for the network because they have specialized hardware attached to them." Appx723-724. The AppleTalk software includes "two parts: an implementation of the protocols (AppleTalk in this case) and network applications chosen by the user." Appx711.

In contrast to standard networking protocols, which rely on static configuration, the AppleTalk protocols enable a form of dynamic configuration where devices can self-configure on the network. Appx798-799. This self-configuration "is made possible by two characteristics built into the protocols. First, each device has the ability to pick its own unique network address. Secondly, AppleTalk devices have the ability to look up across the network and identify, at any given time, what resources are available." Appx799.

AppleTalk's form of dynamic configuration is made possible by the AppleTalk protocol's use of broadcast packets. "The broadcast packet is critical to the ease-of-use of AppleTalk; it allows for simple configuration and reconfiguration of the network without complicated administration tasks." Appx803. As described by Juniper, "AppleTalk networks [are] self-configuring because each device in the network picks a unique address and independently identifies available resources. To do so, devices in an AppleTalk network use broadcast packets when joining a network to identify themselves and other devices." Appellant's Br. 13.

Notably, when used for these purposes "[a] broadcast packet doesn't travel to one particular node, but is sent to every node on the network. In turn, every node receives a broadcast packet and, if appropriate, responds to it." Appx802.

**<u>AppleTalk Zones</u>**:[2] AppleTalkBook describes three device groupings. From the largest to the smallest, the groups comprise: an internetwork, a zone, and one or more networks. Appx914 (zones can "divide devices on an internetwork into logical groups," and "[a] zone may consist of many networks, but all devices in a single network will belong to the same zone."). According to AppleTalkBook, zones are configured so that devices "that work closely together are in the same zone and network resources used by that group are also located within that zone." Appx914.

### D. The IPR Proceedings

#### 1. The '777 Patent IPR Proceeding

Juniper filed its first petition for *inter partes* review against Swarm's patents on July 26, 2021. Appx3455 n.2. That Petition challenged the validity of claims of U.S. Patent No. 9,146,777 which is the parent patent to the '004 and '275 Patents. *See* Appx7190-7197 (the '777 Patent). Similar to the petitions for *inter partes* review of the '004 and '275 patents, Juniper's '777 Petition relied primarily on the Leong, and AppleTalkBook references.

The Board denied institution of Juniper's '777 Petition, stating that "[b]ased on the current record and how Petitioner argues Leong teaches the relevant

[2] The Board held, and Swarm contends, that Juniper improperly raised its Zones theory in its Reply briefs. *See infra* Section IV.B. For completeness, a description of Zones is provided herein.

limitations, we are not sufficiently persuaded that Leong teaches both a 'central processing unit' and a separate 'first solidarity cell' as recited in claims 1 and 14." Appx3455 n.2 (quoting *Juniper Networks, Inc. v. Swarm Technology LLC*, Case No. IPR2021-01317, Paper 15 at 12 (P.T.A.B. Feb. 1, 2022)). The Board continued, "[b]ecause Petitioner relies on a single structural component—Leong's micro-processing units 12A . . .n—to teach two different structural limitations of claims 1 and 14—the CPU and the first solidarity cell—based on the record, Petitioner has not sufficiently shown how Leong teaches both of those limitations." Appx3458 (quoting *Juniper Networks, Inc. v. Swarm Technology LLC*, Case No. IPR2021-01317, Paper 15 at 14 (P.T.A.B. Feb. 1, 2022)). Juniper requested rehearing of the Board's decision denying institution on March 13, 2022. Juniper's request for rehearing was denied on March 17, 2022. *Juniper Networks, Inc. v. Swarm Technology LLC*, Case No. IPR2021-01317, Paper 17 (P.T.A.B. Mar. 17, 2022).

**2. The '004 and '275 IPR Proceedings**

Many aspects of the '004 and '275 IPR Proceedings are similar. Juniper's '004 and '275 IPR Petitions both alleged the claims of the '004 and '275 Patents were obvious over Leong and AppleTalkBook. Appx206; Appx1472. In each Petition Juniper identified Claim Element 1.5 as including the limitation: "wherein the [processing system / collaborative intelligence system] is configured to dynamically accept the first co-processor, the second co-processor, and an additional

co-processor into the processing system on a plug-and-play basis without any communication with the controller." Appx238; Appx1501. While Juniper discussed some of the limitations of Claim Element 1.5 in its Petition, Juniper failed to meaningfully address how the limitation of adding co-processors "without any communication with the controller" was met by the Leong-AppleTalkBook combination. *See* Appx238-244, Appx1501-1507.

The Petitions respectively described that the proposed Leong-AppleTalkBook combination has "no need for manual configuration to add new processing units" (Appx241) and that "a new processing unit in Leong's system would independently discover the bulletin board and obtain work" (Appx1504). However, the Petitions did not squarely address the "without any communication with the controller" limitation. To the contrary, the Petitions expressly describe communication with the purported controller via broadcast packets as a necessary component of its Leong-AppleTalkBook combination:

> The AppleTalk network leverages each device's ability to identify its own address and transmit a broadcast packet to identify available services.
>
> …
>
> Leong's modified processing units, when connected to a network transmit a broadcast packet seeking a bulletin board device type. Any of Leong's bulletin boards receiving this broadcast packet would respond with its address."

Appx241-242; *see also* Appx1504-15506.

The Petitions do not describe or suggest that devices within the Leong-AppleTalkBook combination would be broken up into separate networks or that any communication-blocking devices would be interposed to block communications on Leong's network, nor do the Petitions make any reference to AppleTalk zones. To the contrary, the Petition describes that Leong's "generalized and specialized processing units are connected using standard network technology," (Appx251; *see also* Appx1470) and that Leong's "processing units also *communicate with each other* using standard network protocols such as the Ethernet standard." Appx204 (emphasis added); *see also* Appx1470.

Highlighting the shared roles, continuous communication, and connections among Leong's various devices, the '004 Petition describes:

> Leong's processing units, when acting as either surveying agents (i.e., controllers) or as general processing agents (i.e., co-processors), review the status information of tasks in the bulletin board, including the status information for completed tasks. And Leong's bulletin board notifies the processing units, including the processing unit(s) acting as controllers, of task completion because the status information of tasks is updated to reflect task completion wherein the status information is held by the bulletin board, and the processing units continually read the status information.

Appx271.

In its ’004 Patent Owner Response, and ’275 Patent Owner Preliminary Response, Swarm argued that “[n]one of the cited references teach or suggest the dynamic addition of co-processors on a plug-and-play basis ‘without any communication with the controller.’” Appx4292; *see also* Appx3460-3464; Appx4292-4300. In particular, Swarm highlighted the facts that according to AppleTalkBook, “*[t]he broadcast packet is critical* to the ease-of-use of AppleTalk; *it allows for simple configuration and reconfiguration of the network* without complicated administration tasks,” and that “[a] broadcast packet doesn’t travel to one particular node, *but is sent to every node on the network*.’” Appx4295-4295 (quoting AppleTalkBook) (emphasis added); *see also* Appx3462.

Swarm argued that the above facts, coupled with Juniper’s requirement that the Leong-AppleTalkBook combination use of broadcast packets to add new processing units to Leong’s system, meant that the broadcast packet “communication would necessarily be read by every surveying unit (broadcast packets are read by all nodes on the network). Appx4296; *see also* Appx3462. Therefore, Juniper’s Leong-AppleTalkBook combination did not teach or suggest, and was wholly incompatible with, the “‘without any communication with the controller’ limitations of the ’004 Patent.” Appx4297; *see also* Appx3464.

In its ’004 and ’275 Replies, Juniper raised a new theory of obviousness premised on incorporating AppleTalk zones into its Leong-AppleTalkBook

combination. Specifically, Juniper proposed that Leong's system could be modified to include "a zone for the controller(s)" (Appx6398) that is separate from "the dynamically added coprocessors shar[ing] a zone with the memory …." Appx6399.

#### 3. The Final Written Decisions and Denial of Juniper's Request for Rehearing

Regarding the construction of the "without any communication with the controller" limitation, the Board "construe[d] the claim term 'communication' in the context of the '004 [and '275] patent[s] as including, among other things, *one-way messaging that does not require a response*." Appx66 (emphasis added); s*ee also* Appx25-26; Appx63-66; Appx10046-10049. As a result, the claim limitations reciting dynamic acceptance of co-processors "without any communication with the controller," were properly construed to exclude "both communication with a response and communication *without a response*." *Id.* (emphasis added).

As it related to the Juniper's initial AppleTalkBook combination (proposed in the Petitions), the Board found that the "us[e] [of] broadcast packets—which AppleTalkBook makes clear are sent to every node—is consistent with [Juniper's] description of how an additional processor would be added to its proposed Leong-AppleTalkBook combination." Appx24 (citing Appx242). The Board noted, "[t]he Petition does not describe any other process for adding additional processors in the proposed Leong-AppleTalkBook combination." Appx24; *see also* Appx58 ("the proposed combination of Leong and AppleTalkBook asserted by Juniper against the

challenged claims of the [Patents] 'expressly require AppleTalk broadcast packets to facilitate the integration/configuration of co-processors on a plug-and-play basis.'")

Therefore, "[b]ecause the additional processors will send a broadcast packet to every node in the Leong system, including the processing unit (aka surveying unit) Petitioner identifies as the controller, the Leong-AppleTalkBook combination does not teach 'wherein the processing system is configured to dynamically accept … an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller.' As recited in limitations [1.5] and [3.5]." Appx24-25; *see also* Appx57-58 (adopting and incorporating by reference the '004 Final Written Decision and Decision Denying Juniper's Request for Rehearing into the Board's '275 Final Written Decision).

As it related to Juniper's zones theory, the Board rejected Juniper's zones theory as improperly raised for the first time in Juniper's Reply. Appx28; Appx70; Appx10052-10054. The Board determined that Juniper "discusses AppleTalkBook in detail in the Petition[s]. However, the Petition[s] [do] not mention or describe the use of zones. *See* Pet. Nor is there a reference to the pages in AppleTalkBook that [Juniper] relies on for how a zone operates (pages 220 and 221) in the Petition[s]. *See* Pet. Nor is there any suggestion that Leong's old processors and the additional processors should be separated into different zones. *See* Pet. Because the use of zones to separate Leong's various processors is a new theory raised for the first time

in [Juniper]'s Reply, it is improper and we will not consider it." Appx29; *see also* Appx69-70 ("at no point in its Petition does Juniper explain how Leong's surveying unit and processing units may be separated into different zones to limit the reach of broadcast packets.").

Moreover, the Board found that even if it had considered Juniper's zones theory, it was "inconsistent with the teaching of AppleTalkBook." Appx29; *see also* Appx71. Specifically, the Board noted that AppleTalkBook describes that "although a zone can include multiple networks, '*all devices in a single network will belong to the same zone*." *Id.* (quoting AppleTalkBook). The Board found that Juniper's application of AppleTalk zones was inconsistent with Leong's system where even Juniper conceded that "all of the elements Leong are part of a single network." *Id*. (referencing the Board's discussion with Juniper's counsel during oral argument, "JUDGE HOWARD: And just be clear, though, when you were talking about the network, do you consider all of Leong and all its – its coprocessors as -- as part of a single network? MR. SIGLER: Yes, Your Honor." Appx8738). Moreover, the Board highlighted that Leong itself describes that "micro-processing units 12 are stand alone computers that 'are coupled over a *standard network* (such as an Ethernet, Local Area Network, or the like).'" Appx71 (quoting Leong, Appx690 (5:20-24)).

The Board was also not persuaded by the testimony of Juniper's expert, Dr. Weissman, regarding Juniper's zones theory. Appx29-30. The Board found that

"[b]ecause Dr. Weissman's testimony does not address the limitations on setting up zones explicitly disclosed in AppleTalkBook, we do not find his testimony on this particular issue credible." Appx30.

Consequently, regarding Juniper's zones theory, the Board found that "AppleTalkBook teaches away from Petitioner's theory of placing the different processors of Leong, whether old processors or newly added processors, into different zones," (Appx29) and "Juniper does not reconcile how its zone theory applies to Leong's multi-tasking computing system, especially when each of Leong's processing units are part of a single network and, therefore, would all belong to the same zone in Juniper's proposed combination." Appx71.

## SUMMARY OF ARGUMENT

1. The Board correctly construed the claim element "any communication" to include one-way messaging that does not require a response. Appx66. Claim construction often involves "little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). The Board's construction of "any communication" is no exception. In view of its construction, the Board found that claim limitations reciting dynamic acceptance of co-processors "without any communication with the controller" to properly exclude both communication with a response and communication without a response. Appx25; Appx63-66.

The Board's construction was entirely consistent with the ordinary and customary meaning of "any communication" in context of the claims and in context of the specification. The Patents describes how the CPU may delegate to the task pool the responsibility for identification, authentication, and admittance of new co-processors into the system. Appx89 (10:29-36). In one embodiment, the new co-processors connect *directly* to the task pool without any communication path for communication with the controller. Appx89 (10:45-48). These embodiments preclude any communication with the controller during acceptance of the co-processors into the system (with or without a response).

The Board carefully reviewed each passage of the specification cited by Juniper and found none of the passages to suggest that a special definition was given to "any communication" by the patentee that differs from the meaning it would otherwise possess. Appx25-26; Appx63-65. To the contrary, the primary passage cited by Juniper supported the Board's construction. *Id*.

The Board's construction of the ordinary and customary meaning of "any communication" is consistent with that of other cases, including those cited by Juniper. The Board found the intrinsic record was sufficient to determine the scope and meaning of "without any communication" (Appx62) and Juniper's appeal does not challenge that finding. Nor does Juniper expressly argue that the intrinsic evidence is insufficient to construe the disputed claim term.

Regarding extrinsic evidence, Juniper focuses on a statement made by Dr. Nelson about the meaning of communication in the context of AppleTalkBook. However, Juniper ignores the inconsistent statements of its own expert on the same issue. The Board carefully evaluated both experts' statements on the issue and found both to be unsupported and not credible. *See e.g.*, Appx25; Appx10051. Juniper does not challenge the Board's credibility finding as it relates to the experts' testimony on claim construction of "any communication." Therefore, there is no basis to disturb the Board's credibility findings on appeal. Because the intrinsic evidence was sufficient and consistent with the Board's claim construction, the Board's construction should be affirmed.

2. Critical to this appeal is the fact that Juniper's IPR Petitions suffer from major deficiencies of Juniper's own creation. First, the Petitions fail to address how the claim limitation of adding new coprocessors "without any communication with the controller" is met by the prior art. Second, the Petitions expressly propose, and indeed require, that the Leong-AppleTalkBook combination deploy communication with the controller, via broadcast packets, as part of the addition of new co-processors to the network. Appx58; Appx60.

After Swarm's Patent Owner Response ('004 IPR Proceeding) and Preliminary Patent Owner Response ('275 IPR Proceeding) identified the deficiencies of Juniper's Petitions, Juniper improperly raised a new theory of

obviousness, the zones theory, in its Reply briefs premised upon new embodiments from the prior art references not previously raised in the Petitions. According to Juniper's zones theory, Leong's system could be further modified with AppleTalkBook zones to separate certain of Leong's processing units away from any newly added processing units and away from the memory. Appx6398-6399. The zones theory was rightly rejected by the Board as a new theory, improperly raised for the first time in Juniper's Replies.

The newness of Juniper's zones theory is further compounded in its appeal brief, where Juniper suggests, for the first time, incorporating AppleTalk bridges into its proposed Leong-AppleTalkBook combination. Juniper's new, new zones theory is especially concerning in view of Juniper's previous accusations of Swarm making the "faulty assumption that [Juniper] proposes physically incorporating Apple's hardware/software into Leong's system," (Appx6393) and for "presum[ing] [Juniper] proposes physically incorporating Apple's AppleTalk protocol and components into Leong's system." Appx6863.

Regardless, even if deemed properly raised, Juniper's zones theory fails to render the claims of Swarm's claims obvious. The Leong reference and Juniper's Petitions agree that Leong's processing units operate on a single network and work closely together, sharing responsibilities and resources. *See e.g.*, Appx271. AppleTalkBook discloses that networked devices working closely together and

sharing network resources will form a single network within the same zone. Appx914. Accordingly, substantial evidence supports the Board's finding that "AppleTalkBook teaches away from [Juniper's] theory of placing the different processors of Leong, whether old processors or newly added processors, into different zones." Appx29.

Juniper's Petitions require that under the Leong-AppleTalkBook combination, processing units use broadcast packets when joining a network to identify themselves and other devices. Appx58; Appx60; *see also* Appellant's Br. 13. AppleTalkBook confirms that these broadcast packet communications are sent to and received by every node on the network. Appx802. Juniper's express requirement of broadcast packets to facilitate the integration/configuration of co-processors, coupled with the relevant teachings of AppleTalkBook and Leong, necessarily results in communication with Leong's surveying agent (the purported controller) when co-processors are added to the processing system. The Leong-AppleTalkBook combination therefore does not teach or suggest adding a co-processor "on a plug-and-play basis without any communication with the controller" as recited in the claims. Appx57.

Regardless of whether Juniper's zones theory is considered, the Board's decisions are supported by substantial evidence and should be affirmed.

## ARGUMENT

## I. STANDARD OF REVIEW

This Court "review[s] the PTAB's factual findings for substantial evidence and its legal conclusions de novo." *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 449 (Fed. Cir. 2015). Substantial evidence is "something less than the weight of the evidence but more than a mere scintilla," and includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Mouttet*, 686 F.3d 1322, 1331 (Fed. Cir. 2012). Where different conclusions may reasonably be drawn from the evidence in record, the PTAB's decision to favor one conclusion over the other "is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002).

"Determining the weight and credibility of the evidence is the special province of the trier of fact." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 856 (1982). "The PTAB [i]s entitled to weigh the credibility of the witnesses," *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1358 (Fed. Cir. 2018) (quoting *Trs. of Columbia Univ. v. Illumina, Inc.*, 620 Fed.Appx. 916, 922 (Fed. Cir. 2015)). In so doing, the Board is permitted to "rely on certain portions of an expert's declaration while disregarding others." *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1041 (Fed. Cir. 2017). This Court "defer[s] to the Board's findings concerning

the credibility of expert witnesses." *Yorkey v. Diab*, 601 F.3d 1279, 1284 (Fed. Cir. 2010).

Claim construction is a legal question reviewed *de novo* and underlying factual findings are reviewed for substantial evidence. *Bradium Techs, LLC v. Iancu*, 923 F.3d 1032, 1042 (Fed. Cir. 2019). Similarly, "[o]bviousness is a question of law with underlying factual findings" including "the scope and content of the prior art, differences between the prior art and the claims at issue, the presence or absence of a motivation to combine or modify with a reasonable expectation of success …." *Id*. at 1045.

When an appellant asserts that the Board committed error, it is appellant's burden to show that the error was harmful and that correction of the error yields a different result. *In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004).

## II. THE BOARD CORRECTLY CONSTRUED "WITHOUT ANY COMMUNICATION"

### A. The Board's Construction Was Procedurally Proper

It is proper for the Board to construe disputed claim terms. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction is for "resolution of disputed meanings"); *see also WesternGeco LLC v. Ion Geophysical Corp*., 889 F.3d 1308, 1328 (Fed. Cir. 2018) ("Board was permitted to issue a new construction in the final written decision given that claim construction was a disputed issue during the proceedings"). When the "ultimate construction

adopted in the final written decision is sufficiently similar to a construction disputed by the parties, the Board need not give the parties prior notice of the exact construction the Board adopts." *Axonics, Inc. v. Medtronic, Inc.*, 75 F.4th 1374, 1381 n.7 (Fed. Cir. 2023).

Juniper mistakenly suggests that "neither party asked" the Board to broadly construe the "without any communication with the controller" limitation. Appellant's Br. 1, 5, 26, 29, and 52. In fact, the parties have disputed the construction of this limitation since the earliest stages of the IPR proceedings, and Juniper had expressly requested that the Board construe this disputed claim term. Appx9838-9840; Appx9843 ("Petitioner respectfully requests that the final written decision in this proceeding include an express claim construction for the 'communication' term ….").

Swarm's Patent Owner Response in the '004 IPR proceeding identified "without communication" as one of the disputed terms among the parties. Appx4270; *see also* Appx6811 (PO Sur-Reply) (same). Swarm advanced non-obviousness arguments based on its understanding of the "without any communication" limitation. Appx4292-4298; Appx3460-3464 (PO Prelim. Resp. in the '275 proceeding).

The Board ultimately adopted a claim construction that was substantially similar to Swarm's understanding of the "without any communication" limitation

advanced in its Preliminary Patent Owner Response and Patent Owner Response. Appx66 (the Board broadly construed the claim term "communication" to include, among other things, "one way messaging that does not require a response."); Appx25 ("the use of 'any' before communication in the claims implies a broad interpretation of communication that encompasses a one-way communication that does not require a response.").

Notwithstanding Juniper's misgivings about the substance of the Board's construction, Juniper does not, and cannot, assert in its appeal that the Board's claim construction violated the APA or that Juniper was not afforded notice or an adequate opportunity to respond. The Board's construction of "without any communication" in its final written decisions was therefore procedurally proper.

### B. The Board's Construction is Supported by The Intrinsic Evidence

While the parties disputed the scope and meaning of the "without any communication" limitation during the IPR proceedings, both parties agreed that the limitation should be accorded its ordinary and customary meaning. Appx215, Appx1480, Appx4269-4270, Appx4978, Appx6811. The ordinary and customary meaning of a claim term is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention …." *Phillips*, 415 F.3d at 1313. A person of ordinary skill in the art is "deemed to read the claim term

not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

The Board "construe[d] the claim term 'communication' in the context of the '004 [and '275] patent[s] as including, among other things, *one-way messaging that does not require a response*." Appx66 (emphasis added); s*ee also* Appx25-26; Appx63-66; Appx10046-10049. As a result, the claim limitations reciting dynamic acceptance of co-processors "without any communication with the controller," are properly construed to exclude "both communication with a response and communication *without a response*." *Id.* (emphasis added). The Board's construction is entirely consistent with the ordinary and customary meaning of "without any communication."

"[C]laim construction … [in some cases] involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. The words "any" and "communication" are straightforward and commonplace. Their meanings are plain. Appx26; Appx63-66; Appx10046-10048. And the Board correctly found that the plain meaning of the phrase "any communication" encompasses "one-way messaging that does not require a response." *Id*.

While Juniper does not advance an express construction for "any communication" in its appeal, Juniper implies that the correct construction of "any

communication" contemplates *only* two-way communications.[3] Juniper, however, points to nothing in the specifications that suggest such "a special definition given to [any communication] by the patentee that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316. Nor do the passages cited by Juniper "reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.*

Juniper points instead to the specification's brief reference to a "communication channel" phase. Appx87 (6:18-33). According to the patents' specification, "[d]uring the communication channel phase, the [co-processor] receives the task and begins to execute the task." Appx87 (6:28-30); Appx103 (6:43-45). It is unclear why Juniper focuses on this particular passage. As the Board correctly noted, this passage describes a process that is wholly unrelated to the dynamic addition of co-processors. Appx64; Appx10048. Moreover, this passage supports the notion that a "communication channel" is for passing a one-way communication (a task) from the task pool to the co-processor, thus supporting the Board's construction of the term "communication." Appx25 ("Nor do the various sections of the specification of the '004 patent cited by [Juniper] support its

---

[3] *See* Appellant's Br. 22 (the "patents' use of 'communication' requires the controller to send a response to the device contacting it."). This quote is consistent with Juniper's arguments below that "'communication' requires two-way messaging, and doesn't include broadcasts that don't receive responses." Appx9570.

argument. *See* Pet. Reply 19–20. Instead, the sections discuss how sending a message is a communication.”).

In any event, contrary to Juniper's arguments, the Board did not ignore the passages of the specification cited by Juniper. Rather, the Board scrutinized them and found that they did not support "limiting [the] independent claims to communications that involve only two-way messaging." Appx10048; *see also* Appx26, Appx64. The Board continued: "these two examples of transmitting an acknowledgement message and receiving a task in the specification, by themselves, are not enough to prevent a broad interpretation of 'communication' that includes, among other things, one way messaging that does not require a response." *Id.*; *see also Williamson v. CitrixOnline, LLC*, 792 F.3d 1339, 1346–47 (Fed. Cir. 2015) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002)) ("This court has repeatedly 'cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.'").

Juniper correctly notes that one of the primary goals of the '004 and '275 patents "is to reduce the burdens on the CPU or 'controller' in a multiprocessor system." Appellant's Br. 26. As one example of reducing the communications burden on the controller, the specification describes that the controller may delegate to the task pool the responsibility for identification, authentication, and admittance of new co-processors into the system. Appx89 (10:29-32) "[t]o guard against

undesirable connections, the CPU 11 may provide the task pool 13 with a list of or, alternatively, criteria for identifying trusted and/or untrusted cells as well as authentication requirements or protocols." *See also* Appx105 (10:45-52).

In one embodiment, the '004 patent discloses that "some or all of the co-processing cells may connect directly to the task pool 13, such as by a wired configuration that does not require a switching fabric 14 for communication." Appx89 (10:45-48). Regarding this portion of the specification, Swarm's expert Dr. Nelson opined that "[b]y removing the switching fabric between the co-processors and the CPU, and by having the co-processors connect *directly* to the task pool, a POSITA would understand that the co-processors are integrated into the system without any communication with the CPU. Indeed, a POSITA would understand that in such a configuration, the co-processors are inherently incapable of communicating with the CPU directly."[4] Appx9092 (¶49). *See also* Appx9091-9097 (¶¶48-59).

---

[4] This portion of Dr. Nelson's testimony was originally offered in support of Swarm's Revised Contingent Motion to Amend and not in support of the original claims. However, this Court has held that a party is not barred on appeal from proffering additional or new supporting arguments for its claim construction, when they are based on the evidence of record, and are proffered to support that party's existing claim construction. *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1347 (Fed. Cir. 2001).

These embodiments disclose the addition of co-processors to the multiprocessor system under a system architecture that necessarily precludes the co-processors from communicating with the controller, regardless of whether that communication requires a response.

Curiously, the claim construction section of Juniper's appeal brief cites various cases that either support the Board's construction or are simply inapposite.[5] For example, in the *Free Stream Media Corp.* case citied by Juniper, the claim term "communication session" was found not to contemplate one-way communication. *See Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1367 (Fed. Cir. May 11, 2021). Critical to this finding, however, was the term "session," a term that does not appear in the '004 or '275 patent claims. *Id.* This Court affirmed a district court's finding that to include one-way communications in the construction of "communication session" would improperly read "session" out of the claims. *Id*. This Court reasoned that a construction of "communication" that included one-way communication "would then encompass ***any 'communication.'***" *Id.* (emphasis

[5] *See* Appellant's Br. 29-30, nn. 105-106. Juniper's citation to *Nexpoint Advisors, L.P. v. TICC Cap. Corp.*, No. 3:15-cv-1465, 2015 WL 6408117, at *13 (D. Conn. Oct. 23, 2015) is inapposite to the present case because the passage cited by Juniper turns on the verb "engaged" and not on the preposition "with." The verb "engaged" does not appear in the '004 or '275 patent claims.

added). Stated differently, this Court's decision in *Free Stream Media Corp*. was premised on the understanding that "any communication" encompasses one-way communications. Thus, *Free Stream Media Corp*. supports the Board's construction. Other courts have made similar determinations. *See e.g. Ultratec, Inc. v. Sorenson Commc'ns, Inc*., 45 F. Supp. 3d 881, 931 (W.D. Wis. 2014) (holding that "[t]he term 'communication between' … may refer to a one-way or two-way communication exchange."). In view of the above, the Board correctly construed "without any communication," and its construction is consistent with, and supported by, the intrinsic evidence.

Separately, Juniper argues for the first time that if Swarm had intended "without any communication with the controller" to preclude one-way communications, Swarm's claims should have recited "without any communication ***to*** the controller." Appellant's Br. 29. Setting aside Juniper's implied concession that "any communication" can (at least in its own hypothetical) encompass one-way communications, Juniper's argument fails because it improperly focuses on the directionality of a communication. In the context of Juniper's hypothetical claim language, the word "to" serves to define the direction of a communication (i.e. from the co-processor *to* the controller) and is not determinative of whether "any communication" includes both one-way and two-way communications.

Juniper's citation to *United States v. Castro*, 837 F.2d 441 (11th Cir. 1988) (cited at Appellant's Br. 29) is instructive about the directional nature of the word "to."[6] In that case, the 11th Circuit noted that in a statute relating to the shipment of goods, the phrase "with foreign nations" contemplated both exports to, and imports from, such nations, whereas "if Congress had only intended to reach exports, the term 'to foreign nations' would have been the more accurate rendering of that idea." *United States v. Castro*, 837 F.2d 441, 445 n.6 (11th Cir. 1988). Again, it is clear that the distinction between "with" and "to" centers around the direction of the described shipments, and not whether the term "shipments" can encompass a one-way shipment. Indeed, both imports and exports are one-way shipments.

To the extent one might apply this statutory construction to the '004 and '275 patents, the use of the term *with* in the claim limitation "without any communication *with* the controller," contemplates the preclusion of a one-way communication *to* the controller, as well as a one-way communication *from* the controller. Thus, the Board did not err in focusing on the words "any" and "communication" as argued by Juniper.

The Board carefully evaluated the intrinsic evidence, including the portions of the specification highlighted by Juniper. The Board's construction is supported

[6] Juniper's citation to *USA Choice Internet Servs., LLC v. United States*, 522 F.3d 1332 (Fed. Cir. 2008) acknowledges a similar direction-based meaning.

by the intrinsic evidence and is consistent with widely-accepted meanings of commonly understood words. Other courts have drawn similar conclusions about the scope and meaning of "any communication" and "communication between." The Board's construction should be affirmed.

### C. Extrinsic Evidence Was Unnecessary to Construe "without any communication"

When the "intrinsic evidence alone will resolve any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *see also Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021) ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence.").

Here, the Board found that "the intrinsic record (e.g., the plain language of the challenged claims and the specification of the '275 patent) is sufficient to determine the scope and meaning of 'communication' as that term is used in the context of the '275 patent …." Appx62. Juniper's appeal does not challenge the Board's determination that the intrinsic record was sufficient to determine the meaning of "any communication," nor does Juniper argue that the intrinsic evidence was insufficient to construe the disputed claim term. Rather, Juniper only argues that there exists extrinsic evidence that is inconsistent with the Board's construction.

Juniper's argument regarding extrinsic evidence focuses primarily on highlighting a statement made by Swarm's expert, Dr. Nelson, during cross-examination:

> [I]n the context of AppleTalkBook, there's two cases of broadcast that goes on. And in the first case, the broadcast is sent but a particular processor does not respond. And I would classify that as not a communication between the broadcaster and that particular processor.

Appx6969 (17:14-19).

Considering this statement, the Board concluded that "Dr. Nelson's cross-examination testimony lacks credibility," and accorded it "little to no weight." Appx10050-10052; *see also* Appx60-62. The Board identified multiple reasons to accord little weight to Dr. Nelson's statement. First, Dr. Nelson's statement was "inconsistent with his declaration testimony that general broadcast packets that don't receive responses constitute a communication." Appx70-71; *see also* Appx10049. Second, Dr Nelson's statement was "directed to what qualifies as a communication in the context of AppleTalkBook," and not "what qualifies as a 'communication' in the context of the [] '275 patent."[7] Appx61-62; *see also* Appx10051. Third, Dr.

[7] *See Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1221 (Fed. Cir. 2020) ("It is true that we seek the meaning of claim terms from the perspective of the person of ordinary skill in the art. The key, however, is that we look to how that person would have understood a term in view of the specification.").

Nelson's statement was unsupported by "any references to the intrinsic record, such as the plain language of the challenged claims, the Specification of the '004 patent or the '275 patent, or the prosecution histories of those patents …." Appx10051; *see also* Appx62.

Juniper doesn't contest these findings and instead argues only that Dr. Nelson's testimony "confirms Juniper's understanding and showing in the petitions of how a POSITA would've understood 'communication' in the challenged claims." Appellant's Br. 32. However, even if true, Juniper's argument is moot because Juniper's appeal does not challenge the Board's credibility finding, nor does Juniper assert that the Board erred in according Dr. Nelson's statement little weight.

Similarly, Juniper does not challenge the Board's finding that Juniper's expert, Dr. Weissman, gave testimony regarding the scope of "communication" which was not credible. Dr. Weissman stated that a POSITA "wouldn't have understood that a networked device 'communicates' with a downstream device when that networked device transmits broadcast packets." Appx6431. However, as the Board recognized, Dr. Weissman "d[id] not cite any references to support his opinion." Appx25. Accordingly, the Board found "such unsupported testimony to be not credible and g[a]ve it no weight." *Id*.

The Board has no obligation to consider extrinsic evidence. *Vitronics Corp.*, 90 F.3d at 1583. Moreover, "conclusory, unsupported assertions by experts as to the

definition of a claim term are not useful to a court." *Phillips*, 415 F.3d at 1318. Indeed, this Court has stressed that courts "should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecutions history ….'" *Id.* (quoting *Key Pharms. v. Hercon Lab'ys Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).

Juniper argues that "both sides' experts expressly disagreed" with the Board's construction of "communication." Appellant's Br. 1; *see also id.* 4-5, 26, and 52. This is untrue. Dr. Nelson never "expressly disagreed" with the Board's construction. Moreover, Juniper ignores the fact that Dr. Weissman also gave testimony that supported the Board's construction that a one-way message qualifies as a "communication." For example, during cross-examination, Dr. Weissman testified that various forms of one-way messaging (e.g., assigning tasks to co-processors or sending an interrupt) may constitute a "communication." Appx9140 (24:8-15) (referring to "assigning tasks to co-processors" as communication in the context of task management); Appx9144 (28:17-18) ("I won't dispute interrupt is a type of communication in some sense"); Appx9173 (57:12-15) ("I would agree communicate -- interrupts are a form of communication").

The Board found the intrinsic evidence was sufficient to determine the scope and meaning of "any communication." Juniper does not contest this. After careful analysis, the Board found the extrinsic evidence cited by Juniper to be unsupported

and not credible and accorded it no weight. Juniper does not contest these credibility findings. Because the intrinsic evidence was sufficient, the Board's determination of the scope and meaning of "any communication" should be affirmed.

## III. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING OF NON-OBVIOUSNESS

The Board "construe[d] the claim term 'communication' … as including, among other things, *one-way messaging that does not require a response*." Appx66 (emphasis added); s*ee also* Appx25-26; Appx63-66. Therefore, the claim limitation reciting dynamic acceptance of co-processors "without any communication with the controller," "precludes both communication with a response and *communication without a response*." *Id.* (emphasis added); *see also* Appx10047.

Applying this construction, the Board found that "the combination of Leong and AppleTalkBook does not teach or suggest adding a co-processor 'on a plug-and-play basis without any communication with the controller,' as recited in [the claims]." Appx57. Substantial evidence supports the Board's finding.

With regard to AppleTalkBook, the Board noted that "AppleTalkBook describes itself as 'a practical book' that 'is about the process of choosing and using an AppleTalk network.'" Appx52 (citing Appx705). "AppleTalk is the foundation for a LAN, a Local Area Network," and consists of "cables, hardware, and software." Appx711. The AppleTalk software consists of "two parts: an implementation of the protocols (AppleTalk in this case) and network applications chosen by the user." *Id.*

According to AppleTalkBook, prior network protocols relied on "static configuration." This configuration was disadvantageous in that "[b]efore the devices can communicate, an administrator is required to pick a unique node number, or address, for every device on the network and distribute that information around the network." Appx798.

AppleTalk protocols, on the other hand, enable devices to implement "self-configuring because each device in the network picks a unique address and independently identifies available resources. To do so, *devices in an AppleTalk network use broadcast packets when joining a network to identify themselves and other devices*." Appellant's Br. 13. (citing AppelTalkBook) (emphasis added). With respect to the broadcast packet, AppleTalkBook emphasizes, "[t]he broadcast packet is critical to the ease-of-use of AppleTalk; it allows for simple configuration and reconfiguration of the network …." Appx803. Critically, "[a] broadcast packet doesn't travel to one particular node, but is sent to every node on the network. In turn, *every node receives a broadcast packet and, if appropriate, responds to it*." Appx802 (emphasis added).

Combining Leong with AppleTalkBook, Juniper's own Petitions describe that "Leong's modified processing units, when connected to a network *transmit a broadcast packet* seeking a bulletin board device type …. A POSITA would have understood this to be *adding of the new processing unit 'on a plug-and-play basis'*

because the devices are automatically configured …." Appx1505 (emphasis added); *see also* Appx242.

In view of the above, the Board found that "the proposed combination of Leong and AppleTalkBook asserted by Juniper against the challenged claims of the ['004 and] '275 patent[s] 'expressly require AppleTalk broadcast packets to facilitate the integration/configuration of co-processors on a plug-and-play basis.'" Appx58. Consequently, "the combination of the relevant teachings of AppleTalkBook and Leong results in the additional co-processor communicating with Leong's controller by sending a broadcast message to all components when it is added." Appx21-22. And thus, "the combination of Leong and AppleTalkBook does not teach or suggest adding a co-processor 'on a plug-and-play basis without any communication with the controller,' as recited in [the claims]." Appx57.

**A. Juniper's Information Theory**

In an effort to find error in the Board's Decision, Juniper suggests that "the Board failed to address whether the AppleTalk broadcast packet would impart any information to the Leong-AppleTalkBook combination's controller …." Appellant's Br. 38. This argument is both belated and contrived. Juniper never argued below that broadcast packets contained no information. To the contrary, Juniper confirmed that "broadcast packets include messages," and are commonly used for specific purposes "like confirming that network links are active or distributing routing

*information.*" Appx9838 (emphasis added). In any event, Juniper's argument defies common sense; it is widely accepted in computer networking that the term "packet" is shorthand for "packet of information" or "data packet."

As highlighted by the Board, Swarm argued that "the AppleTalk protocol employs *a special packet of information* known as the 'broadcast packet.'" Appx18-19 (quoting Appx4295) (emphasis added). Juniper never challenged this idea below.

And AppleTalkBook confirms broadcast packets are sent to, and received by, every node on the network, "[a] broadcast packet doesn't travel to one particular node, *but is sent to every node on the network*. In turn, *every node receives a broadcast packet* and, if appropriate, responds to it." Appx802 (emphasis added). Regarding this portion of AppleTalkBook, Dr. Nelson testified that a POSITA would understand that the broadcast packet "would necessarily be read by [Leong's] surveying unit (broadcast packets are read by all nodes on the network)." Appx4374; Appx5090.

Juniper's appeal brief does not affirmatively dispute that broadcast packets are read by the nodes that receive them. Rather, Juniper argues that after the broadcast packet is received/read by a "controller" in the Leong-AppleTalkBook combination, "there's still no evidence showing that the controller would do anything except discard or ignore it since the broadcast packet isn't requesting a controller response." Appellant's Br. 37. This argument is moot because the Board

"construe[d] the claim term 'communication' … as including, among other things, *one-way messaging that does not require a response*." Appx66 (emphasis added). In essence, Juniper attempts to fault the Board for not finding obviousness under Juniper's proposed construction, a construction which the Board expressly rejected.

Lastly, Juniper argues that "substantial evidence must support the Board's conclusion that AppleTalk broadcast packets necessarily or always constitute the precluded 'communication,'" and that "the Board didn't explain why this would necessarily occur in the Leong-AppleTalkBook combination …." Appellant's Br. 37-38. Juniper is mistaken. As shown by the above-described evidence, the broadcast packet "is critical to the ease-of-use of AppleTalk," "is sent to every node on the network," and "every node receives a broadcast packet …." Appx802-803. Furthermore, the use of a broadcast packet was essential to Juniper's Petitions. As the Board found, "each of Juniper's proposed combination of Leong and AppleTalkBook 'expressly require AppleTalk broadcast packets to facilitate the integration/configuration of co-processors on a plug-and-play basis.'" Appx60. Juniper does not challenge this finding.

### B. The Board Correctly Rejected Juniper's Zones Theory as New, Belated, and Improperly Raised

This Court "review[s] the Board's assessments of what has been argued to and put before it in an IPR for abuse of discretion." *Corephotonics, Ltd. v. Apple Inc.*, 84 F.4th 990, 1002–03 (Fed. Cir. 2023). The Board abuses its discretion when its

decision "(1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact finding; or (4) involves a record that contains no evidence on which the Board could rationally base its decision." *Ericsson Inc. v. Intell. Ventures I LLC*, 901 F.3d 1374, 1379 (Fed. Cir. 2018).

The Board "must make judgments about whether a Petition identified the specific evidence relied on in a Reply and when a Reply contention crosses the line from the responsive to the new." *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1368 (Fed. Cir. 2015). Characterizing its decision in *Ariosa*, this Court highlighted that "the Board rejected the petitioner's reliance on its reply submissions because the petitioner discussed 'previously unidentified portions of a prior-art reference to make a meaningfully distinct contention.' 805 F.3d 1359, 1367 (Fed. Cir. 2015). *The reply declaration pointed to an embodiment of the prior art that was not discussed in the petition*. *Id*. Accordingly, we held that the Board reasonably determined that the reply declaration raised a new argument that was not otherwise addressed in the petition." *Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 706 (Fed. Cir. 2020) (emphasis added).

Like the petitioner in *Ariosa*, Juniper's Replies relied on previously unidentified portions of the AppleTalkBook reference and pointed to new embodiments of AppleTalkBook to raise new arguments not discussed in the

Petitions. Worse, Juniper continues to add new embodiments to its obviousness contentions in its principal appeal brief.

### 1. Juniper's Petitions Do Not Mention, Describe, or Rely on AppleTalkBook's Zones

According to Juniper's Petitions, "Leong discloses processing units are computers coupled over a standard network" such as a local area network. Appx1492; *see also* Appx227. Leong's Figure 2 depicts these processing units as interchangeable devices (12) coupled together over the standard network. Appx678. According to Juniper's Petitions, "Leong explains the processing agents change behavior and 'survey' the queue in memory to determine whether new data has arrived." Appx228; *see also* Appx1493. Juniper's Petitions distinguish a "surveying unit" (12) on the network from the other processing units (12) on the network by arbitrarily annotating one of the processing units (12) in Leong's Figure 2 as a "surveying unit":




Leong FIG. 2 (Annotated)

Appx229; Appx1493.

There is nothing in Leong, or in the Petitions' modified version of Leong, to suggest that processing unit 1 should be assigned to a separate network (or zone) apart from processing units 2 to N, and apart from memory 14. To the contrary, Juniper's Petitions highlight that the surveying unit(s), processing unit(s), and memory work closely together. Appx271; Appx228; Appx1493 (describing the close interaction and continuous communication of Leong's "surveying agents" with the memory). The entirely new obviousness theories advanced in Juniper's Replies stand in stark contrast to the obviousness theories advanced in Juniper's Petitions. Juniper's Replies pointed for the first time in the IPR proceedings to AppleTalkBook's "zones" embodiment to propose that Leong's system could be modified to include "a zone for the controller(s)" (Appx6398) that is separate from "the dynamically added coprocessors shar[ing] a zone with the memory …." Appx6399.

Regarding Juniper's discussion of AppleTalkBook in the Petitions, the Board found that Juniper "discusses AppleTalkBook in detail in the Petition[s]. However, the Petition[s] [do] not mention or describe the use of zones. *See* Pet. Nor is there a reference to the pages in AppleTalkBook that [Juniper] relies on for how a zone operates (pages 220 and 221) in the Petition[s]. *See* Pet. Nor is there any suggestion that Leong's old processors and the additional processors should be separated into different zones. *See* Pet. Because the use of zones to separate Leong's various

processors is a new theory raised for the first time in [Juniper]'s Reply, it is improper and we will not consider it." Appx29; *see also* Appx69-70 ("at no point in its Petition does Juniper explain how Leong's surveying unit and processing units may be separated into different zones to limit the reach of broadcast packets.").

Juniper's reliance on AppleTalkBook's zones embodiment in its Reply to propose meaningfully distinct modifications to Leong epitomizes the improper advancement of an entirely new theory of obviousness in a reply that was not present in a petition. Juniper's reliance on *Corephotonics, Ltd. v. Apple Inc.,* 84 F.4th 990 (Fed. Cir. 2023) to suggest otherwise is misplaced. In that case, the petitioner, Apple, did not use its reply brief to put forward new embodiments from the prior art or to propose new rationales and modifications. Instead, Apple used its reply brief to clarify its position that certain prior art references constituted analogous art to the challenged patent. In view of this, the Court reaffirmed its prior holdings that "a Petitioner may 'use its reply' to respond to patent owner's response arguments against *the references being analogous*" *Id*. at 1009-10 (emphasis added). Juniper's use of its Replies to advance new obviousness theories falls outside the scope of a permissible reply delineated by the *Corephotonics* court.

The newness of Juniper's zones embodiment and modification is further compounded by its own appeal brief. Juniper argues now, for the first time, that its proposed Leong-AppleTalkBook modification should "*contain a bridge or a*

*gateway*," where "the controller is on one side of the bridge and the co-processors are on the other …." Appellant's Br. 48-49 (emphasis added). This proposed modification to Leong/AppleTalkBook to further include a bridge or gateway component—and its particular placement within Leong's network—was *never* mentioned in the Petitions or the Replies. Once again, Juniper seeks to advance a new embodiment based on new arguments and evidence, citing portions of AppleTalkBook not previously relied on.[8] This portion of Juniper's appeal should be disregarded as improperly raised.

Indeed, the only relevant mention of bridges and gateways in the record below was by Swarm in its Patent Owner Responses. There, Swarm argued that Leong taught away from a combination with AppleTalkBook. Appx4301-02; *see also* Appx5007-08. Leong teaches that a "disadvantage of the prior art system is that the hardware must be *custom designed and usually requires special network switching technology*." Appx688 (1:42-44) (emphasis added). AppleTalkBook, on the other hand, touts devices that are customized with "specialized [networking] hardware

[8] Juniper's appeal brief points to pages 37 and 86 of the AppleTalkBook Exhibit (Appx731, Appx780) to support its newly proposed addition of bridges and gateways into its Leong-AppleTalkBook combination. *See* Appellant's Br. 48-49, nn. 168, 170, 171. These portions of AppleTalkBook were not cited in either the Petitions or the Replies.

attached to them." Appx723-724. Moreover, Swarm's Patent Owner Response argued, "[i]n order to connect and add non-specialized devices (such as PCs, UNIX machines, and other non-Apple devices) to an AppleTalk network, AppleTalk requires additional specialized network switching technology such as *specialized bridges, gateways*, networking cards, and additional protocols.)." Appx4301-02.

In its Reply, Juniper didn't embrace a reliance on the specialized hardware/software such as AppleTalk's bridges, gateways, or protocols. Instead, Juniper chastised Swarm for making the "faulty assumption that [Juniper] proposes physically incorporating Apple's hardware/software into Leong's system," (Appx6393) and for "presum[ing] [Juniper] proposes physically incorporating Apple's AppleTalk protocol and components into Leong's system." Appx6863.

In fact, Juniper assured the Board that it "does not propose physically incorporating AppleTalkBook into Leong's system." Appx20. Despite its disavowal, Juniper now reverses course with newly proposed embodiments premised on AppleTalk's zone protocols and the incorporation of an AppleTalk bridge component, arguing "if an embodiment of a Leong 'standard network' uses zones, in must simultaneously be an AppleTalkBook 'internetwork' because it would have to contain a bridge or a gateway, and there's no other way to implement a zone in AppleTalkBook." Appellant's Br. 48-49.

### 2. Juniper's Replies Were an Improper Attempt to Fix the Deficiencies of its Petitions

Juniper argues that its introduction of the zones theory in its Replies was necessary to address "an argument raised for the first time in Swarm's responses – *namely, that AppleTalkBook's one-way messages necessarily go to the controller* and thus teach away from 'without any communication with the controller.'"[9] Appellant's Br. 43-44 (emphasis added). According to Juniper, it wasn't until Swarm raised the argument that "[broadcast packets] necessarily go to the controller, that there was a reason to further address that issue." Appellant's Br. 42. The record below reveals a very different story.

First, Juniper's Petitions are essentially silent with respect to the "without any communication with the controller" limitation in context of adding co-processors to the processing system. Simply put, Juniper failed to provide any reasonable analysis of this limitation in the Petitions. For example, consider Juniper's discussion of the relevant Claim Element 1.5 in the '004 Petition spanning Appx238-244. Other than

---

[9] Juniper mischaracterizes Swarm's argument as one of *teaching away*. Properly characterized, Swarm's argument was that "*[n]one of the cited references teach or suggest* the dynamic addition of co-processors on a plug-and-play basis 'without any communication with the controller.'" Appx4292-4298; *see also* Appx3461-3464. Swarm's assertion that Leong *teaches away* from a combination with AppleTalkBook was a separate contention. Appx4298-4302.

verbatim recitation of the claim language introducing Claim Element 1.5, Juniper makes only a single mention of the "without any communication" limitation. Specifically, Juniper asserts, in conclusory fashion, without citation or analysis, that:

> The new processing units would operate as any processing unit already in Leong's system, including retrieving a task from the task pool, delivering the task to the processing unit and processing the task, generating resulting data, and updating the task pool to reflect completion of the second task, *without communicating with the controller*.

Appx239-240 (emphasis added). Problematically for Juniper, this passage doesn't relate to the *dynamic addition* of co-processors that is recited in Claim Element 1.5. Rather, it relates to the co-processors *processing tasks* "without any communication with the controller." As such, it is relevant to Claim Elements 1.3 and 1.4, and these Claim Elements are distinct from the dynamic addition of new co-processors into the processing system recited in Claim Element 1.5. By failing to reasonably describe *how* and *why* the Leong-AppleTalkBook combination teaches the "without any communication with the controller" limitation in its Petitions, Juniper has created the very problem it attempts to fix with its Replies. Juniper's problem exists independent of any arguments which may have been advanced by Swarm in its Patent Owner Preliminary Responses or Patent Owner Responses.

Second, it was Juniper who introduced and required the use of broadcast packets as part of its obviousness argument in its Petitions:

> The AppleTalk network leverages each device's ability to identify its own address and transmit a broadcast packet to identify available services.
>
> …
>
> In one implementation, Leong's modified processing units, when connected to a network transmit a broadcast packet seeking a bulletin board device type.
>
> …
>
> A POSITA would have understood this to be an adding of the new processing unit 'on a plug-and-play basis' ….

Appx241-242; *see also* Appx24 (Board finding that "[t]he Petition does not describe any other process for adding additional processors in the proposed Leong-AppleTalkBook combination.").

Describing the implementation of broadcast packets in its proposed Leong-AppleTalkBook combination, Juniper's Petitions cite page 108 of AppleTalkBook exhibit six times. *See e.g.*, Appx241-243 (nn. 142-145, 148, 153). Notably, it is page 108 of AppleTalkBook that expressly states: "[a] broadcast packet doesn't travel to one particular node, *but is sent to every node on the network*. In turn, *every node receives a broadcast packet* and, if appropriate, responds to it." Appx802 (emphasis added).

In view of its own requirement to use broadcast packets and its own presentation of evidence highlighting that such packets are sent to every node on the network, Juniper's assertion that it wasn't until Swarm raised the argument that "[broadcast packets] necessarily go to the controller, that there was a reason to further address that issue," rings hollow. Appellant's Br. 42.

Juniper's failure to address or even consider the flawed logic of its own obviousness combination until it was pointed out to them by Patent Owner, cannot justify Juniper conducting a hindsight reimagining of its obviousness contentions and to proceed with a new theory, citing new embodiments of the prior art in its Replies. Swarm concedes that this Court has broadly found that "a petitioner is entitled to respond to new arguments made in a patent owner response." *Axonics, Inc. v. Medtronic, Inc*., 75 F.4th 1374, 1380 (Fed. Cir. 2023). But such an entitlement cannot be extended to allow Juniper to remedy deficiencies of its own making.

For this reason, the Board correctly found "[a]lthough Petitioner was free to argue why the combined Leong and AppleTalkBook system it described in the Petition did not have that issue, the ability to respond does not give Petitioner free reign to expand and revise its arguments by adding new features and configurations not previously discussed in the Petition. … [N]one of [the cases cited by Petitioner] stand for the proposition that the Board must allow a party to change theories midstream." Appx10053.

### C. Substantial Evidence Supports the Board's Finding that Juniper's Zone Theory Fails on the Merits

The Board's finding that "all of the elements of Leong are part of a single network" was supported by substantial evidence from both Leong itself and Juniper's descriptions of Leong.

The Board highlighted that "Leong discloses that micro-processing units 12 are stand-alone computers that 'are coupled over a standard network (such as an Ethernet, Local Area Network, or the like).'" Appx71; Appx10054 (quoting Appx690 (5:20-24)). Indeed, Figure 2 of Leong depicts the direct network coupling between all the processing units 12 and the memory 14. Appx69; Appx678 (Fig. 2).

Juniper's Petition highlights the changing nature of the processing units 12 coupled over the same network. Appx228 ("Leong explains *the processing agents change behavior* and 'survey' the queue in memory to determine whether new data has arrived.[] *When acting as a surveying agent*, Leong's processing units determine tasks to be performed on the data, define status information for the tasks, and post status information for the tasks on the bulletin board.") (emphasis added).

Juniper's Petitions also highlight the close interactions and communications between the processing units acting as surveying agents, the processing units acting as general agents, and the memory/bulletin board. Appx271 ("Leong's processing units, when acting as *either surveying agents* (i.e., controllers) *or as general processing agents* (i.e., co-processors), *review the status information of tasks in the bulletin board*, including the status information for completed tasks. And *Leong's bulletin board notifies the processing units, including the processing unit(s) acting as controllers,* of task completion because the status information of tasks is updated to reflect task completion wherein the status information is held by the bulletin

board, and *the processing units continually read the status information*.") (emphasis added).

During oral argument, Juniper confirmed what Leong and the Petitions had already made clear, that all of the elements of Leong are part of a single network:

> JUDGE HOWARD: And just be clear, though, when you were talking about the network, do you consider all of Leong and all its -- its coprocessors as -- as part of a single network?
>
> MR. SIGLER: Yes, Your Honor.

Appx8738.

In view of all the above, it is clear that Leong describes a group of devices working closely together and sharing resources *over a single network,* and it is clear that there was sufficient evidence to support the Board's finding that "Leong teaches its processing units are part of a single network." Appx71; Appx10054.

Regarding AppleTalkBook zones, the Board underscored AppleTalkBook's description that "although a zone can include multiple networks, '*all devices in a single network will belong to the same zone*." Appx29 (quoting Appx914). Moreover, the Board noted that Juniper's Replies highlight AppleTalkBook's use of zones "to group devices that 'work closely together.'" Appx20 (citing Appx6398 (quoting Appx914)). A closer look at the sentence quoted by Juniper reveals that

AppleTalkBook teaches to ensure that devices "that work closely together are in the same zone *and network resources used by that group are also located within that zone*." Appx914 (emphasis added).

Thus, substantial evidence supports: (1) that Leong's system is a group of devices working closely together and sharing resources over a single network; and, (2) that according to AppleTalkBook, devices in a single network will belong to the same zone, particularly when such devices work closely together and share resources. The foregoing provides ample evidentiary support for the Board's finding that "AppleTalkBook teaches away from Petitioner's theory of placing the different processors of Leong, whether old processors or newly added processors, into different zones." Appx29.

The Board did not misunderstand AppleTalkBook's teachings on zones. In addition, Juniper's assertion that Leong and AppleTalkBook use the term "network" differently, misses the point. As the Board pointed out: (i) zones can be used "to divide an internetwork into logical groups," (Appx29 (quoting Appx914)); (ii) "a zone can include multiple networks," (Appx29 (citing Appx914)); and (iii) "all devices on a single network will belong to the same zone." Appx29 (quoting 914); *see also* Appx914 ("a zone may consist of many networks …."). AppleTalkBook thus describes three forms of grouping devices. From the largest to the smallest, the groups comprise: an internetwork, a zone, and one or more networks.

In its decision denying Juniper's Request for Rehearing (Appx10041-10056), the Board highlighted that "[Juniper] does not—either in the Reply or the Request for Rehearing—reconcile how its zone theory applies to Leong's multi-tasking computing system, especially when each of Leong's processing units are part of a single network and, therefore, belong to the same zone." Appx10054. Juniper's attempt in this appeal to paint Leong's "single network" of closely operating devices utilizing shared resources as describing that which AppleTalkBook calls an "internetwork" (i.e. a grouping of multiple zones, each comprising one or more networks) is illogical and precisely the theory that the Board rejected as contrary to the teachings of AppleTalkBook. Appx29.

In view of all the above, substantial evidence demonstrates that: (1) Leong's processing units operate on a single network and work closely together, sharing responsibilities and resources; (2) AppleTalkBook discloses that networked devices that work closely together and share network resources will form a single network within the same zone; (3) AppleTalkBook's broadcast packet communications are sent to and received by every node on the network; and, (4) according to Juniper's Leong-AppleTalkBook combination, processing units will use broadcast packets when joining a network to identify themselves and other devices.

Therefore, the Petitions' Leong-AppleTalkBook combination fails because it requires communication with the controller upon the integration and configuration

of co-processors being added to the system. This combination does not and cannot teach or suggest adding a co-processor "on a plug-and-play basis without any communication with the controller" as recited in the claims.

Moreover, even if timely raised (it wasn't), the Replies' Leong-AppleTalkBook combination fails because "AppleTalkBook teaches away from [Juniper's] theory of placing the different processors of Leong, whether old processors or newly added processors, into different zones." Appx29.

## CONCLUSION

For the foregoing reasons, the Board's decisions should be affirmed.

Dated: January 22, 2024

*__/s/ Michael K. Kelly__*
Michael K. Kelly
Christine N. Jones
Daniel J. Anderson
NEWMAN JONES, PLLC
14747 N. Northsight Blvd.
Ste. 111-143
Scottsdale, AZ 85260
(480) 686-7762

## CERTIFICATE OF SERVICE AND FILING

I certify that on January 22, 2024, I electronically filed the foregoing **APPELLEE SWARM TECHNOLOGY LLC'S RESPONSE BRIEF** of Appellee using the Court's CM/ECF filing system. Counsel for Appellant were electronically served by and through the Court's CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(e).

*/s/ Michael K. Kelly*
Michael K. Kelly

## CERTIFICATE OF COMPLIANCE

**APPELLEE SWARM TECHNOLOGY LLC'S RESPONSE BRIEF** of Appellee is submitted in accordance with the type-volume limitation of Fed. Cir. R. 32(b). **APPELLEE SWARM TECHNOLOGY LLC'S RESPONSE BRIEF** contains 12,948 words, excluding the parts of the brief excepted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2). **APPELLEE SWARM TECHNOLOGY LLC'S RESPONSE BRIEF** has been prepared in a proportionally space typeface using Microsoft Word 365 in Times New Roman, 14 Point font.

Dated: January 22, 2024

*/s/ Michael K. Kelly*
Michael K. Kelly